1
2
3
4                   UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    MICHAEL RODMAN,                        Case No.  11-cv-03003-JST

              Plaintiff,
8
                                            **ORDER GRANTING IN PART AND**
9          v.                               **DENYING IN PART PLAINTIFF'S**
                                            **MOTION FOR CLASS**
10   SAFEWAY, INC.,                         **CERTIFICATION**

              Defendant.
11                                          Re: ECF No. 114

12   **I.      INTRODUCTION**

13         Plaintiff Michael Rodman has moved to certify the following class:

14             All persons in the United States who: (1) registered to purchase
               groceries through Safeway.com at any time prior to November 15,
15             2011, and (2) purchased groceries at any time through Safeway.com
               that were subject to the price markup implemented on or about April
16             12, 2010.

17         Plaintiff seeks certification of his claims for breach of contract, as well as for violations of

18   California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*,

19   False Advertising Law ("FAL"), California Business and Professions Code § 17500, *et seq.*, and

20   Unfair Competition Law, California Business and Professions Code § 17200, *et seq.* ("UCL")

21   (collectively, the "statutory claims").  The matter came for hearing January 16, 2014.

22   **II.     BACKGROUND**

23         **A.      Factual and Procedural Background**

24         Defendant Safeway, Inc. ("Defendant" or "Safeway") offers groceries for home delivery

25   through Safeway.com.  (It also has sold under the trade names Safeway.com, Vons.com and

26   Genuardis.com, but the Court refers to all of these collectively as "Safeway" for purposes of

27   simplicity.)   When using Safeway.com, customers select items for home delivery, and the website

28   displays a price for each selected item.  Declaration of Steve Guthrie ("Guthrie Decl.") ¶ 8, ECF

*United States District Court*
*Northern District of California*

No. 131-8, Exh. 19 to Declaration of Brian R. Blackman ("Blackman Decl.") 194:22-23, ECF No. 132-21.  Safeway employees or contractors then select the customer's items at brick-and-mortar Safeway stores and deliver them to the customer.  Declaration of Joseph Anastasi ("Anastasi Decl.") ¶ 14, ECF No. 131-28.  The store utilized to facilitate the delivery of goods purchased online is referred to by Safeway as the "Pick Store."  Id.  Not all brick-and-mortar Safeway stores serve as Pick Stores, and Safeway.com does not inform its users which store is the Pick Store for a given order until the order is complete.  Id. ¶ 15; Declaration of Steve Guthrie ("Guthrie Decl.") ¶ 12, ECF No. 131-8.  Safeway frequently changes which stores serve as Pick Stores, and which Pick Stores serve which delivery areas.  Anastasi Decl. ¶¶ 23, 25-26. Safeway does not charge the same prices uniformly in all of its brick-and-mortar stores; prices vary from store to store.  Exh. 18 to Declaration of Brian R. Blackman ("Blackman Decl.") 19:23-20:3, ECF No. 131-25; Anastasi Decl. ¶¶ 20-26.

From 2006 to April 2010, the prices a customer paid for items at Safeway.com were the same as prices in the Pick Store, with a few specific exceptions.  Exh. A to Declaration of Timothy Matthews ("Matthews Decl.") 4:16-17, ECF No. 120-9; Anastasi Decl. ¶ 16; Declaration of Michael McCready ("McCready Decl.") ¶ 4 at 35:20-39:11; Exh. 17 to Blackman Decl. 36:24-37:2.

During the relevant period, customers registering for Safeway.com checked a box on the bottom of the registration page indicating that they agreed to a set of "Special Terms," which displayed on a different page, to which the registration page hyperlinked.  Exh. 17 to Blackman Decl. 178:19-179:16; Guthrie Decl. ¶ 3.  The "Special Terms" stated, *inter alia*:

> This Agreement (the 'Agreement') is a legal agreement between you and Safeway.com . . .  that states the terms and conditions under which you may receive . . . [Safeway's] online service and use the . . . .  [Safeway.com] Web site (the 'Site').  Your use of the . . . [Safeway] online service and the Site constitute your agreement to the terms and conditions set forth below.  If you do not agree to these terms and conditions, do not use the Site or the service.
>
> **Notwithstanding any statements on the . . . [Safeway.com] web pages or elsewhere, these Terms and Conditions are the agreement between you and . . . [Safeway]. By completing the on-line registration process, submitting each order and completing the checkout process, you confirm and affirm that**

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**you have read, understood and agree to these Terms and Conditions, and the form in which they appear at the time your on line registration is completed.**

[. . .]

The total amounts you shall pay for the Product per each order shall be the sums of the respective prices for the items you select and submit via the online order form, plus all applicable sales taxes and shipping charges, if any, as reported to you as the "TOTAL" in the delivery receipt.

[. . .]

The prices quoted on our web site at the time of your order are estimated prices only. You will be charged the prices quoted for Products you have selected for purchase at the time your order is processed at checkout. The actual order value cannot be determined until the day of delivery because the prices quoted on the Web site are likely to vary either above or below the prices in the store on the date your order is filled and delivered.

[. . .]

A service (delivery) fee applies to all orders, no matter how small or large, and is nonrefundable.  The service fee covers the costs associated with filling each order.  Please see "about deliveries" in the customer help section for applicable charges.

[. . .]

We reserve the right not to deliver items that your local store, where your groceries are selected, deems to be excessive in quantity.

[. . .]

[Safeway] reserves the right to, from time to time, with or without notice to you, in [Safeway's] sole discretion, amend the Terms and Conditions for use and purchases regarding the online shopping services.  Any amendment by [Safeway] will be effective only as to orders you place after [Safeway's] revisions of these Terms and Conditions as displayed on the Web site.  [Safeway] will plan to notify you of any material amendments to these Terms and Conditions; however, it is your responsibility to review the Terms and Conditions before submitting each order. [Safeway] has no responsibility to notify you of any changes before any such changes are effective.

[. . .]

These Terms and Conditions, as amended from time to time, shall be the sole terms of the agreement between you and [Safeway] regarding your online purchases.  All statements otherwise made on the Web site, or otherwise, are intended only for you convenience and do not form and are not included in our Agreement or the terms for your purchase.

1  Exh. C to Declaration of Matthews Decl., ECF No. 120-12 (bold face in the original).[1]  While all

2  Safeway.com registrants were required to click the box indicating that they agreed to the Special

3  Terms, between June 1, 2010 and November 30, 2011, only 2.2% of all visitors to the website and

4  only 4.5% of successful Safeway.com registrants clicked the link to the Special Terms.

5  Declaration of Robert Sorenson ("Sorenson Decl.") ¶¶ 6-7.

6       Several Frequently Asked Questions ("FAQ") pages on Safeway.com's website also

7  contained information on home delivery pricing.  Until October 26, 2011, Safeway had separate

8  FAQ pages for different subject areas, but after that date all FAQs were consolidated on a single

9  page.  Sorensen Decl. ¶ 8.  Before October 26, 2011, the "Main FAQ" page stated, *inter alia*:

> **How much do you charge for delivery**
>
> Fees range from $6.95 to $12.95 depending on time slot and order size (detailed below).
>
> [. . .]
>
> Fees may vary by location and other factors.  You can see the delivery fee for your area when you select your delivery time as you check out.
>
> [. . .]
>
> **Where do my products come from, and how do you deliver them**
>
> We hand-select all your groceries from a Safeway store local to your area.

Exh. OO to Supplemental Declaration of Tim Matthews., ECF No. 137-30.  The "Prices and

Promotions" FAQ page stated as follows:

> **Will I pay the same prices online that are in your stores?**
>
> Except for certain items, you'll find most of the same great prices and promotions online as in your local store. Our goal is to keep our prices low while giving you choices in how you shop. Some special offers and promotions, such as manager specials, etc., are limited to in-store purchases only and are not available for online purchases. Safeway Club Card specials vary from store to store and Club Card prices may not apply to certain products offered online. You will

---

[1] The version of the Terms & Conditions viewed by Plaintiff Rodman referred to "Genuardi's" rather than "Safeway," but the parties agree that the Terms and Conditions were otherwise identical for all Safeway brand names.  The Court has substituted "Safeway" for "Genuardi's" but has made no other alterations to the text of these excerpts.

> receive the prices and promotions applicable from your online store
> on the day of delivery as noted next to each item.

Exh. 15 to Blackman Decl., ECF No. 132-17.  The "Payment & Receipt" FAQ page stated, *inter alia*:

> **Why does my order confirmation say that the prices are estimates only**
>
> Prices on our web site are estimated due to a number of reasons. Products sold by weight (for example: produce, meat, etc.) have estimated prices. The price you pay will be based on the actual weight of those items at the time your order is picked for delivery. The order confirmation shows estimated prices only and does not include sales tax, CRV and other charges. Depending upon the delivery date you select, prices could vary from the time you place your order and the time your order is delivered, due to sale changes. You will be charged the prices charged in the store on the day your order is picked and delivered.

