UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| MICHAEL RODMAN, | Case No. 11-cv-03003-JST |
|---|---|
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; SETTING CASE MANAGEMENT CONFERENCE** |
| SAFEWAY INC., | |
| Defendant. | Re: ECF Nos. 171 & 173. |

## I. INTRODUCTION

In this class action, Plaintiff Michael Rodman ("Plaintiff" or "Rodman") and members of the certified class, bring a single breach of contract action against Defendant Safeway, Inc. ("Defendant" or "Safeway"). Plaintiff argues that Defendant breached the terms of the parties' agreement by charging higher prices for groceries on its online safeway.com delivery service than it charged in the stores where the groceries were selected. Both Plaintiff and Defendant have filed cross-motions for partial summary judgment on the Class's breach of contract claim. The matter came for hearing on September 11, 2014.

## II. BACKGROUND

### A. Undisputed Facts and Procedural History

Safeway operates an online grocery delivery service on its website, safeway.com. Prior to placing a delivery order with safeway.com, customers must register for an account. Exh. 7 to Declaration of Timothy Mathews ("Matthews Decl.") (ECF No. 171-9); see also ECF No. 194-5 at 2 (ECF No. 194-5) ("Safeway does not dispute that customers must agree to the Special Terms as part of their registration process"). As part of that registration process, a registrant must click a box that states, "Check this box if you agree to the Terms and Conditions." Id.

The referenced Special Terms of Use ("Special Terms") contain the following language:[1]

Customer Agreement

[. . .]

Your use of the . . . [Safeway] online service and the Site constitute your agreement to the terms and conditions set forth below.

[. . .]

Notwithstanding any statements on the . . . [Safeway.com] web pages or elsewhere, these Terms and Conditions are the agreement between you and . . . [Safeway].

[. . .]

Responsibilities

If [Safeway] accepts your order, [Safeway] shall, in return for your payment, provide the Product that you order through the online shopping service. The Product shall be delivered to you . . . at the delivery address you designate. Your payment for the Product and shipping and delivery, including any applicable sales taxes, is due upon completion of the checkout and delivery of your order . . . . The total amounts you shall pay for the Product per each order shall be the sums of the respective prices for the items you select and submit via the online order form, plus all applicable sales taxes and shipping charges, if any, as reported to you as the "TOTAL" in the delivery receipt.

---

[1] The parties have produced competing versions of the Special Terms, and dispute which version is the parties' contract. Plaintiff submits his version as Exhibit 8 to the Matthews Declaration, ECF No. 171-10, while Defendant has produced three versions as Exhibits 9-11 to the Declaration of Brian Blackman, ECF Nos. 177-1 to 177-3, which are substantially identical to each other but different than Plaintiffs' version. The content quoted above appears in all versions of the contract. The parties agree that the differences are not material to the dispute over whether Safeway promises the same prices on safeway.com that it charges in its physical stores. See ECF No. 186-5, at 16 (Plaintiff) ("In most respects, including all statements concerning pricing, the two versions are substantively identical, with variation only in the numbering of sub-headings"); ECF No. 194-4, at 20 (Defendant) ("What version of the Special Terms was operative has no bearing on whether Safeway promised price parity"). However, the document contains substantially different language regarding later amendments to the contract, which the Court discusses *infra*, at III-C. The documents contain the same headings, but with differing section numbers, and so the Court refers to the sections by their heading names rather than their numbers. The Court refers to language in the preliminary section, under the heading of "Customer Agreement," as the "preamble." Different versions of the contract used different names for different Safeway brand names - Safeway, Genaurdi's, Vons, etc. However, the parties agree that the versions were the same for each brand name. Therefore, the Court has substituted "[Safeway]" and [safeway.com]" where necessary.

2

[. . .]

Product Pricing and Service Charges

The prices quoted on our web site at the time of your order are estimated prices only. You will be charged the prices quoted for Products you have selected for purchase at the time your order is processed at checkout. The actual order value cannot be determined until the day of delivery because the prices quoted on the Web site are likely to vary either above or below the prices in the store on the date your order is filled and delivered.

[. . .]

A service (delivery) fee applies to all orders, no matter how small or large, and is nonrefundable. The service fee covers the costs associated with each order. Please see "about deliveries" in the customer help section for applicable charges.

[. . .]

[Safeway.com] Communications

On occasion, [Safeway.com] may need to contact you regarding your account or a significant business issue. These communications will be marked "Special service notification: Please read."

[. . .]

Delivery

. . . We reserve the right not to deliver items that your local store, where your groceries are selected, deem to be excessive in quantity.