Id.; Exh. T to Matthews Decl., ECF No. 120-45.  Finally, the "Production Selection & Availability" FAQ page stated, *inter alia*:

> **How do you select and deliver my products**
>
> We hand-select your products from a local Safeway store, just before we deliver them to your door, so they always arrive fresh in our temperature-controlled trucks.

Exh. 15 to Blackman Decl.

On or about April 12, 2010, Safeway changed the formula used to set prices on safeway.com for items not sold on club-card-based promotions, adding a markup of $0.10 per each increment of $0.99 that the item cost in the Pick Store.  Exh. A to Matthews Decl. 5:13-14; Anastasi Decl. ¶ 27.  This charge did not appear separately as one of the delivery charges itemized on the customer's bill, but instead simply became part of the price displayed on safeway.com for the selected item.

Plaintiff Michael Rodman registered with Safeway.com in February 2011. He has testified that he reviewed the Special Terms "top to bottom" when registering.  Exh. 19 to Blackman Decl. 135:21-136:9, ECF No. 132-21.  He also read the FAQs.  Id., 136:19-20.  He believed the Special Terms conveyed that the items he would be coming from a specific brick-and-mortar store close to him and that he would receive the same prices as if he were shopping at that store.  Id. at 147:1-22,

152:5-153:16; Exh. 20 to Blackman Decl. at Response Number 7, ECF No. 132-22.  He placed

orders on February 9 and April 28.  Exh. 19 to Blackman Decl. 193:17-18, 209:9-11; Exh. 20 to

Blackman Decl. at Response Number 6.  After the April 28 order, he checked his receipt against

prices in a brick-and-mortar store and concluded that the prices he paid were higher.  Exh. 19 to

Blackman Decl. 221:24-222:1.

Plaintiff filed his initial complaint in June 2011.  ECF No. 1.  In response to Defendant's

motion to dismiss, Plaintiff filed the operative Amended Complaint, bringing causes of action for

breach of contract, and for violations of the CLRA, FAL, and UCL.  ECF No. 29.  On November

1, 2011, the Court denied Defendant's motion to dismiss, finding that "Plaintiff adequately alleges

the existence of a contract, which both parties construe to be binding, and which is susceptible to

Plaintiff's reasonable construction," as well as that Plaintiff had alleged injury, reliance, and an

actionable misrepresentation or omission sufficiently to state a claim under the CLRA, FAL, and

UCL.  ECF No. 38.

On November 15, 2011, Safeway.com revised the Special Terms "to state that online

and physical store prices, promotions and offers may differ."  Safeway's Opposition to Motion for

Class Certification ("Opp.") 10:21-23, ECF No. 131-6.

After discovery, Plaintiff filed this Motion for Class Certification ("Motion"), ECF No.

120-5.

### B.      Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) & (6), the Class Action

Fairness Act of 2005 ("CAFA"), since there are 100 or more Proposed Class Members, the

amount in controversy exceeds $5,000,000, and at least one plaintiff and defendant are citizens of

different states.

### C.      Legal Standard

Class certification under Rule 23 is a two-step process.  First, Plaintiff must demonstrate

that the four requirements of 23(a) are met: "numerosity," "commonality," "typicality," and

"adequacy."  "One or more members of a class may sue or be sued as representative parties on

behalf of all members only if (1) the class is so numerous that joinder of all members is

1   impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

2   defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

3   representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ.

4   Pro. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous

5   analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 709 F.3d 829,

6   833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes ("Dukes"), ___ U.S. ___, 131 S.Ct.

7   2541, 2551 (2011)).

8            Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is

9   met. Here, Plaintiff invokes 23(b)(3), which requires plaintiffs to prove the elements of

10  "predominance" and "superiority": "questions of law or fact common to class members

11  predominate over any questions affecting only individual members, and . . . a class action is

12  superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.

13  R. Civ. Pro. 23(b)(3).

14           The party seeking class certification bears the burden of demonstrating by a preponderance

15  of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements

16  under Rule 23(b) are met. See Dukes, 131 S.Ct. at 2551 ("A party seeking class certification must

17  affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that

18  there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

19           In addition, "[w]hile it is not an enumerated requirement of Rule 23, courts have

20  recognized that 'in order to maintain a class action, the class sought to be represented must be

21  adequately defined and clearly ascertainable.'" Vietnam Veterans of Am. v. C.I.A., 288 F.R.D.

22  192, 211 (N.D. Cal. 2012) (quoting DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970)).

23  **III.    ANALYSIS**

24      **A.    Commonality and Predominance**

25           "[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do." Dukes, 131

26  S. Ct. at 2556 (internal citation omitted). Where questions common to class members present

27  significant issues that can be resolved in a single adjudication "there is clear justification for

28  handling the dispute on a representative rather than on an individual basis." Amchem Products,

7

1    Inc. v. Windsor, 521 U.S. 591, 623 (1997) (internal quotation marks and citation omitted).

2    However, the common contention "must be of such a nature that it is capable of classwide

3    resolution—which means that determination of its truth or falsity will resolve an issue that is

4    central to the validity of each one of the claims in one stroke." Dukes, 131 S.Ct. at 2551. "What

5    matters to class certification . . . is not the raising of common 'questions'—even in droves—but,

6    rather the capacity of a classwide proceeding to generate common answers apt to drive the

7    resolution of the litigation." Id. (quoting Richard A. Nagareda, Class Certification in the Age of

8    Aggregate Proof, 84 N.Y.U.L.Rev. 97, 131–132 (2009)).

9         In seeking to certifying a Rule 23(b)(3) class, Plaintiff must further show that these

10   common questions "predominate over any questions affecting only individual members."

11   "Considering whether questions of law or fact common to class members predominate begins . . .

12   with the elements of the underlying causes of action." Erica P. John Fund, Inc. v. Halliburton Co.,

13   ___ U.S. ___, 131 S. Ct. 2179, 2184 (2011). In determining whether common questions

14   predominate, the Court identifies the substantive issues related to plaintiff's claims (both the

15   causes of action and affirmative defenses), and then considers the proof necessary to establish

16   each element of the claim or defense; and considers how these issues would be tried. See

17   Schwarzer, et al., Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10-C § 10:412. The

18   predominance inquiry requires that plaintiff demonstrate that common questions predominate as to

19   each cause of action for which plaintiff seeks class certification. Amchem, 521 U.S. at 620.

20        The Court considers whether there are common questions that predominate over

21   individualized issues first with regard to the breach of contract claim and second with regard to the

22   California statutory claims.

### 1.    Breach of Contract

24        Plaintiff proposes two common questions relative to the breach of contract claim that can

25   be resolved on a class-wide basis: "(1) did Safeway's Special Terms promise Plaintiff and Class

26   members parity between "online" and "in store" prices?; [and] (2) if so, did Safeway breach its

27   price parity promise by marking up the price of groceries by approximately 10%?" Motion 12:1-

28   5. The Proposed Class Members have in common the same relationship to an alleged form

United States District Court
Northern District of California

United States District Court
Northern District of California

1    contract.  All of the Proposed Class Members have in common the fact that they signed up for

2    Safeway.com, and in doing so checked a box indicating that they agreed to certain "Special

3    Terms," the contents of which were the same at the time that all Proposed Class Members first

4    registered.  The question of whether, in so doing, the Proposed Class Members became parties to a

5    contract whose terms Safeway breached is a question "capable of classwide resolution," because

6    the "determination of its truth or falsity will resolve an issue that is central to the validity of each

7    one of the claims in one stroke."  Dukes, 131 S.Ct. at 2551.

8            Plaintiff argues that the Court can determine the parties' rights and obligations from the

9    objective language of the Special Terms and other relevant evidence to which all members of the

10   Proposed Class bear the same relationship.  Defendant advances a contrary contractual

11   interpretation, arguing that that the meaning of any alleged contract necessarily turns on the

12   particular meaning the individual users placed on the words "local store" and "in-store," and that

13   therefore both commonality and predominance fail.  In addition, Defendant argues that assessing

14   Plaintiff's contractual claims will require individualized inquiries regarding Defendant's

15   contractual affirmative defenses, and that those determinations will predominate over the common

16   issues.