[. . .]

Applicable Law

These Terms and Conditions and the order form, collectively constituting the sole and entire agreement between Safeway and you regarding the online shopping services, are governed by laws of the State of California without regard to conflict of laws and rules. The parties agree to jurisdiction and venue for any dispute hereunder solely in Pleasanton, California and Alameda County, California.

[. . .]

Changes to Terms and Conditions

[Safeway] reserves the right to, from time to time, with or without notice to you, in [Safeway's] sole discretion, amend the Terms and Conditions for use and purchases regarding the online shopping services. Any amendment by [Safeway] will be effective only as to orders you place after [Safeway's] revisions of these Terms and Conditions as displayed on the Web site. [Safeway] will plan to notify you of any material amendments to these Terms and

3

>Conditions; however, it is your responsibility to review the Terms and Conditions before submitting each order. [Safeway] has no responsibility to notify you of any changes before any such changes are effective.
>
>[. . .]
>
>Terms and Conditions Govern
>
>These Terms and Conditions, as amended from time to time, shall be the sole terms of the agreement between you and [Safeway] regarding your online purchases. All statements otherwise made on the Web site, or otherwise, are intended only for you convenience and do not form and are not included in our Agreement or the terms for your purchase.

Once registered, customers place orders for home delivery by browsing selections and prices displayed on the website. Declaration of Steve Guthrie ("Guthrie Decl.") ¶11 (ECF No. 175). For each item, the online store describes the item, displays its image, and displays a price next to the item. Id. ¶12. Customers select a delivery time, which can be several days after the order is placed online. Id. ¶14. Groceries are then selected from a physical Safeway store and delivered to the customer. Prices for products in Safeway's physical stores, and in its online store, change frequently. Declaration of Michael McCready ("McCready Decl.") ¶ 6 (ECF No. 172-6).

As initially operated from 2001 to 2006, safeway.com "generally priced the items sold in the online store the same as the brick-and-mortar store from which the items were picked and delivered," although "[t]his pricing was never exactly the same due to exceptions . . ., such as manager specials." Id. In April 2010, Safeway instituted a new pricing model for regular retail, non-promotional items on safeway.com, instituting "a markup applied to the prices charged in the price zone of the physical store from which the customer's order is picked and delivered." Id. ¶¶ 9-10. "If the price of an item is between $0.00 and $0.99, the markup adds $0.10, from a $1.00 to $1.99, the markup adds $0.20 cents, from $2.00 to $2.99 the markup adds $0.30 cents, and so on." Id. ¶ 10. Under this new structure, the prices displayed for items on the safeway.com website displayed this marked-up price. Id. ¶ 11.

Plaintiff Rodman, who used the safeway.com delivery service and later discovered the prices were higher than those in his local store, brought suit, alleging causes of action for breach of contract and under California's Unfair Competition Law, Consumer Legal Remedies Act, and

4

False Advertising Law. Plaintiff argued that he understood the Special Terms to promise the same prices in the local stores as were charged on the website, and Safeway argued that his claims failed as a matter of law. On November 1, 2011, the Court denied Safeway's motion to dismiss Plaintiff's claims. 2011 WL 5241113 (ECF No. 38).

On November 15, 2011, Safeway revised the Special Terms to include the following language: "Please note before shopping online at [Safeway.com] that online and physical store prices, promotions, and offers may differ." Exh. 42 to Matthews Decl. (ECF No. 171-44). "All references to 'store', 'online', 'website', or 'on line store' as used herein refer to the . . . Online Shopping Services only unless expressly stated." Id. Safeway did not contact safeway.com registrants to notify them that it had amended the Special Terms. Exh. 9 to Matthews Decl., at 288:13-18 (ECF No. 170-9). On August 29, 2012, Safeway sent an email to customers who had opened an email from Safeway.com in the last six months, informing them that "Grocery delivery prices, promotions, discounts, and offers may differ from your local store." ECF No. 175-5 at 2. This email also did not reference the Special Terms. Id.

On March 9, 2014, the Court granted Plaintiff's motion to certify a class for purposes of bringing the breach of contract action, although not for the CLRA, UCL and FAL causes of action. 2014 WL 988992 (ECF No. 163). The class is comprised of: "All persons in the United States who: (1) registered to purchase groceries through Safeway.com at any time prior to November 15, 2011, and (2) purchased groceries at any time through Safeway.com that were subject to the price markup implemented on or about April 12, 2010." Id. These motions followed.