17           The Court addresses each of these arguments in turn.

18                   a.      Meaning of "In Store" and "Local Store"

19           Defendant argues that the meaning of the parties' agreement turns on the question of "what

20   'in store' or 'local store' subjectively meant to each customer."  Opp. 15:19-20.  From this,

21   Defendant argues that two things follow: (1) commonality fails under Dukes, and (2) determining

22   whether each plaintiff was damaged, and the amount of those damages, will require individualized

23   inquiries that defeat predominance.

24           Dukes is distinguishable.  In that case, there was no form contract to which all the

25   plaintiffs alleged they were parties.  Dukes was a gender discrimination case in which it was the

26   plaintiff's burden to show a "companywide discriminatory pay and promotion policy," but in

27   which the plaintiff had produced "no convincing proof" suggesting that there was any such policy.

28   131 S. Ct. at 2556-57.  Without that link established among members of the class, the members of

1  the class -- who worked at a variety of jobs, in thousands of different stores, and under a variety of

2  different workplace policies -- had "little in common but their sex and this lawsuit."  Id. at 2557

3  (citing Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571 652 (9th Cir. 2010) (Kozinski, C.J.,

4  dissenting).

5       Defendant argues that Dukes should apply here because, while the Class Members all had

6  the same relationship to the contractual terms, determining the scope and legal effect of those

7  terms will not advance the litigation because "customers ordering groceries on Safeway.com do

8  not know where their groceries come from until the time of delivery."  Opp. 16:10-11.  Insofar as

9  Defendant is arguing that, for *all* customers, the alleged "price parity" promise was indeterminate

10  or illusory, the Court can decide that question with a determination that is common to all members

11  of the Proposed Class by interpreting the reasonable objective meaning of the contractual terms

12  and relevant extrinsic evidence that is common to the entire class.

13       Defendant also argues that "without ascertaining each individual class member's

14  expectation of his own 'local store,' there is no way the Court can reach common answers to

15  Plaintiff's questions that are 'apt to drive the resolution of the litigation' 'in one stroke.'"  Opp.

16  17:10-13 (quoting Dukes, 131 S.Ct at 2551).  What Defendant appears to suggest is that the

17  meaning of the form contract varies from customer to customer, and turns on each customer's

18  subjective understanding of the contractual terms. Plaintiff, on the other hand, seeks certification

19  on the grounds that the parties' agreement was, in all cases, that customers would pay the same

20  prices as charged in the "Pick Store."

21       The Court is unaware of any authority extending Dukes' rule to find that Rule 23(a)(2)

22  precludes a plaintiff from certifying a class action for breach of an alleged form contract.[2]  Even

23  after Dukes, the Ninth Circuit has characterized the "commonality" requirement as establishing

24  only a "limited burden."  Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 589 (9th Cir. 2012).

25  In considering a similar argument against certification, the Ninth Circuit held that "the

26  

27  [2] In Monaco v. Bear Stearns Companies, Inc., discussed further *infra*, the court considered a
similar issue when jointly analyzing commonality and predominance, but appeared to rest its

28  holding more firmly on issues going to predominance.   No. 09-cv-05438-SJO-JCX, 2012 WL
10006987, at *6 (C.D. Cal. Dec. 10, 2012).

1    individualized issues raised go to preponderance under Rule 23(b)(3), not to whether there are

2    common issues under Rule 23(a)(2)." <u>Id.</u>  The Court finds this categorization equally appropriate

3    to this case.

4            The distinction here is largely academic since Defendant makes essentially the same

5    argument against predominance as it does against commonality.  In opposing commonality,

6    Defendant emphasizes the fact that the interpretation of the Special Terms will not drive the

7    resolution of the case since liability will hinge on more individualized issues.  Defendant appears

8    to argue that for some members of the class, the parties' agreement was that customers would pay

9    the same prices as are charged in a *particular* brick-and-mortar store that that particular customer

10   envisioned as being the reference point for the price parity promise.  Phrased as a predominance

11   issue, Plaintiff argues that, for those customers, if that particular store charged *more* than that

12   customer paid for Safeway.com groceries, then those customers suffered no damages and can state

13   no claim for breach of contract.  And even as to those Class Members who did suffer damages,

14   individualized damage calculations will predominate, since the particular prices at each local store

15   at the time of purchase will have to be separately determined, and compared to the prices each

16   individual customer actually paid.

17           At class certification, a court does not accept at face value a plaintiff's theory of the case;

18   the court must engage in a "rigorous analysis . . . [into whether] . . .  the prerequisites of Rule

19   23(a) have been satisfied," and "frequently that 'rigorous analysis' will entail some overlap with

20   the merits of the plaintiff's underlying claim."  <u>Dukes</u>, 131 S.Ct. at 2551 (<u>quoting</u> <u>General</u>

21   <u>Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 160 (1982)).  But by the same token, neither

22   is a Defendant entitled to characterize a Plaintiff's theory of the case and dispute commonality

23   based on its own chosen interpretation of contractual language.[3]  As Defendant puts it in its

24   _____

25   [3] Especially where, as here, Defendant does not formally commit to any particular theory of the
     contract, but instead throws out various possible contractual interpretations, many of them
26   possibly inconsistent with each other.  For example, Defendant argues that "[n]owhere in the
     language above [in the Special Terms] does Safeway.com affirmatively promise price parity."
27   Opp. 3:20-21; <u>see also</u> Guthrie Decl. ¶ 4.  Presumably, Safeway believes that this is the proper
     interpretation of the Special Terms in all situations and for all customers.  But if this were so, class
28   certification would be proper to reach a common answer to this question that is binding upon all

United States District Court
Northern District of California

papers, "[c]lass certification is not the time to choose between interpretations, but the time to

determine if any plausibly possible interpretation fails to lend itself to the high standard of class

certification." Sur-Reply 4:13-15; see also Defendants' Administrative Motion for Leave to File

Sur-Reply 3:12-13, ECF No. 146 (adopting one party's contractual interpretation as "the only

possible interpretation of the contractual language . . . [would be] . . . an impermissible merits

determination at the class certification stage").[4]

Plaintiff's possible interpretation of the contract is more than sufficiently plausible to lend

itself to the high standard of class certification.  The Special Terms state:

> The prices quoted on our web site at the time of your order are
> estimated prices only. You will be charged the prices quoted for
> Products you have selected for purchase at the time your order is
> processed at checkout. The actual order value cannot be determined
> until the day of delivery because the prices quoted on the Web site
> are likely to vary either above or below *the prices in the store on the
> date your order is filled and delivered.*

(Emphasis added.)  In a later section discussing delivery, the Special Terms state: "[w]e reserve

the right not to deliver items that *your local store, where your groceries are selected*, deem to be

excessive in quantity."

Taken together, this language is susceptible to the interpretation that groceries will be

purchased at a brick-and-mortar store, that the prices charged will be those charged at that brick-

and-mortar store, and that the prices displayed online are attempts to estimate those prices.

Plaintiff is likely to argue that, in stating that the prices quoted online may vary from "the prices in

the store," the Special Terms must be referring to prices in a *brick-and-mortar* store.  From

Plaintiff's perspective, "[i]n the store" is unlikely to mean "in the online store," because otherwise

the sentence would be nonsensical.  Defendant's explanation of this language is that "[t]his section

of the Special Terms explains variances in the prices quoted and charged in the online store

---

similarly situated individuals.  Defendant seems to maintain that the Special Terms could only be
reasonably understood not to promise price parity to anyone, while simultaneously arguing that
the legal meaning of the Special Terms varies significantly from customer to customer.

[4] See also Amgen Inc. v. Conn. Ret. Plans & Trust Funds, ___ U.S. ___, 133 S. Ct. 1184, 1194-
1195 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the
certification stage.")

United States District Court
Northern District of California

1  between the time a customer places his or her order and the actual delivery time of the order . . .

2  variances [which] arise due to the weight of random-weight items delivered . . . taxes, bottle

3  deposits, products that are out of stock, substitutions, and price changes in the online store

4  between the date of order and date of delivery of contracts."  Guthrie Decl. ¶ 4.

5          The resolution of this dispute over the meaning of the Special Terms is far more likely to

6  hinge on the objectively reasonable interpretation of the contractual language rather than the

7  interrogation of each individual class member's personal understanding of these words.

8  "California recognizes the objective theory of contracts, under which it is the objective intent, as

9  evidenced by the words of the contract, rather than the subjective intent of one of the parties, that

10  controls interpretation . . . [t]he parties' undisclosed intent or understanding is irrelevant to

11  contract interpretation." Founding Members of the Newport Beach Country Club v. Newport

12  Beach Country Club, Inc., 109 Cal. App. 4th 944, 956 (2003) (internal citations and quotation

13  marks omitted).  It is for this reason that, "[w]hen viewed in light of Rule 23, claims arising from

14  interpretations of a form contract appear to present the classic case for treatment as a class action,

15  and breach of contract cases are routinely certified as such."  Ewert v. eBay, Inc., No. 07-cv-02198

16  RMW, 2010 WL 4269259, at *7 (N.D. Cal. Oct. 25, 2010) (quoting Kleiner v. First Nat'l Bank,

17  97 F.R.D. 683, 691 (N.D.Ga.1983)).