**B.     Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) & (6), the Class Action Fairness Act of 2005 ("CAFA"), since there are 100 or more Proposed Class Members, the amount in controversy exceeds $5,000,000, and at least one plaintiff and defendant are citizens of different states.

**C.     Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

1    genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

2    of law." Fed R. Civ. Pro. 56(c). In order to prevail, a party moving for summary judgment must

3    show the absence of a genuine issue of material fact with respect to an essential element of the

4    non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant

5    has made this showing, the burden then shifts to the party opposing summary judgment to

6    designate "specific facts showing there is a genuine issue for trial." Id. The court draws all

7    reasonable factual inferences in favor of the non-movant. Anderson v. Liberty Lobby Inc., 477

8    U.S. 242, 255 (1986). "[A]t the summary judgment stage," courts are "not permitted to weigh

9    evidence." Zobmondo Entm't, LLC v. Falls Media, LLC, 602 F.3d 1108, 1121 (9th Cir. 2010).

## III.  ANALYSIS

The parties agree that the Special Terms are fully integrated.[2] Therefore, the parol evidence rule "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument." Casa Herrera, Inc. v. Beydoun, 32 Cal. 4th 336, 343 (2004). However:

> When the meaning of the words used in a contract is disputed, the trial court engages in a three-step process. First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury.

Wolf v. Walt Disney Pictures & Television, 162 Cal. App. 4th 1107, 1126-27 (2008), as modified

---

[2] The text of the preamble differs from version to version, but all versions have the following sentence: "Notwithstanding any statements on the . . . [Safeway.com] web pages or elsewhere, these Terms and Conditions are the agreement between you and . . . [Safeway]." A second integration clause appears in the section entitled "Terms and Conditions Govern," which is identical in all four versions of the Special Terms.

on denial of reh'g (June 4, 2008) (internal citations omitted). The Court must first determine if "the language of the instrument is reasonably susceptible" to the interpretation urged by the party seeking to introduce extrinsic evidence, such that it would be appropriate to provisionally consider extrinsic evidence shedding light on that meaning. If so, the Court will interpret the contract from the language of the contract as a whole as well as in light of any extrinsic evidence that sheds light on any ambiguous terms. Finally, the Court must consider whether members of the Class who used safeway.com after the Special Terms were altered in November 2011 are entitled to damages for purchases they made after that point.

### A. Reasonable Susceptibility of the Contractual Language

This contractual dispute turns primarily on the "Product Pricing and Service Charges" section of the Special Terms, which state:

> The prices quoted on our Web site at the time of your order are estimated prices only. You will be charged the prices quoted for Products you have selected for purchase at the time your order is processed at checkout. The actual order value cannot be determined until the day of delivery because the prices quoted on the Web site are likely to vary either above or below the prices in the store on the date your order is filled and delivered.

Both parties maintain that the words of the contract alone entitle them to judgment.

Plaintiff interprets this section to promise that, except for otherwise disclosed delivery fees, the customer will be charged the prices charged in the physical store where the groceries are selected, and that the prices quoted on the website are attempts to estimate those in-store prices. Defendant, on the other hand, argues that the phrase "the prices in the store" means the prices in the *online* store, and that the terms explain to a customer that it if she places an order Monday for delivery Thursday, she will be charged the price that the *online* store displays for the product on Thursday. Both parties argue that their interpretation is the only plausible interpretation of these words, and that the language is not "reasonably susceptible" to the alternate explanation, making it inappropriate for the Court to even provisionally accept the opposing parties' proffered extrinsic evidence to aid the court in interpreting the language.

The Court does not agree with either party. The language of the contract itself is

7

"reasonably susceptible" to both interpretations, permitting the Court to allow the admission of extrinsic evidence, for the reasons set forth below.

### 1. Plaintiff's Interpretation

In denying Defendant's motion to dismiss Plaintiff's contractual claims as a matter of law, the Court concluded that "Plaintiff's interpretation of the contract is more likely the accurate construction which gives meaning to the intention of the parties at the time of contracting." 2011 WL 5241113, at *3. More recently, in conducting the limited, but rigorous, inquiry into the merits that was required to ensure that class certification was proper, the Court concluded that the "language is susceptible to the interpretation that groceries will be purchased at a brick-and-mortar store, that the prices charged will be those charged at that brick-and-mortar store, and that the prices displayed online are attempts to estimate those prices." 2014 WL 988992, at *7.

It is true that neither of those determinations have become the law of the case. But the relevant words of the Special Terms remain the same as when those orders issued. It can therefore come as little surprise to Defendant that the Court now concludes that the language of the Special Terms is, at the very least, reasonably susceptible to Plaintiff's interpretation.