18          As Defendant correctly points out, there are times where, even with regard to a form

19  contract, a court will need to inquire into the parties' subjective understanding of an ambiguous

20  term, as well as to the parties' course of dealing, and that that necessity will defeat class

21  certification.  See Monaco v. Bear Stearns Companies, Inc., No. 09-cv-05438-SJO-JCX, 2012 WL

22  10006987, at *6-8 (C.D. Cal. Dec. 10, 2012).  But unlike the Monaco court, this Court has yet to

23  hold that the terms in question are "ambiguous," and for the reasons discussed infra is in fact

24  likely to conclude that the meaning of the terms can be discerned by considering the reasonable

25  objective interpretation of the contractual language.  Monaco is further distinguishable since in

26  that case there was significant "variability of . . . evidence regarding the circumstances

27  surrounding the formation of the contract for the three named Plaintiffs," and the parties' course of

28  performance was particularly indicative of the parties' likely intent.  Id. at *6-7.  Here, there is no

United States District Court
Northern District of California

1    contention that the circumstances surrounding contract formation importantly differ from customer

2    to customer, and the parties' course of performance is not particularly likely to shed important

3    light on the meaning of any ambiguous term.

4            Even more importantly, unlike in the <u>Monaco</u> opinion, this contract contains not one but

5    two "integration clauses," which state specifically that "[n]otwithstanding any statements on the . .

6    . [Safeway.com] web pages or elsewhere, these Terms and Conditions are the agreement between

7    you and . . . [Safeway]," and that the terms "shall be the sole terms of the agreement between you

8    and [Safeway] regarding your online purchases."  This language was drafted by Safeway, the party

9    that now argues that extrinsic evidence must be introduced to give meaning to the parties' legal

10   agreement.

11           In addition, California contractual law generally expresses a preference for interpreting

12   form contracts against the drafter:

> Since the alleged ambiguities appear in a standardized contract,
> drafted and selected by the bank, which occupies the superior
> bargaining position, those ambiguities must be interpreted against
> the bank. The rule of resolving ambiguities against the drafter 'does
> not serve as a mere tie-breaker; it rests upon fundamental
> considerations of policy.' (<u>Steven v. Fidelity & Casualty Co.</u> (1962)
> 58 Cal.2d 862, 871, 27 Cal.Rptr. 172, 178, 377 P.2d 284, 290.)
> Thus, in determining whether an instrument is reasonably
> susceptible to an interpretation suggested by the extrinsic evidence,
> one factor for consideration by the court is whether that
> interpretation would do violence to the principles of construing
> documents against the party who drafts and selects them.
>
> In the present case, we conclude that to permit a creditor to choose
> an allegedly ambiguous form of agreement, and then by extrinsic
> evidence seek to give it the effect of a different and unambiguous
> form, would be to disregard totally the rules respecting
> interpretation of adhesion contracts, and to create an extreme danger
> of over-reaching on the part of creditors with superior bargaining
> positions. The bank must bear the responsibility for the creation and
> use of the assignment it now claims is ambiguous; it is only 'poetic
> justice' (CEB, s 2.38) if such ambiguity is construed in favor of the
> borrower.

25   <u>Tahoe Nat'l Bank v. Phillips</u>, 4 Cal. 3d 11, 20 (1971); <u>see also</u> <u>Vedachalam v. Tata Consultancy

26   Servs., Ltd.</u>, No. 06-cv-0963-CW, 2012 WL 1110004, at *9 (N.D. Cal. Apr. 2, 2012), <u>leave to

27   appeal denied</u> (June 13, 2012) (applying <u>Tahoe Nat'l Bank</u>).  Finally, in a standardized contract "a

28   writing is interpreted wherever reasonable as treating alike all those similarly situated, without

United States District Court
Northern District of California

regard to their knowledge or understanding of the standard terms of the writing."  Restatement

(Second) of Contracts § 211(2).

　　　　For all of these reasons, the Court considers it likely that the meaning of the contract will

be determined by the objective meaning of the Special Terms, without resort to extrinsic evidence.

But even the need to take into account extrinsic evidence should not defeat certification, provided

that the extrinsic evidence is common evidence.  If the Court does need to consider extrinsic

evidence (to determine whether the language is ambiguous or to resolve any identified ambiguity),

extrinsic evidence about the reasonable objective meaning of these words can be considered

without endangering predominance.  But the Court is very unlikely to take into account extrinsic

evidence for the purpose of concluding that for some customers (unlike others), the meaning of the

parties' mutual agreement was to promise price parity with a specific particular store that was

envisioned by the particular customer who registered.

　　　　It is possible, or even likely, that customers may not have even known that different

Safeway stores charge different prices for the same goods, or at least may not have had that

distinction firmly in mind at the time of contracting.  Some customers (including Plaintiff

Rodman) may have had the impression that items were coming from a specific brick-and-mortar

store.  But the Special Terms themselves do not indicate any relationship to any particular brick-

and-mortar store.  However, they are certainly susceptible to the interpretation that they promise

(1) that the customer's groceries will be purchased at a brick-and-mortar Safeway store, and (2)

that, with the exception of the disclosed special delivery fees, the prices charged to customers will

be the same as those charged in the brick-and-mortar store where the groceries were purchased,

*whichever store that happened to be.*

　　　　Before taking into account parol evidence to discern the meaning of a contractual term, the

Court must first consider, *inter alia*, whether "the agreement [is] susceptible of the meaning

contended for by the party offering the evidence."  Wang v. Massey Chevrolet, 97 Cal. App. 4th

856, 873 (2002).  Whatever any specific customer's actual subjective understanding, the objective

words of the contract nowhere indicate that prices will be the same as in any *specific* brick-and-

mortar store.  Again, it is possible that customers may not have known that there was any

difference between prices in different brick-and-mortar stores.  Many customers presumably saw no difference between the concept of a Pick Store and the concept of a specific brick-and-mortar store.  But the contractual language is not susceptible to the interpretation that it distinguishes the two possibilities and affirmatively refers to the latter.

Defendant objects that at earlier points in the litigation Plaintiff argued that the contract promised price parity with a particular, customer-specific brick-and-mortar store, rather than the Pick Store.  The Court does not agree; at various points Plaintiff clearly referred to the prices "charged in the store from which their groceries are delivered," FAC ¶ 3; Motion 1-2, and the other references to which Defendant points are best explained by the fact that Plaintiff Rodman may not have understood before contracting that there was any distinction between Pick Store prices and prices in other brick-and-mortar stores.  In any case, the Court granted Defendant's motion to file a sur-reply addressing this issue, and Plaintiff's Pick Store-based theory of the contract has now been fully briefed and argued.

For very similar reasons, the need to assess damages also does not defeat predominance.  Plaintiff's theory of the contract is that Defendant promised all Class Members that, except for the disclosed extra charges, customers would be charged the same prices for groceries as were charged at checkout in the Pick Store.  If Plaintiff can prevail on the merits on its theory of the contract, all Class Members will have damages in the amount of the undisclosed fees, and calculating damages is a simple matter of refunding those charges.  Defendant argues that "[w]hile such a remedy might be capable of 'mechanical' application, it is unmoored from the contract itself, Plaintiff's own understanding and would result in a windfall to many putative class members, and is far from sufficient under Comcast."  In Comcast, the plaintiff's "[damages] model assumed the validity of all four theories of antitrust impact initially advanced by [plaintiffs]," even though only one of those theories remained in the case.  Comcast Corp. v. Behrend, ___ U.S. ___, 133 S. Ct. 1426, 1434 (2013).  Here, Plaintiff proposes no calculation that would assess damages on the basis of dismissed or abandoned theories of liability.  See Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013) (distinguishing Comcast).  Defendant's other objections are extensions of its contractual interpretation, which the Court, after rigorous

United States District Court
Northern District of California

16

1    inquiry, does not adopt at the class certification stage.

2         The Court does not yet reach the question of how the alleged contract should be

3    interpreted, but it can determine after rigorous analysis that there is no obstacle to commonality or

4    predominance.  The scope and proper interpretation of the objective words of the parties'

5    agreement is a common question that applies commonly to all members of the class, is an issue

6    whose resolution will drive resolution of the litigation, and will predominate over any

7    individualized issues.