Defendant characterizes Plaintiff's interpretation as adding an implied term of price parity, and argues that Plaintiff has not satisfied the very high bar against implying the existence of a term not included expressly within the contract. See Hinckley v. Bechtel Corp., 41 Cal. App. 3d 206, 211 (1974). But Plaintiff does not urge the Court to add or imply a term. The term already exists in the contract, and it is an affirmative promise: "You will be charged the prices quoted for Products you have selected for purchase at the time your order is processed at checkout." The term "checkout" is given meaning by next sentence of the Special Terms, which makes clear that "the prices quoted on the Web site are likely to vary either above or below the prices *in the store* on the date your order is filled and delivered." (emphasis added). The only question is whether a reasonable contracting party would have understood the "checkout" that dictates the prices charged to be something that occurs at the physical store or the online store, in light of the accompanying explanation that the prices quoted at "checkout" are correlated with the "prices in the store on the date your order is filled and delivered."

The Special Terms, read as a whole, repeatedly make reference to a physical Safeway store as playing a role in the online shopping experience, supporting Plaintiff's interpretation. The "Delivery" section of the Special Terms states that "your groceries are selected" in "your local store." By indicating to customers that they will be charged in accordance with the "prices in the store on the date your order is filled and delivered," the terms can be reasonably interpreted as promising the prices charged in a physical store. But while it is common to refer to an e-commerce website as an "online store," it is less common to use the simple term "store" to mean a website, without additional explanation.

It might be another matter if some other portion of the contract used the word "store" by itself to refer to the safeway.com website. But in *every* other use of the term "store" in the Special Terms, the word "store" means a physical store. See Preamble ("If you are not satisfied with any substitution selected, you may return it to the physical store"; "We will make every attempt to deliver on all your orders; however, large orders of specific items will be fulfilled at the discretion of the store. For example, if you were to make an order of 100 bottles of wine, which would use up all the store's stock, the store may only be able to deliver 50 bottles."); Delivery ("We reserve the right not to deliver items that your local store, where your groceries are selected, deem to be excessive in quantity").[3] Some of these uses of "store" are modified by the descriptors "physical" or "local," making clear they mean brick-and-mortar store rather than online store, however nowhere in the Special Terms is the word "store" used on its own to mean "online store." For instance, when the Special Terms say that an order of "100 bottles of wine" would potentially "use up all the store's stock," the Special Terms clearly appear to be referencing a physical store, given the unlikelihood that an order of 100 bottles would deplete the entire inventory of safeway.com as an online store.

Plaintiff's interpretation of the contract gives effect to every one of three sentences in the

---

[3] In fact, the version of the Special Terms that Defendant maintains is the parties' contract contains an additional term not contained in the version relied upon by Plaintiff, which refers to a "store" as a concept distinct from the website: "to serve you better, we may combine information you give us online, in our stores or through our catalogs." See ECF Nos. 171-9-11, section entitled "Cookies."

9

1   first paragraph of the "Product Pricing and Service Charges" section, is consistent with a
2   reasonable objective reading of the language in light of the contract as a whole, and is a very
3   compelling interpretation of the contract.

### 2. Safeway's Interpretation

5   The Special Terms, on the other hand, are somewhat less susceptible to Safeway's
6   interpretation of the term "store."

7   The main problem with Safeway's interpretation is that it argues that very different words
8   in the same sentence mean the same thing. The terms say that "prices quoted on the Web site are
9   likely to vary either above or below the prices in the store on the date your order is filled and
10  delivered." Safeway argues that "on the Web site" means "on the Web Site" and that "in the
11  store" *also* means "on the Web site." This is not a very compelling explanation of the objective
12  meaning of these words. If Safeway meant "on the Web site" both times, it could have said "on
13  the Web site" both times, or simply said "prices quoted on the Web site on the time of your order
14  are likely to vary either above or below the prices on the date your order is filled and delivered."
15  By adding the phrase "in the store" --a phrase that, everywhere else in the Special Terms, means
16  the physical Safeway store where the groceries are selected-- the Special Terms add to the
17  sentence a concept that a reasonable contracting party would interpret to mean a physical store.

18  It is also difficult to accept Safeway's argument that when it promised "[y]ou will be
19  charged the prices quoted for Products you have selected for purchase at the time your order is
20  processed at checkout," it meant at the time the order is processed at the *online* checkout process,
21  as opposed to a checkout that occurs in the physical grocery store. A customer would presumably
22  have considered her "online checkout" process to be complete once she had completed her order.
23  In introducing the concept of a later-occurring "checkout," the Special Terms again refer to
24  something a customer would have expected to occur in a physical store.