8                       **b.      Affirmative Defenses**

9         Defendant also argues that certain customers learned of the additional charges and

10   continued to shop with Safeway.com after so learning.  Defendant argues that, as to those

11   customers, it will be able to assert the affirmative defenses of waiver/affirmation, consent, and

12   estoppel, and that the inquiry into those defenses will require an individualized inquiry that will

13   predominate over common questions.

14        It is far from clear that these customers legally consented to the undisclosed charges by

15   continuing to use the Safeway.com service.  The customers who indicated that they learned of the

16   undisclosed charges were calling to complain about them.  See, e.g., Exh. HH to Suppl. Matthews

17   Decl.  But much more importantly, there is nothing in the record before this Court that suggests

18   that determining this issue will require so much individualized inquiry as to defeat certification.

19   Defendant has provided evidence that the number of Proposed Class Members who communicated

20   to Safeway that they knew of the additional charge and also continued to shop afterwards is

21   significantly less than one percent of the total number of customers.  Anastasi Decl. ¶ 70-71.

22        If the Court needs to determine whether shoppers who continued to use the service after

23   learning of the undisclosed charge legally waived their rights to enforce the contract, it can make

24   such a legal determination commonly and then subdivide the class as appropriate.  But

25   individualized issues applying to such a small portion of the Class cannot defeat certification.

26   Cases such as Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co., 95 F.R.D. 168 (D.

27   Del. 1982), which involved 97 different companies, each with different individual contracts, are

28   clearly distinguishable.

*United States District Court*
*Northern District of California*

1    If Defendant is arguing that predominance automatically fails if there is *any possibility* that

2    *any* Class Members *might* have consented to the terms of a contract, it would be arguing that no

3    class action could ever be maintained for breach of a form contract.  See Brotherson v. Prof'l

4    Basketball Club, L.L.C., 262 F.R.D. 564, 573 (W.D. Wash. 2009) (noting that "[i]n the ordinary

5    contract case, proof that the exercise of a contract will be lucrative for the plaintiff is enough to

6    erase any question about whether he would have chosen to eschew the contract's benefits," and

7    finding that "[i]n the face of objective, non-individualized evidence that the [contractual benefit] .

8    . . . was a valuable one . . . [defendant's request that] the court . . . consider that individual . . .

9    [plaintiffs] might have nonetheless failed to exercise the option for individualized, economically

10   irrational reasons" was a "novelty," and did not defeat certification).  Here, there is no reason to

11   suspect that it is likely that a predominant number of Class Members might have knowingly and

12   willingly chosen to pay an additional fee that they were under no obligation to pay under the terms

13   of the contract.  With no evidence to suggest that inquiry into particular issues will predominate

14   over the common issues driving the litigation forward, a defendant cannot defeat predominance

15   that a plaintiff has otherwise established.

16   Plaintiff has satisfied its burden of demonstrating that, as to his breach of contract claim,

17   common issues of law and fact predominate over individualized issues.

18        **2.      Statutory Claims**

19   Defendant argues that the individualized issues regarding the statutory claims predominate

20   over common questions because it appears that an overwhelming majority of Safeway.com

21   customers did not view the alleged misrepresentations.  The Court agrees.

22    "[California law does not] authorize an award . . . on behalf of a consumer who was never

23   exposed in any way to an allegedly wrongful business practice."  Mazza, 666 F.3d at 595 (quoting

24   Cohen v. DIRECTV, Inc., 178 Cal.App.4th 966, 980 (2009)).  To establish the reliance necessary

25   to maintain a class action challenging a misrepresentation, "[i]t is necessary for everyone in the

26   class to have viewed the allegedly misleading advertising."  Mazza, 666 F.3d at 596.  This

27   requirement applies to all of Plaintiff's statutory claims (the UCL, the FAL, and the CLRA).  See

28   Mazza, 666 F.3d at 587; see also Pfizer Inc. v. Superior Court, 182 Cal. App. 4th 622, 631 (2010)

United States District Court
Northern District of California

(applying requirement to the UCL and the FAL); <u>see also</u> <u>Cohen</u>, 178 Cal.App.4th at 989-90 (UCL and CLRA).  There is a limited exception to this requirement when a plaintiff alleges "exposure to . . . an extensive and long-term advertising campaign," <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 328 (2009), but Plaintiff does not allege any such campaign.

"In the absence of the kind of massive advertising campaign at issue in <u>Tobacco II</u>, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading."  <u>Mazza</u>, 666 F.3d at 596; <u>see also</u> <u>Sevidal v. Target Corp.</u>, 189 Cal. App. 4th 905, 923 (2010) (class certification denied where "the essence of this allegation is based on an alleged false misrepresentation to which the majority of class members were never exposed").  <u>Sevidal</u>, applying California class action law, characterized the problem as one of "overbreadth," but <u>Mazza</u> located the problem within the Rule 23 taxonomy as an issue of predominance.  The reasoning is that an individual plaintiff must establish "actual reliance" to recover on a misrepresentation-based UCL, CLRA or FAL claims, just as she must in bringing a common-law fraud claim.  Class action plaintiffs can avoid the need to show each class member's individual reliance by resorting to California law's presumption of common reliance, but that presumption is only available where the entire class saw the misrepresentations or was exposed to a pervasive long-term advertising campaign.  Where the presumption of common reliance is unavailable, individual questions concerning each class members' actual reliance will undoubtedly predominate over common questions because each class member must demonstrate her own individualized reliance by some method other than the presumption of common reliance provided by California law.

Plaintiff hinges its claims on alleged misrepresentations contained in the Special Terms. <u>See</u> Reply 2:15-3:19.  Given these background principles, the fact that less than five percent of Safeway.com registrants actually clicked through to view the Special Terms is likely to be fatal to most of the Proposed Class Members' statutory claims.  To the extent that Plaintiff's statutory claims also rest on representations on the "Payment & Receipt" FAQ page ("[y]ou will be charged the prices charged in the store on the day your order is picked and delivered"), an even smaller number of web site visitors viewed that page.  Sorensen Decl. ¶ 9.  It therefore appears certain

1   that, in determining liability on the statutory claims, individualized issues will predominate over

2   the common issues.

3          In its Reply Brief and at oral argument, Plaintiff objects that it would be unfair not to hold

4   Defendant to the representations it made in its own Special Terms, and argues that the Proposed

5   Class Members clicked the box indicating that they agreed to the Special Terms even if they did

6   not actually view the terms.  That is a potentially viable contractual argument; contract law

7   recognizes that terms can be incorporated into the parties' agreement by reference, and a

8   contracting party need not show that she subjectively read and relied on each term of the contract

9   to enforce a particular term.  See Swift v. Zynga Game Network, Inc., 805 F. Supp. 2d 904, 912

10  (N.D. Cal. 2011) ("clickwrap presentations providing a user with access to the terms of service

11  and requiring a user to affirmatively accept the terms, even if the terms are not presented on the

12  same page as the acceptance button, are sufficient" to be binding).  But this argument does nothing

13  to salvage the statutory claims, which require proof of actual reliance, or at least proof that the

14  Proposed Class Members actually viewed the challenged misrepresentation.

15         Plaintiff argues for the first time on Reply that, even if few Proposed Class Members

16  viewed the challenged misrepresentations, he should still be able to certify a class challenging

17  Defendant's omissions and nondisclosures.  Reply Brief 12:5-25.  But this is not the theory on

18  which Plaintiff sought certification.  Plaintiff's Motion does not contain the word "omission" or

19  the word "nondisclosure," and focuses almost entirely on specific misrepresentations made by

20  Safeway, mainly in the Special Terms.  Motion 1:25-2:2, 3:6-14, 7:3-9:13.  The relevant "common

21  questions" Plaintiff argues will drive the litigation are whether "Safeway's *Special Terms*

22  promise[d] Plaintiff and Class members parity between 'online' and 'in store' prices?," and

23  whether "Safeway's price parity *representations* [are] false and likely to deceive the reasonable

24  consumer."  Motion 12:2-5 (emphases added).  The Amended Complaint, too, focuses on what

25  Safeway "states" and "affirmatively represents."  ¶¶ 3, 5, 14-17, 21-24, 26.[5]  Plaintiff refers only

26

27  [5] ¶ 5 does mention that "Safeway does not disclose that consumers will be charged higher prices
    for items ordered through Safeway.com."  But in this context, Plaintiff is arguing that in light of
28  the representations Safeway *did* make, it was obligated to disclose more.  The Amended

United States District Court
Northern District of California

to "representations" and "misrepresentations" in bringing the CLRA and FAL claims.  ¶¶ 55-57, 63-67.  (The UCL claim does mention "omissions" and "nondisclosures," but in fairly boilerplate language.  ¶ 74.)  Given the nature of the operative complaint, Defendant is not reasonably on notice of the need to defend itself against an entirely omission- or nondisclosure-based theory of recovery on the statutory claims.