25  From the words of the Special Terms alone, the Court finds Safeway's interpretation
26  considerably less compelling that Plaintiff's. However, Plaintiff's interpretation does some
27  (lesser) violence to the language as well. Under Plaintiff's reading of the second sentence -- "You
28  will be charged the prices quoted for Products you have selected for purchase at the time your

order is processed at checkout" -- "prices quoted" means the prices *charged* in the physical store. It is not all that common to think of grocery store tags as "quoting" prices. This sentence is reasonably susceptible to the interpretation that "prices quoted" means a price quoted on the website. This provides some support for Safeway's argument that the rest of the sentence refers to an online checkout. This potential ambiguity is sufficient to allow the admission of extrinsic evidence that might shed light on what a reasonable contracting party might have understood the words of the contract to mean.

### B. Provisional Consideration of Extrinsic Evidence

The Court can only consider extrinsic evidence that sheds light on the objective meaning of the language as it would have been understood by a reasonable contracting party. It is not admissible to alter the term of the contract. See Casa Herrera, 32 Cal. 4th at 343. Extrinsic evidence is also not relevant to the extent it is only probative of one party's subjective understanding of what it was promising. See, e.g., Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., 109 Cal. App. 4th 944, 956 (2003) ("The parties' undisclosed intent or understanding is irrelevant to contract interpretation.").

As set forth *supra*, the Court begins with the conclusion that Plaintiff's interpretation is more compelling, but is open to extrinsic evidence demonstrating that ambiguous language should be interpreted in the manner Safeway suggests. For the most part, Safeway's papers resist the incorporation of any extrinsic evidence. However, it does argue in its motion that two types of extrinsic evidence support its interpretation. Mem. Pts. & Auth. In Support of Safeway's Motion for Summary Judgment, at 20-21 (ECF No. 172-4).

First, Defendant argues that two "Frequently Asked Questions" ("FAQs") documents that appeared on the safeway.com website support its interpretation. The two FAQs state:

> **Will I pay the same prices online that are in your stores**
>
> Except for certain items, you'll find most of the same great promotions online as in your local store. Our goal is to keep our prices low while giving you choices in how you shop. Some special offers and promotions, such as manager specials, etc., are limited to in-store purchases only and are not available for online purchases. Safeway Club Card specials vary from store to store and Club Card

> prices may not apply to certain products offered online. You will receive the prices and promotions applicable from your online store on the day of delivery as noted next to each item. Please note: Safeway.com does not issue rain checks.
>
> [. . .]
>
> **Why does my order confirmation say that the prices are estimates only**
>
> Prices on our web site are estimated due to a number of reasons. Products sold by weight (for example: produce, meat, etc.) have estimated prices. The price you pay will be based on the actual weight of those items at the time your order is picked for delivery. The order confirmation shows estimated prices only and does not include sales tax, CRV and other charges. Depending upon the delivery date you select, prices could vary from the time you place your order and the time your order is delivered, due to sale changes. You will be charged the prices charged in the store on the day your order is picked and delivered.

Exhs. 12 & 13 to Blackman Decl. (ECF Nos. 177-4 & 177-5). Safeway argues that since it said "[e]xcept *for certain items*, you'll find *most* of the same great promotions online as in your local store," it cannot be understood to have represented that safeway.com offers *all* of the same prices charged in the local store. Therefore, since an accompanying FAQ states that "[y]ou will be charged the prices charged in the store on the day your order is picked and delivered," Safeway must have been using the term "charged in the store" to mean "charged in the online store." But the Special Terms explicitly provide that representations on the website are not part of the parties' agreement, and so the FAQs are only probative of Safeway's understanding of what it was offering in the contract, not what a reasonable consumer would have understood the contract to have been offering. The FAQs therefore do not help the Court understand how a reasonable contracting party would have understood the words in the contract and are of little assistance to the Court's task. In fact, in the first FAQ, Safeway uses the terms "in-store" and "from store to store" to mean a physical store. The FAQ's usage of the term "store" to mean a physical store at least some of the time would actually buttress Plaintiff's interpretation.

Second, Safeway argues that it did not amend its Special Terms when it changed its pricing policy to no longer offer the same prices it offered online as it offered in the physical stores. Defendant argues that this reinforces its argument that Safeway must not have understood the

terms of the contract to promise online parity with prices in physical Safeway stores. Again, even assuming that this is the most persuasive explanation of Safeway not updating the Special Terms, this shows, at most, Safeway's subjective understanding of what it thought it was offering rather than the objective meaning of the terms.