Even *later*, Plaintiff raises a third possibility: that he can challenge as misleading a single representation which appeared on the *Main* FAQ, which received more visitors than the other specialty FAQ sites.  That FAQ stated that "[w]e hand-select all your groceries from a Safeway store local to your area," and that "delivery [f]ees range from $6.95 to $12.95."  Mathews Supp. Ex. OO.  This argument is not mentioned in the Motion and was only elliptically referenced in a footnote in the Reply Brief, at 13:23-25.  The first time Plaintiff made this argument clearly was in an administrative motion for leave to file a sur-reply, ECF No. 157, filed five days after oral argument on the class certification motion.  The Court need not consider this new argument, but even if it did, the fact that this FAQ appeared on a higher-traffic webpage does not prove that all, or even most, Class Members actually viewed this page.  Plaintiff does not allege that it appeared on a page all registrants necessarily would have seen while signing up.  Plaintiff cannot invoke the presumption of common reliance, and cannot meet his burden of demonstrating that common issues will predominate over individualized issues going to reliance.[6]

Finally, Plaintiff cites evidence that it says demonstrates that the "vast majority of Safeway.com purchasers believed that online and in-store prices were the same," and argues that if "Safeway had charged the prices that it said it would charge, and that it was obligated to charge under the contract, Class members would have paid less for groceries, regardless of whether they

Complaint does not argue that, even in the absence of any misleading representations, Safeway had an affirmative duty to disclose further information.

[6] Plaintiff's argument is that since there were 221,514 visits to the Main FAQ page between June 1, 2010 and October 25, 2011, most Proposed Class Members read this FAQ.  See Sorensen Decl. ¶ 8.  He bases this on the fact that there were 367,373 safeway.com registrants during a very similar time period and Safeway's internal studies indicate only half of registrants intended to shop for groceries online.  Id. ¶ 7; Exh. 5 to McCready Decl. at SWY0000305, ECF No 135-13.  This is a speculative leap.  There is no reason to think it likely that all (or even most) registrants who purchased groceries were necessarily the same visitors who visited the Main FAQ page.

United States District Court
Northern District of California

21

1    actually viewed the Special Terms or FAQs or not." Reply 13:1-2, 15-17.  Even assuming all of

2    this is true, it does not relax California's requirement that a plaintiff must demonstrate that she

3    actually viewed a misleading misrepresentation to bring a UCL, FAL or CLRA claim, and

4    Plaintiff cites no authority suggesting that it does.

5         Plaintiff has failed to demonstrate that the common issues he identifies will predominate

6    over individualized issues relating to the merits of his statutory claims.

7         **C.      Superiority**

8         A class action must be "superior to other available methods for fairly and efficiently

9    adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3).  "The superiority inquiry under Rule

10   23(b)(3) requires determination of whether the objectives of the particular class action procedure

11   will be achieved in the particular case."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir.

12   1998).  "[C]ertification pursuant to Rule 23(b)(3) . . . is appropriate 'whenever the actual interests

13   of the parties can be served best by settling their differences in a single action.'"  Id. at 1022

14   (quoting 7A Wright & Miller, Federal Practice & Procedure § 1777 (2d ed. 1986)).

15        Defendant argues that superiority is not established for the same reasons discussed *supra*,

16   and for the same reasons discussed *supra*, the Court agrees with regard to the statutory claims, but

17   disagrees with regard to the breach of contract claim.  Resolving the Proposed Class Members'

18   claims for breach of a form contract in a class action is a superior method of resolving the dispute

19   than conducting litigation on an individual basis.

20        As a secondary argument, Defendant argues that a class action is not superior because

21   some customers like using the Safeway.com service, and that if Defendant loses this lawsuit it

22   might consider shutting down the service.  The sole authority it cites for applying this novel

23   argument is plainly distinguishable.  In Ratner v. Chemical Bank New York Trust Company, the

24   court found that a class action was not superior, generally accepting the defendant's argument that

25   applying the then-applicable statutory penalties of the Truth in Lending Act to allow "thousands of

26   minimum recoveries . . . would carry to an absurd and stultifying extreme the specific and

27   essentially inconsistent remedy Congress prescribed as the means of private enforcement,"

28   resulting in "a horrendous, possibly annihilating punishment, unrelated to any damage to the

United States District Court
Northern District of California

1    purported class or to any benefit to defendant, for what is at most a technical and debatable

2    violation." 54 F.R.D. 412, 416 (S.D.N.Y. 1972).  Here, a class action would only entitle Class

3    Members to recover their actually suffered contractual damages, not recover statutory penalties.[7]

4         What decisions Safeway might choose to make to its customer offerings in the event that it

5    is found liable is neither knowable by this Court nor a relevant factor in determining superiority.

6    Superiority is established.

7         **D.     Typicality and Adequacy**

8         Typicality ensures that "the interests of the named representatives align with the interests

9    of the class." Wolin v. Jaguar Land Rover N. Am. LLC, 617 F.3d 1168, 1175 (9th Cir. 2010).

10   "The test of typicality 'is whether other members have the same or similar injury, whether the

11   action is based on conduct which is not unique to the named plaintiffs, and whether other class

12   members have been injured by the same course of conduct.'" Hanon v. Dataproducts Corp., 976

13   F.2d 497, 508 (9th Cir. 1992) (quoting Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal.1985).

14   "The adequacy of representation requirement . . . requires that two questions be addressed: (a) do

15   the named plaintiffs and their counsel have any conflicts of interest with other class members and

16   (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

17   class?" In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 462 (9th Cir. 2000).

18        "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and

19   typicality criteria of Rule 23(a)." Amchem, 521 U.S. at 626, n. 20 (1997) (quoting Gen. Tel. Co.

20   of Sw. v. Falcon, 457 U.S. 147, 158, n. 13 (1982).  Among other functions, these requirements

21   serve as ways to determine whether "the named plaintiff's claim and the class claims are so

22   interrelated that the interests of the class members will be fairly and adequately protected in their

23   absence." Falcon, 457 U.S. at 158, n. 13.

24        Plaintiff Rodman is bringing these claims on behalf of Proposed Class Members who

25

26   [7] The Court also notes that Ratner's notion of the "superiority" requirement has been rejected by
     many other courts, especially as applied to non-"technical" violations.  See, e.g., Kenro, Inc. v.
27   Fax Daily, Inc., 962 F. Supp. 1162, 1166, n. 2 (S.D. Ind. 1997) (citing Haynes v. Logan Furniture
     Mart, Inc., 503 F.2d 1161, 1164 (7th Cir. 1974); White v. E-Loan, Inc., No. 05-cv-02080-SI, 2006
28   WL 2411420, at *8 (N.D. Cal. Aug. 18, 2006).

*United States District Court*
*Northern District of California*

suffered the same alleged breach of contract injury, based on the same conduct Plaintiff shares

with the Proposed Class Members (signing up for safeway.com, clicking the box indicating

agreement with the Special Terms, and ordering groceries subject to the price markup).  There is

no reason to believe Plaintiff's interests or Proposed Class Counsel's interests are not aligned with

the members of the Proposed Class, nor that Proposed Class Counsel is likely to be an inadequate

representative.

 Defendant raises three objections to Plaintiff's typicality and adequacy.

### 1. Plaintiff Rodman's Lack of Reliance

 Defendant argues that Plaintiff Rodman is subject to a unique defense that he did not rely

on Safeway's representation.  This only directly imperils the statutory claims, which the Court will

not certify.  But in any case, Defendant's argument is based only this on the following interaction

at Plaintiff's deposition:

> Q: Did you rely upon [Safeway's Special Terms] in any way in deciding to move forward with your ordering?
>
> PLAINTIFF'S COUNSEL: Objection, vague.
>
> THE WITNESS: Did I rely upon it in any way. That's hard – extremely hard to answer that question. I do not recall.
>
> Q. If you can't answer that question, I'm not sure why we're here. So we're here because you filed a lawsuit based in part upon [the Special Terms]. So I'm asking you did you rely upon it when you placed an order at Genuardi's.com?
>
> A: Did I rely upon it. Could you define that term for me, please?
>
> Q: No, I think it's self-explanatory. Yes or no.
>
> A: Then I would say no.