Plaintiff has submitted significant extrinsic evidence – including the same FAQs, evidence of Safeway's own course of performance, and customer surveys – which he argues tends to show that Safeway understood the terms to represent price parity, and understood its customers to have believed that as well. Safeway objects to the admissibility of all such evidence. In any event, it is unnecessary for the Court to consider Plaintiff's extrinsic evidence. After considering the language of the Special Terms, and all extrinsic evidence Defendant has submitted to shed light on the meaning of those terms, the Court concludes that Plaintiff's interpretation is the more faithful interpretation of what a reasonable contracting party would have understood the terms to promise. No consideration of Plaintiff's extrinsic evidence is necessary to support this conclusion. The Special Terms promise that, with the exception of the actually disclosed special charges and delivery fees, the prices charged for safeway.com products will be those charged in the physical store where the groceries are delivered. Since Safeway actually marked up the charges for the in-store prices beyond the disclosed delivery and special charges, the Court grants summary judgment that Safeway breached its contract with its customers.

**C.    November 2011 Amendments to the Special Terms**

Next, the Court must address is whether Class Members can recover damages for purchases they made after the Special Terms were amended in November 15, 2011.[4] Safeway amended the Special Terms in November 2011 to specifically provide that safeway.com was not offering the same prices offered in the physical stores. Safeway did not provide notice of this

---

[4] Safeway argues that damages should be cut off from June 16, 2011, since that is the date it updated one of its online FAQs to state that prices online differ from prices in physical Safeway stores. The Special Terms are a fully integrated contract that specifically provide that it is not altered by any representations on the website. Changes to the words on the website did not change the parties' contract. Therefore, the Court only considers Safeway's argument to the extent it argues that damages should be cut off after November 15, 2011.

change to Class Members and did not conspicuously notify safeway.com users of this amendment. Safeway argues that it did not need to notify Class Members of the change to the Special Terms because, at the time of their registration, safeway.com registrants agreed to be bound to any amended versions of the terms posted to the website. Plaintiff contends that a term whereby website users agree to be bound to any future changes an online retailer makes to a contract without any notice of those changes is unenforceable and that those changes are merely unaccepted offers to amend the contract.[5]

On this point, there are some significant differences between Plaintiff's version of the Special Terms and Defendant's. The version submitted by Plaintiff states that the registrants "agree to these Terms and Conditions, and the form in which they appear *at the time your online registration is completed*," while Defendant's version states that the registrant agrees to the terms "and the form in which they appear at *the time your online transaction is processed*." ECF No. 187 at 17 (emphases added). Plaintiff's version provides that Safeway "will plan to notify you of any material amendments to these Terms and Conditions." Id. Defendant's versions omit that depiction of Safeway's intentions, but in both versions, Safeway provides that it "has no responsibility to notify you of any changes before any such changes are effective." Id. In both versions, Safeway "reserves the right to, from time to time, with or without notice to you, in [Safeway's] sole discretion, amend the Terms and Conditions." Id. Defendant's version reinforces this with an additional term: "We may amend the Agreement at any time by posting the amended terms on the Site." Id. In both versions, the Special Terms provide that "[a]ny amendments by [Safeway] will be effective only as to orders you place after [Safeway]'s revisions of these Terms and Conditions as displayed on the Web site." Id.

The Court finds it unnecessary to resolve the factual question of whether Plaintiff or Defendant's version of the Special Terms was operative at any particular moment in time. Regardless of the version of the Special Terms that Class Members viewed when they registered with safeway.com, it is undisputed that Class Members were not provided with conspicuous notice

---

[5] Plaintiff does not argue that safeway.com's pricing structure breached the as-amended Special Terms, and so the Class only includes customers who registered before November 15, 2011.

that changes had been made to the Special Terms at the time those changes were made. Therefore, those changes represent an offer to which the class members never expressed assent, and class members were therefore not bound by those changes.

Defendant argues that, at the time of their safeway.com registration, Class Members agreed to give Safeway the authority to change the terms of the contract without notice to them, by indicating that they agreed to the version of the Special Terms that are in effect at the time they make their subsequent orders. Defendant's version of the Special Terms states that customers agree to the terms "and the form in which they appear at *the time your online transaction is processed*." ECF No. 187 at 16-17 (emphases added). In order to complete their registration, Customers were required to manifest agreement to the Special Terms shown to them by clicking a link. Defendant contends that, as a result of users' agreement to this Special Term at the time of their registration, Safeway was not required to notify customers of future changes to the terms for those changes to become effective. Safeway contends that, because Class Members read the initial registration contract, every time they opted to go forward with an online purchase after registration, they were on notice that they were assenting to a new contractual agreement, governed by the Special Terms operative elsewhere on the website at the time of that purchase.