Exh. 19 to Blackman Decl. 175:6-23.  Plaintiff Rodman is not an attorney.  Even assuming this

argumentative, vague, and misleading colloquy is admissible, it isn't particularly relevant, because

an "admission" extracted from a plaintiff who obviously does not understand the nature of the

term he is being asked to apply says virtually nothing of value on the legal question of reliance.  In

fact, Plaintiff has testified that he read the Special Terms when he registered, that he understood

Safeway's statements to mean that there would be price parity, that he subsequently placed two

United States District Court
Northern District of California

orders, and then made no further purchases after he conducted a price check and concluded the online prices were marked-up above those prices. He also has declared that he made the online purchase because, among other things, he "believed that Safeway's policy was to charge the same prices for delivery as were charged in the store." Exh. 20 to Blackman Decl., at Response No. 7. Taken as a whole, the available evidence will not place Plaintiff Rodman in a poor position to establish reliance compared to other members of the Proposed Class.

### 2.      Unique Experiences and Circumstances

Defendant argues that Plaintiff's own subjective understandings and experiences formed his particular expectation of "price parity." They note that some of his understandings appeared to come from specific placards that he says he viewed at certain specific stores, that he incorrectly believed he had chosen a specific "local store" online, and that he had certain personal expectations and interests that were relevant to his decision to shop with safeway.com.

These factors do not defeat Plaintiff's typicality. "Typicality refers to the nature of the claim or defense of the class representative, *and not to the specific facts from which it arose* or the relief sought." Hanon, 976 F.2d at 508 (emphasis added). "The test of typicality is whether other members have the same or similar injury, *whether the action is based on conduct which is not unique to the named plaintiffs*, and whether other class members have been injured by the same course of conduct." Id. at 508-09 (emphasis added). Plaintiff does not and will not argue that he will be able to recover on any of his claims for any reasons that were particular to him. This is particularly the case since, as to the breach of contract claim, the Court will be guided primarily, and perhaps even exclusively, by the objective words of the parties' agreement. See Newport Beach, 109 Cal. App. 4th at 956 (2003) ("[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation").

### 3.      Plaintiff's Credibility

Finally, Defendant argues that "Plaintiff's inconsistent and incredible statements under oath regarding issues central to his claims diminish his credibility and will expose him to damaging cross-examination contravening the interests of the class." Opp. 34:14-16. Defendant cites the same testimony discussed at III-D-2, *supra*, as well as other testimony in which

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiff's observations are inconsistent with the way Safeway claims to operate its business, and

2    some statements that are probably inconsistent with each other or unlikely to be accurate.  Opp.

3    34:20-35:13.

4          After careful review of these statements, nearly all of which are about minor details that

5    are highly unlikely to affect the merits of this litigation, the Court sees nothing approaching the

6    level where "attacks on the credibility of the representative party are so sharp as to jeopardize the

7    interests of absent class members," which is the standard articulated in the case on which

8    Defendant primarily relies.  Harris v. Vector Mktg. Corp., 753 F. Supp. 2d 996, 1015 (N.D. Cal.

9    2010) (quoting Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 177 (S.D.N.Y.2008)).  To the

10   contrary, "[t]here is 'inadequacy only where the representative's credibility is questioned on issues

11   directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal

12   conviction for fraud.'"  Harris, 753 F.Supp.2d at 105 (quoting Ross v. RBS Citizens, N.A., No.

13   09-cv-5695, 2010 WL 3980113, at *14 (N.D. Ill. Oct. 8, 2010) aff'd, 667 F.3d 900 (7th Cir. 2012)

14   cert. granted, judgment vacated on other grounds, ___ U.S. ___, (2013), 133 S.Ct. 1722.  In the

15   only other case on which Defendant relies, the primary problem with the plaintiff's inconsistent

16   testimony was that it imperiled her ability to demonstrate her own reliance, an issue the Court

17   finds supra is not an issue for Rodman.  Bohn v. Pharmavite, LLC, No. 11-10430-GHK AGRX,

18   2013 WL 4517895, at *3 (C.D. Cal. Aug. 7, 2013).  To the extent that Bohn's adequacy holding

19   rested on other factors (that the plaintiff "failed to conduct basic due diligence," and was part of an

20   "an eight-year friendship [with Proposed Class Counsel] involving weekly gatherings"), those

21   factors are not present here.  2013 WL 4517895, at *2, 3.

22         The Court finds that Plaintiff and Proposed Class Counsel have established their typicality

23   and adequacy to represent the Proposed Class in bringing the breach of contract claims.

24             **F.**     **Ascertainability**

25         "While it is not an enumerated requirement of Rule 23, courts have recognized that 'in

26   order to maintain a class action, the class sought to be represented must be adequately defined and

27   clearly ascertainable.'"  Vietnam Veterans, 288 F.R.D. at 211 (quoting DeBremaecker v. Short,

28   433 F.2d 733, 734 (5th Cir. 1970)).  "A class definition is sufficient if the description of the class

1    is 'definite enough so that it is administratively feasible for the court to ascertain whether an

2    individual is a member.'" <u>Vietnam Veterans</u>, 288 F.R.D. at 211 (quoting <u>O'Connor v. Boeing N.

3    Am., Inc.</u>, 184 F.R.D. 311, 319 (C.D. Cal. 1998)).

4           The Proposed Class definition includes "[a]ll persons in the United States who:

5    (1) registered to purchase groceries through Safeway.com at any time prior to November 15, 2011,

6    and (2) purchased groceries at any time through Safeway.com that were subject to the price

7    markup implemented on or about April 12, 2010."  Plaintiff has submitted evidence indicating that

8    Defendant maintains sufficient records to determine which Safeway.com customers registered

9    with Safeway.com and placed orders during these time periods, and Defendant does not dispute

10   this in its papers.  <u>See</u> Exh. U, ECF No. 120-49, at 5-11.  The class definition appears to be

11   sufficiently definite and the identity of the individual members ascertainable.

12          Defendant, however, raises five issues that it claims defeat ascertainability.  In each of

13   these arguments, Defendant maintains that certain members of the defined class will, for one

14   reason another, not have viable claims or be unable to show any damages.  But Defendant does not

15   demonstrate that it would be administratively infeasible to *identify* those members; it argues only

16   that their inclusion in the class is improper and therefore certification is inappropriate.

17          This Court is aware that, in addition to considering the standard "ascertainability"

18   requirements described *infra*., "some courts also have considered whether the class definition must

19   exclude anyone who does not have a viable claim."  Wright & Miller, 7A Fed. Prac. & Proc. Civ.

20   § 1760 (3d ed.).  "In effect, this interpretation means that plaintiffs must plead what effectively is a

21   'fail-safe' class."  <u>Id.</u>  But this concept does not appear in the text of Rule 23, and Defendant cites

22   no precedential authority suggesting that this Court is bound to apply it.[8]  As noted in Wright &

23   Miller, an *en banc* panel of the Third Circuit recently addressed "whether . . . [a] class could be

24   properly certified if it contained class members who did not possess a viable claim," and

25   concluded "that it was not necessary to limit the class to those in states where a viable claim could

26   be brought."  <u>Id.</u> (citing <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 304-07 (3d Cir. 2011));

27

28   [8] In the only case Defendant cites, <u>Lozano v. AT & T Wireless Servs., Inc.</u>, 504 F.3d 718, 730-31 (9th Cir. 2007), the district court had failed to undertake any Rule 23(a) analysis at all.

United States District Court
Northern District of California

27

1    see also DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1201 (10th Cir. 2010) ("[t]hat a class

2    possibly or even likely includes persons unharmed by a defendant's conduct should not preclude

3    certification").  Ninth Circuit authority seems to be in accord.  See Wolin, 617 F.3d at 1173

4    (quoting Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975) ("proof of the manifestation of a

5    defect is not a prerequisite to class certification . . . '[n]either the possibility that a plaintiff will be

6    unable to prove his allegations, nor the possibility that the later course of the suit might

7    unforeseeably prove the original decision to certify the class wrong, is a basis for declining to

8    certify a class which apparently satisfies the Rule.'")

9         There is a place in the Rule 23 analysis for considering whether a class definition is

10   sufficiently "overbroad" as to preclude certification.  The fact that a Proposed Class "will often

11   include persons who have not been injured by the defendant's conduct . . . does not preclude class

12   certification," but it is also the case that "a class should not be certified if it is apparent that it

13   contains a *great many* persons who have suffered no injury at the hands of the defendant."  Kohen

14   v. Pac. Inv. Mgmt. Co. LLC, 571 F.3d 672, 677 (7th Cir. 2009) (collecting cases) (emphasis

15   added).  The Court views this inquiry as encompassed within the commonality, predominance and

16   typicality factors already addressed *supra*.  In considering those factors, a court must determine

17   whether there are demonstrated issues affecting the cohesiveness of the class, and the

18   predominance of the common issues, that would make the class uncertifiable.