The Court rejects this argument. The safeway.com agreement did not give Safeway the power to bind its customers to unknown future contract terms, because consumers cannot assent to terms that do not yet exist. A user confronting a contract in which she purports to agree to terms in whatever form they may appear in the future cannot know to what she is are agreeing. At most, this term in the safeway.com agreement could be read to indicate that a customer agrees to read the terms and conditions every time she makes a purchase on the website in the future. But the Court also concludes that, even in light of their agreement to the Special Terms at the time of registration, customers' assent to the revised Terms cannot be inferred from their continued use of safeway.com when they were never given notice that the Special Terms had been altered.

The Ninth Circuit has taken a skeptical view of contracts in which online retailers have sought to alter the offer and acceptance structure by contending that assent can be inferred by a customer's continued use of a service even in the absence of notice of the terms in question. In

15

Douglas v. U.S. Dist. Court for Cent. Dist. of California, 495 F.3d 1062, 1065 (9th Cir. 2007), the Ninth Circuit held that the District Court had clearly erred in concluding that "a service provider may change the terms of its service contract by merely posting a revised contract on its website" without providing customers with additional notice of the changes. Plaintiff in that case was a customer who had contracted with America Online for long distance telephone service. Id. After Talk America acquired the business from America Online, it changed several material terms in the services contract without informing preexisting customers. Id. The District Court held that, given his continued use of the service, Plaintiff could be bound by the revised contract terms even in the absence of notice. Id. at 1067. The Ninth Circuit, applying California law, disagreed, as "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." Id. at 1066. Even if a customer's continued use of a service could be considered assent to revised terms, "such assent can only be inferred after [that customer] received proper notice of the proposed changes." Id.

Earlier this year, in Nguyen v. Barnes & Noble, Inc., the Ninth Circuit held that a customer had not agreed to be bound to Barnes & Noble's Terms of Use "by merely using Barnes & Noble's website" when he "was never prompted to assent to the Terms of Use and never in fact read them." 763 F.3d 1171 at 1173 (9th Cir. 2014).[6] The website's Terms of Use were available "via a hyperlink located in the bottom left-hand corner of every page on the Barnes & Noble website." Id. at 1174. But the Terms of Use purported to bind even those users that had not read them, claiming that a user would be deemed to have accepted the terms of use "[b]y visiting any area in the Barnes & Noble.com Site, creating an account, [or] making a purchase." Id.

The Nguyen decision distinguished between two forms of internet contracts: 1) "clickwrap" agreements, "in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use," which courts generally enforce, and

---

[6] Barnes & Noble's Terms of Use included a choice of law provision stating that questions regarding the validity of the term in question would be governed by New York law. The Nguyen decision sidestepped the "circular inquiry" into whether the choice of law provision was enforceable by noting that "both California and New York law dictate the same outcome," and applying "New York law, to the extent possible." Id. at 1175.

2) "browsewrap" agreements, "where a website's terms and conditions are generally posted on the website via a hyperlink at the bottom of the screen," which courts view with skepticism. Id. at 1175-76. Because the Barnes & Noble contract did not require users to assent before it purported to bind them, it constituted a browsewrap agreement. Courts are typically reluctant to apply browsewrap agreements against consumers who were not provided with sufficient notice that their use of a website would be construed as a manifestation of assent to the agreement's terms. Id. at 1177, 1178 n. 2. "While failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." Id. at 1179. The Nguyen decision reasoned that "consumers cannot be expected to ferret out hyperlinks to terms and condition to which they have no reason to suspect they will be bound." Id. Because Nguyen lacked sufficient notice of Barnes & Noble's Terms of Use, the Ninth Circuit held that he never in fact entered into an agreement to be bound by them.