19        If Defendant is arguing that, even after a plaintiff establishes all of the Rule 23 factors, a

20   defendant can still defeat certification by pointing to the possibility that certain members of the

21   class will not be able to recover on their claims, the Court does not adopt that view of the

22   "ascertainability" inquiry.  This Court joins other in this district that hold that "[w]hen rejecting

23   class certification based on overbreadth . . . the problem lies in the court's ability to ascertain the

24   class, not whether the putative classmembers have been aggrieved."  Kurihara v. Best Buy Co.,

25   Inc., No. 06-cv-01884 MHP, 2007 WL 2501698, at *5 (N.D. Cal. Aug. 30, 2007) (citing Mateo v.

26   M/S Kiso, 805 F.Supp. 761, 773 (N.D. Cal. 1992); see also Ries v. Arizona Beverages USA LLC,

27   287 F.R.D. 523, 534-36 (N.D. Cal. 2012), appeal dismissed (Jan. 25, 2013) (largely encompassing

28   merits-related ascertainability analysis within the Rule 23 analysis); In re AutoZone, Inc., Wage &

United States District Court
Northern District of California

28

1    Hour Employment Practices Litig., 289 F.R.D. 526, 533 (N.D. Cal. 2012) reconsideration denied,

2    3:10-MD-02159-CRB, 2013 WL 163289 (N.D. Cal. Jan. 15, 2013) (approvingly citing the

3    approach of In re Whirlpool Corp. Front Loading Washer Prods. Liab. Litig., 678 F.3d 409, 420

4    (6th Cir. 2012), which held that "[e]ven if some class members have not been injured by the

5    challenged practice, a class may nevertheless be appropriate.").  Some courts have even gone so

6    far as note that while "the class definition may include individuals who did not perceive that they

7    were short changed by [the defendants' actions], individuals who do not wish to pursue action, and

8    individuals that have inadequate proof to go forward with the class . . . these ascertainability issues

9    are not fatal to class certification and may be addressed later in the litigation."  In re TFT-LCD

10   (Flat Panel) Antitrust Litig., No. 07-M-1827 SI, 2012 WL 253298, at *3 (N.D. Cal. Jan. 26, 2012)

11   (quoting Galvan v. KDI Distribution Inc., No. 08-cv-0999-JVS ANX, 2011 WL 5116585, at *5

12   (C.D. Cal. Oct. 25, 2011)).[9]

13          The Court finds this analysis dispositive of the issue of ascertainability, but will go on to

14   address the five objections Defendant has raised insofar as they raise issues beyond those

15   described in the foregoing analysis.

16                      **1.      November 2011 Modification of Special Terms**

17          On November 15, 2011, Safeway.com revised the Special Terms to state that "online and

18   physical store prices, promotions, and offers may differ."  Defendant argues that the proposed

19   class definition is "overly broad as to time period," because while it only includes customers who

20   *registered* before November 15, 2011, it includes customers who *purchased* groceries after that

21   date.

22          Although the issue is not fully briefed, the parties dispute the legal effect of the November

23   15 amendment.  Plaintiff invokes the familiar principle that "[p]arties to a contract have no

24   obligation to check the terms on a periodic basis to learn whether they have been changed by the

25

26   _____

27   [9] Not all courts in this district have reached the same conclusion.  See, e.g., Stearns v. Select
     Comfort Retail Corp., 763 F. Supp. 2d 1128, 1152 (N.D. Cal. 2010) (declining to certify class that

28   would include members who had suffered no injury).

1    other side." Douglas v. U.S. Dist. Court for Cent. Dist. of California, 495 F.3d 1062, 1066 (9th

2    Cir. 2007).  Defendant argues that the change was not sufficiently "material" to require Safeway to

3    affirmatively update past Safeway.com registrants of the change, and that the pre-November 15

4    Special Terms, to which all Class Members consented, provided that "by completing the online

5    registration process, submitting each order and completing the checkout process, you confirm and

6    affirm that you have read, understood and agree to these Terms and Conditions, *and the form in*

7    *which they appear at the time your on line registration is completed*," and that "[t]hese Terms and

8    Conditions, as amended from time to time, shall be the sole terms of the agreement" (emphases

9    added).  Therefore, Defendant argues that all post-November 15 purchasers should be held to the

10   Terms and Conditions, as amended, under which they have no viable breach of contract claim.

11         As discussed *infra*, this does not affect whether the class definition is sufficiently definite

12   or its members ascertainable.  Moreover, to the extent that the Court needs to determine whether

13   the November 15 amendment reduces certain class members' damages, or provides that certain

14   class members suffered no damages, it can do so with a legal determination that is common to the

15   entire class.  Therefore, even if Defendant had framed the issue as a Rule 23 issue, the Court

16   would find no obstacle to certification.

17              **2.      Customers Who Returned Groceries or Cancelled Orders**

18         Defendant objects that "[p]laintiff's proposed class fails to exclude those customers who

19   returned groceries to Safeway or sought their money back and therefore lack standing to sue."

20   Opp. 37:7-10.  For the reasons already discussed, this does not affect the definiteness of the class

21   definition or the ascertainability of its members.  Even if the Court were to re-construe this as a

22   Rule 23 argument, it would find that this issue, which Defendant has not demonstrated affects any

23   significant portion of the class, would not defeat certification.

24              **3.      Customers Who Were Aware of the Price Difference**

25         Defendant argues the class is overbroad because certain "customers . . . perceived the price

26   difference and consciously chose to continue using the service."  Opp. 38:4-5 (citing Anastasi

27   Decl. ¶¶ 70-76).  This is the same very small subgroup of customers whose existence the Court

28   previously found did not defeat predominance.  The same argument derives no greater force as an

United States District Court
Northern District of California

30

ascertainability question.

### 4.      Customers Who Did Not View the Representations

Defendant objects that "the class fails to exclude individuals who never looked at or read Safeway's terms and conditions or FAQs." The Court agrees that this defeats certification, but for reasons of predominance rather than ascertainability. This determination does not affect the contractual claims.

### 5.      CLRA non-consumers

Finally, Defendant argues that the class definition includes members who are not "consumers" as defined by the CLRA, namely businesses. Under the CLRA, a "consumer" is "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." Cal. Civ. Code § 1761.

Since the Court will not certify a class for purposes of bringing CLRA claims, the issue is moot. But again, since Safeway's records show which customers have registered as businesses, if the Court needed to exclude certain Class Members from CLRA-based recovery, it can do so with a common determination and based on common proof. The speculative possibility that certain businesses might have registered falsely as individuals is insufficient to defeat certification. See Anastasi Decl. ¶¶ 77-79.

### G.      Numerosity

"[C]ourts generally find that the numerosity factor is satisfied if the class comprises 40 or more members." In re Facebook, Inc., PPC Advertising Litig., 282 F.R.D. 446, 452 (N.D. Cal. 2012). Plaintiff submits, Defendant does not dispute, and the Court concludes based on the record, that this requirement is satisfied.

## IV.    CONCLUSION

It is hereby ORDERED as follows:

1.      Plaintiff's Motion for Class Certification is hereby GRANTED IN PART and DENIED IN PART.

2.      The following class is hereby certified pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, solely for the purposes of bringing the breach of contract

United States District Court
Northern District of California

1  claim identified in the Amended Complaint in this action:

2          All persons in the United States who registered to purchase groceries through
3          Safeway.com at any time prior to November 15, 2011, and made one or more
           purchases subject to the price markup implemented on or about April 12, 2010 (the
4          "Class").

5          Excluded from the Class are Defendant, as well as all employees of the judges
6          assigned to this action in this Court, their spouses and any minor children living in
           their households, and other persons within a third degree relationship to any such
7          federal judge; and finally, the entire jury venire called to for jury service in relation
           to this lawsuit. Also excluded from the Class are any attorneys or other employees
8          of any law firms hired, retained and/or appointed by or on behalf of the named
           Plaintiffs to represent the named Plaintiffs and/or any proposed Class members or
9          proposed class in this lawsuit.

10         3.       The Court also appoints Plaintiff Michael Rodman as class representative.

11  Pursuant to Fed. R. Civ. P. 23(g), the Court appoints the law firms of Shepherd, Finkelman, Miller

12  & Shah, LLP and Chimicles & Tikellis, LLP as counsel for the Class.

13         4.       The parties are ordered to meet and confer, and to file with the Court a Joint Case

14  Management Statement not later April 8, 2014 addressing the remaining case schedule, a class

15  notice program and any disputed issues.  The Court will conduct a Case Management Conference

16  on April 23, 2014 at 2:00 p.m.

17         **IT IS SO ORDERED.**

18  Dated: March 9, 2014

19                                                      _____
20                                                      JON S. TIGAR
                                                        United States District Judge

United States District Court
Northern District of California

32