Safeway's claim that a court could infer a customer's assent to the revised terms from that customer's continued use of the safeway.com website resembles the type of browsewrap agreement the Ninth Circuit rejected in Nguyen. Although Class Members were presented with a clickwrap agreement at the time of their registration, they were never presented with a subsequent clickwrap agreement asking them to consent to the revised Special Terms. As was the case in Nguyen, Class Members could have completed all their subsequent purchases on safeway.com without ever visiting the webpage hosting the revised Special Terms which Safeway claims governed the sale and without ever clicking anything on the website that would indicate that they have agreed to those terms. Customers' lack of awareness that the Special Terms have been altered undermines Safeway's claim that each purchase on safeway.com constitutes an agreement to those changes. Douglas teaches that assent to a contract's revised terms "can only be inferred" from a customer's ongoing use of a service "after [the customer] received proper notice of the proposed changes." Douglas, 495 F.3d at 1066.

Although it is true that a customer could, as matter of course, read the entirety of the Special Terms before every grocery purchase they make from safeway.com, generally "[p]arties to

17

1  a contract have no obligation to check the terms on a periodic basis to learn whether they have
2  been changed by the other side." Id. Safeway has attempted to impose that obligation onto
3  customers via a contractual term, to which users agree as a condition of their initial safeway.com
4  registration. If the Court gave that term effect, then every individual consumer would be expected
5  to scrutinize the Special Terms every time she seeks to purchase groceries from safeway.com.
6  Such a burden would seriously compromise the convenience that makes online shopping a
7  desirable alternative to the in-store experience.

8  But beyond the impracticality of expecting consumers to spend time inspecting a contract they have no reason to believe has been changed, the imposition of such an onerous requirement on consumers would be particularly lopsided, as Safeway is aware that it has – or has not – made changes to the Terms and is the party to the contract that wishes for the new terms to govern. "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." Nguyen, 763 F.3d at 1179. Safeway is best positioned to make sure customers are aware of changes that Safeway has made to its contract with Class Members. After making a change, Safeway can take any number of actions to alert users that the Special Terms they agreed to at registration have been altered. For instance, Safeway could ask customers to click to indicate that they agree to the new Special Terms or send all existing safeway.com customers an email in order to ensure that every consumer is aware of a change in the Special Terms prior to making a purchase. When Safeway changed the Special Terms on November 15, 2011, it opted to do neither.

21  Therefore, assent to the revised Special Terms cannot be inferred from Class Members'
22  continued use of safeway.com following November 15, 2011. Instead, Class Members
23  safeway.com use continued to be governed by the Special Terms that were operative at the time of
24  their registration, which promised price parity.

25  **D.  August 29, 2012 Email**

26  Finally, Safeway argues that, even if damages are not cut off as of November 15, 2011,
27  when the Special Terms were amended without notice to Class Members, damages should still be
28  cut off as of August 29, 2012, the date Safeway sent an email to "all active, lapsed, and RNO

18

1 (registered but not ordered) customers, who had opened an email from Safeway.com in the last six
2 months." ECF No. 207 at 14. This email stated, under the heading "Helpful Information on
3 Grocery Delivery Pricing and Promotions" that "Grocery delivery prices, promotions, discounts,
4 and offers may differ from your local store." ECF No. 175-5 at 2. The Court does not agree that
5 this email gave Class Members notice of the change to the Special Terms, as it did not refer to the
6 Special Terms or indicate that Safeway had made any change to them. Moreover, Safeway admits
7 the email was not sent to all Class Members, but instead was only sent to those users who had
8 opened a safeway.com email within the last six months. Finally, the representation contained
9 within the email, which stated that prices "*may* differ from your local store," was not even
10 factually accurate, as Safeway in fact always added a markup to items sold in the online store as
11 compared to items sold in the physical store. ECF No. 172-6 at ¶¶ 8-12.

Therefore, Class Members' assent to the revised Special Terms can also not be inferred from their continued use of safeway.com following the August 29, 2012 email. Even following that date, Class Members safeway.com use continued to be governed by the Special Terms that were operative at the time of their registration, which promised price parity.

**IV. CONCLUSION**

Plaintiff's motion for summary judgment is GRANTED. The Court finds as follows:

1. Safeway breached the contract by charging Plaintiff and the Class more than the prices permitted under the terms of the contract;

2. The Class is entitled to damages even for purchases which occurred after the Special Terms were amended on November 15, 2011; and

3. Therefore, Safeway is liable to Plaintiff and the Class for the aggregate amount of the online mark-up from April 12, 2010, through the present.

/ / /
/ / /
/ / /
/ / /
/ / /

The Court hereby SETS a case management conference for January 21, 2015, at 2:00 p.m., at which time it will set the remaining dates in this action. A joint case management statement, including a proposed schedule, is due ten court days before the conference.

**IT IS SO ORDERED.**

Dated: December 10, 2014



JON S. TIGAR
United States District Judge