SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
P. CRAIG CARDON, Cal. Bar No. 168646
ccardon@sheppardmullin.com
BRIAN R. BLACKMAN, Cal. Bar No. 196996
bblackman@sheppardmullin.com
JAY T. RAMSEY, Cal. Bar No. 273160
jramsey@sheppardmullin.com
4 Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:     415-434-9100
Facsimile:     415-434-3947

Attorneys for Defendant
SAFEWAY INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL RODMAN, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>     v.<br><br>SAFEWAY INC.,<br><br>        Defendant. | Case No. 3:11-CV-03003-JST (JCS)<br><br>***REDACTED* SAFEWAY'S NOTICE OF MOTION AND MOTION TO DECERTIFY THE CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>[*Declarations Filed Concurrently Herewith*]<br><br>Date:        April 23, 2015<br>Time:       2:00 PM<br>Courtroom:  9, 19th Floor<br><br>The Honorable Jon S. Tigar |

<u>**REDACTED VERSION OF**</u>

<u>**SAFEWAY'S NOTICE OF MOTION AND MOTION TO DECERTIFY**</u>

<u>**SOUGHT TO BE SEALED**</u>

SMRH:436585176.1          *REDACTED* SAFEWAY'S NTC. MTN. & MTN. TO DECERTIFY THE CLASS

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ....................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.    INTRODUCTION ............................................................................................................... 1

II.   FACTUAL BACKGROUND ............................................................................................ 3

    A.   Safeway's Consumer Surveys Establish That A Significant Percentage Of
Customers Knew That Safeway Charged Higher Prices Online Than In
Physical Stores ....................................................................................................... 3

    B.   Because The Vast Majority Of Online Customers Are Repeat Customers, It
Is Certain That A Large Number Of Them Knew Of the Price Difference
And Placed Online Orders Anyway ..................................................................... 6

    C.   Customers Could Have Learned That Prices Online Were Different In
Multiple Ways And There Is No Way To Determine On A Classwide Basis
Who Knew What, And When ................................................................................ 7

III.  ARGUMENT ..................................................................................................................... 11

    A.   The Court Must Reevaluate Whether Continued Class Certification Is
Proper ..................................................................................................................... 11

    B.   Safeway's Affirmative Defenses Of Consent, Waiver, And Mutual Mistake
Require Individualized Inquiry And Warrant Decertification .......................... 11

        1.   Numerous Customers Consented To Safeway's Online Pricing
Policy By Making Voluntary Payments For Groceries With
Knowledge That Online Prices Differed From In-Store Prices ............. 12

        2.   Numerous Customers Waived Their Right To Enforce The Special
Terms By Accepting Safeway's Performance Without Objection ......... 14

        3.   Numerous Customers Never Expected Price Parity, Even When
Contracting, And So A Mutual Mistake Bars Their Claims For
Damages ..................................................................................................... 15

    C.   The Existence Of Damages Cannot Be Determined On A Classwide Basis .......... 15

        1.   Plaintiff Must Present A Reliable Classwide Damages Model In
Order To Certify A Class, And Damages Cannot Be Bifurcated
Because It Is An Element of Plaintiff's Contract Claim ......................... 15

        2.   Calculating Damages, Or Even The Fact Of Damage, Is Not A
Mechanical Task Because Certain Class Members Received
Benefits That A Factfinder Must Consider In Awarding Any
Damages ..................................................................................................... 17

3.  Calculating Damages, Or Even The Fact Of Damage, Is Not A Mechanical Task Because The Proper Measure Of Damages Is Not The Markup ................................................................................ 20

D.  A Class Action Is Not Superior Because Class Damages Under Plaintiff's Theory Are Grossly Disproportionate To Any Expected Injury ............................ 21

IV.  CONCLUSION .................................................................................................. 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

<u>Federal Cases</u>

4

*Anderson v. Capital One Bank*
    224 F.R.D. 444 (W.D. Wis. Oct. 5, 2004)............................................................................ 24

5

*Bateman v. American Multi-Cinema, Inc.*
6
    623 F.3d 708 (9th Cir. 2010)............................................................................................... 25

7

*Bruno v. Eckhart Corp.*
    280 F.R.D. 540 (C.D. Cal. 2012) ....................................................................................... 11
8

9

*Caldera* v. *The J.M. Smucker Co.*
    2014 U.S. Dist. LEXIS 53912 (C.D. Cal. Apr. 15, 2014)............................................. 18, 21

10

*CLN Properties, Inc. v. Republic Services, Inc.*
11
    No. CV-09-1428, 2010 U.S. Dist. LEXIS 135953 (D. Ariz. Dec. 13, 2010)....................... 13

12

*Coast Trading Co. v. Cudahy Co.*
    592 F.2d 1074 (9th Cir. 1979)............................................................................................ 17
13

14

*Comcast Corp. v. Behrend*
    133 S. Ct. 1426 (2013) ....................................................................................................... 16

15

*Endres v. Wells Fargo Bank*
16
    No. C 06-7019, 2008 WL 344204 (N.D. Cal. 2008)............................................................ 13

17

*Erica P. John Fund, Inc. v. Halliburton Co.*
    131 S. Ct. 2179 (2011) ....................................................................................................... 16
18

19

*In re Flash Memory Antitrust Litigation*
    2010 U.S. Dist. LEXIS 59491 (N.D. Cal. Mar. 31, 2010) ................................................... 16

20

*Gene and Gene LLC v. BioPay LLC*
21
    541 F.3d 318 (5th Cir. 2008)............................................................................................. 13

22

*In re Google Adwords Litig.*
    2012 U.S. Dist. LEXIS 1216 (N.D. Cal. Jan. 5, 2012) ..................................................... 16

23

24

*In re Google Inc. Gmail Litigation*
    No. 13-MD-02430, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ...................................... 13

25

*In re Graphics Processing Units Antitrust Litig.*
26
    253 F.R.D. 478 (N.D. Cal. 2008) ...................................................................................... 16

27

*Hinojos v. Kohl's Corp.*
    718 F.3d 1098 (9th Cir. 2013).......................................................................................17, 20

28

*Intel Corp. v. Hartford Acc. & Indem. Co.*
   952 F.2d 1551 (9th Cir. 1991)................................................................. 14

*Jones v. Conagra Foods, Inc.*
   2014 U.S. Dist. LEXIS 80139 (N.D. Cal. June 13, 2014) ................................. 18, 21

*Kline v. Coldwell Banker & Co.*
   508 F.2d 226 (9th Cir. 1974)................................................................. 25

*Lilly v. Jamba Juice Co.*
   2014 U.S. Dist. LEXIS 131997 (N.D. Cal. Sept. 18, 2014)....................... 12, 16, 17

*Marlo v. United Parcel Service, Inc.*
   639 F.3d 942 (9th Cir. 2011)................................................................. 11

*In Re POM Wonderful LLC Marketing And Sales Practices Litig.*
   2014 U.S. Dist. LEXIS 40415 (C.D. Cal. Mar. 25, 2014) ......................... 17, 20

*Ratner v. Chemical Bank New York Trust Co.*
   54 F.R.D. 412 (S.D.N.Y. Feb. 14, 1972)................................................... 24

*Roling v. E*Trade Securities LLC*
   860 F. Supp. 2d 1035 (N.D. Cal. 2012) ................................................... 14

*Thompson v. Clear Channel Communs., Inc.*
   247 F.R.D. 98 (C.D. Cal. 2007) ............................................................ 16

*Trahan v. U.S. Bank National Ass'n*
   2015 U.S. Dist. LEXIS 1144 (N.D. Cal. Jan. 6, 2015) ............................... 12

*Wal-Mart Stores, Inc. v. Dukes*
   131 S. Ct. 2541 (2011) ....................................................................... 11

*Werdebaugh v. Blue Diamond Growers*
   2014 U.S. Dist. LEXIS 173789 (N.D. Cal. Dec. 15, 2014) ...................... 11, 16

**State Cases**

*American Oil Service v. Hope Oil Co.*
   194 Cal. App. 2d 581 (1961)................................................................. 13

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*
   226 Cal. App. 3d 442 (1990)................................................................. 20

*Hess v. Ford Motor Co.*
   27 Cal. 4th 516 (2002)........................................................................ 15

*Oasis West Realty, LLC v. Goldman*
   51 Cal. 4th 811 (2011)........................................................................ 16

*Smith v. Mady*
   146 Cal. App. 3d 128 (1983)...................................................................................17

*Stratton v. Tejani*
   139 Cal. App. 3d 204 (1982)...................................................................................17

*Whitney Inv. Co. v. Westview Dev. Co.*
   273 Cal. App. 2d 594 (1969)...................................................................................14

**Federal: Statutes, Rules, Regulations, Constitutional Provisions**

Fair and Accurate Credit Transactions Act ("FACTA")..................................................25

**State: Statutes, Rules, Regulations, Constitutional Provisions**

Cal. Civ. Code § 3300 ...................................................................................................20

Cal. Civ. Code § 3399 ...................................................................................................15

Cal. Civ. Code § 3515 ...................................................................................................13

Cal. Civ. Code § 3516 ...................................................................................................13

**Other Authorities**

CACI 331 .......................................................................................................................15

Rest. (2d) Contracts, § 153............................................................................................15

## NOTICE OF MOTION AND MOTION

TO THE ABOVE-CAPTIONED COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE that on April 23, 2015 at 2:00 p.m., or as soon thereafter as counsel may be heard in Courtroom 9 of the above-entitled Court, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California, 94102, the Honorable Jon S. Tigar presiding, Defendant Safeway Inc. ("Safeway") will and hereby does move, pursuant to Federal Rules of Civil Procedure ("FRCP") 23(c)(1)(C), to decertify the class as to the claim for breach of contract alleged in the Amended Complaint filed by Plaintiff Michael Rodman ("Plaintiff").

This Motion is made on the grounds that individual issues over individual and class damages, as well as Safeway's affirmative defenses of consent, waiver, estoppel and mutual mistake, predominate and the class procedures are not superior to other efficient means for adjudication of this contract dispute.  This Motion is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities, and the declarations of Brian Blackman, Stephen E. Fleming and Matt Campbell filed concurrently herewith, all other pleadings, papers, records and documentary materials on file or deemed to be on file in this action, those matters of which this Court may take judicial notice, and upon the oral arguments of counsel made at the hearing on this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

When Plaintiff filed his class certification motion more than a year ago, the primary issue on the horizon was whether Safeway's Special Terms promised price parity.  The focus of the class inquiry at that time was thus whether that contractual interpretation, along with any breach, could be addressed on a classwide basis.  The Court found that it could, and each side thereafter moved for partial summary judgment, urging its respective interpretation of the Special Terms.  Issues concerning the measure and amount of damages were further down the road and could be addressed in various ways, depending on the Court's contract interpretation ruling.

Now that the Court has interpreted the Special Terms to include a promise of price parity, the parties and the Court must examine the looming damages issues—which customers are entitled

to damages and if so, how much—and determine how to address them procedurally.  This inquiry involves whether (1) adjudicating Safeway's affirmative defenses of consent, waiver, and mutual mistake—each of which could negate damages in whole or part as to particular customers and particular transactions—requires individualized inquiries; and (2) if a customer is entitled to damages, the damages calculation requires individualized inquiries.  The answer to both issues is "yes."  Individualized factual questions would predominate in adjudicating Safeway's affirmative defenses and the calculation of damages.

Although the Court has ruled that the Special Terms promised price parity until November 15, 2011, when Safeway posted revised terms, this does not mean all customers who ordered groceries online are entitled to damages.  If customers knew or believed that Safeway was not providing price parity and nevertheless placed orders, they consented to Safeway's pricing policy or waived their right to object to it, or both.  The evidence here proves that between ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████.  It is impossible to prove with common evidence *which* customers knew of the price differential or *when* each acquired that knowledge.  Customers learned from a variety of sources that online prices may differ—they could have conducted their own price comparisons (as Plaintiff did), reviewed the FAQs, reviewed other advertisements and marketing materials that disclosed this, spoken with the delivery person or call center (who had scripts disclosing pricing differences), reviewed the Class Notice in this case, reviewed the modified Special Terms, or read Safeway's August 2012 email that disclaimed any promise of price parity.  Presenting these affirmative defenses as to each customer will require individualized inquiries to determine if and when each customer learned about Safeway's pricing policy.  This individualized inquiry would overwhelm the common issues to be tried.

Calculating damages would also require individualized inquiry.  Plaintiff's proposed damages calculation may be simple, but it is wrong.  Merely calculating the amount of the markup on non-promoted items, in the aggregate or by customer, will not yield a proper damages figure, even if customers were entitled to *any* damages in the face of consent, waiver, and mutual mistake.

1   For example, that calculation will not incorporate individual offsets to account for benefits that

2   customers received and accepted—benefits they would not otherwise have been offered if

3   Safeway had not implemented the markup.   These benefits include more free delivery windows,

4   various promotional credits, and various online-only specials.  Having accepted (and obtained)

5   these benefits, these customers are estopped from seeking the entire value of the markup.

6          Finally, it would be unfair to allow the damage elements of this case to proceed as a class

7   action.  The real-world fact is that customers knew exactly what Safeway charged for orders

8   placed online – they saw the prices when they placed their order – and agreed to pay those prices.

9   Moreover, in exchange for charging the markup, and as noted above and explained in more detail

10  below, Safeway gave customers a host of other discounts and freebies.  ██████████████

11  ███████████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ████████████████  Plaintiff has presented no evidence that all or substantially all online customers

15  expected price parity—and certainly not from reading the Special Terms.  As a result, permitting

16  all customers to obtain a windfall damages award when many otherwise would have had no online

17  access to groceries is unfair, and renders class treatment of the damages phase inferior.

## II.      FACTUAL BACKGROUND

19         Many customers knew or believed Safeway was charging higher prices online for its non-

20  promotional items than it was charging for those items in its physical stores.  Yet they continued

21  to place online orders and willingly paid the markup.

**A.     Safeway's Consumer Surveys Establish That A Significant Percentage Of Customers Knew That Safeway Charged Higher Prices Online Than In Physical Stores**

24         Between 2009 and 2014, Safeway surveyed its customers at various times and in various

25  ways.  These surveys conclusively establish that significant percentages of Safeway.com

26  customers knew or believed that online prices were different—and higher—than physical store

27  prices.

28

1    In August 2009, before Safeway implemented its online markup, it conducted a survey of a

2    randomly-selected sample of customers who had visited its website.  *See* ECF No. 171-34 (Exh.

3    32 to Mathews Decl.).  ████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    In 2010, the year the online price zone was implemented, Safeway administered a Service

7    Satisfaction Survey, which it emailed to randomly-selected customers after it had delivered their

8    online order.  *See* ECF No. 171-36 (Exh. 34 to Mathews Decl.).  ███████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████

14   ████████████████████████████████████████████

15   ██████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████

18   ███████████████████████████████████████████████████

19   ██████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████

21   In late 2010, almost a full year into the markup period, Safeway interviewed 1,139

22   customers from across the United States.  *See* ECF No. 171-35 (Exh. 33 to Mathews Decl.).  Of

23   those, 200 were Safeway.com "Triers"—meaning that they had used the online grocery service.

24   *Id*. at 4.  ███████████████████████████████████████████████████████

25   ████████████████████████████████████████

26   Yet another survey, conducted in 2010 and 2011, reflected that an even higher percentage

27   of online shoppers knew or believed that prices online were higher than in physical stores.  *See*

28   Declaration of Stephen E. Fleming ("Fleming Decl."), Exhs. A & B.  During this period, at the

completion of each online order, customers were asked to take a Web Site Satisfaction survey, and were asked whether ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Thus, that survey showed that a substantial number of respondents believed there was a difference between online and in-store prices and promotions.[1]

In 2012, Safeway sent a survey to nearly 28,000 customers who had registered for the online grocery service but had not placed an order. *See* ECF No. 132-14 (Exh. 12 to McCready Decl.). ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████ While the 28,000 customers who received the survey are not class members because they never placed an online order, the results confirm that a significant percentage were aware or believed that online prices were higher than in-store prices.

Finally, from 2012 to 2014, Safeway emailed a "Lapsed Customer" feedback survey weekly to some 2,000 customers who had placed orders previously but none in the preceding 12 weeks. *See* Fleming Decl., Exhs. E-G. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ *See*

_____

[1]  Also during this period, in 2010 and 2011, Safeway administered a Lapsed Customer Feedback survey.  *See* Fleming Decl., Exhs. C & D.  The survey was emailed to about 2,000 customers who had previously placed orders but had not placed one in the previous 12 weeks. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Thus, some customers were aware of the price differential and opted not to further participate in the program.  But importantly, many continued to order, well aware of the absence of price parity.

1  Blackman Decl., ¶3.  Again, a higher percentage may have known of the price difference, but

2  stopped using the service for another reason or simply did not care about the difference.

3       That customers learned of the lack of price parity, but overwhelmingly did not change their

4  buying practices, is also consistent with Safeway's "Hi-Lo" business model, which many

5  traditional grocers use—i.e., for customers to buy non-promotionally priced items for reasons

6  other than price.  A "Hi-Lo" model encourages customers to shop with Safeway based on

7  promotionally priced products; for the most part, these are Club Card items.  ███████████

8  ███████████████████████████████████████████████████████.  ECF

9  No. 132-12 (McCready Decl.), ¶2.  Both Safeway and its customers recognize that *non*-

10  promotional items will likely cost more than items at an every-day-low-price (EDLP) grocer like

11  Walmart.  Customers purchase non-promotional products from Safeway not because they are

12  offered at the lowest price, but, rather, because customers are already purchasing Club Card and

13  promotional products and simply add non-promotional products to their purchase.

14       In sum, survey after survey has confirmed that at least ███████████████, of

15  online customers knew or believed they were being charged higher online prices than in-store

16  prices.  The surveys further confirm that *non*-promotional prices were not the driving, much less

17  sole, reason customers purchased the *non*-promoted items

18  **B.  Because The Vast Majority Of Online Customers Are Repeat Customers, It Is

19     Certain That A Large Number Of Them Knew Of the Price Difference And Placed

20     Online Orders Anyway**

21       The vast majority of Safeway's online customers are repeat shoppers.  ███████████

22  ███████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████a significant

27  percentage must have known or believed that online prices were higher than in-store prices but

28  continued to place online orders nevertheless.

1    Safeway's internal data also show that a large percentage of customers who learned about

2    the price differential continued to place online orders.  ECF Nos. 132-6 (McCready Decl.), ¶19;

3    132-12 (Exh. 10 to McCready Decl.); 132-13 (Exh. 11 to McCready Decl.); 132-31 (Anastasi

4    Decl.), ¶¶70-76.  Based on a review of Safeway.com's focus groups, customer research and call

5    center logs, Safeway's expert, Joseph Anastasi, testified that certain customers knew of the price

6    differential and submitted various inquiries and complaints.  ███████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ████████████████████████████████████

11   These data strongly suggest that other customers who learned about the price differential

12   but did *not* call to complain also continued to order groceries online; after all, the customers who

13   took time to call were, by and large, those who were most troubled by the pricing policy.  Many

14   others who learned about the price differential were likely indifferent as to price parity—they

15   knew what they were getting when they placed an online order and were satisfied.  The point is

16   that even customers who may have been disturbed by the price differential nevertheless consented

17   by placing additional orders.  The conclusion that customers who were *not* disturbed by the

18   pricing policy also consented to it applies with even greater force.

19   **C.    Customers Could Have Learned That Prices Online Were Different In Multiple**

20   **Ways And There Is No Way To Determine On A Classwide Basis Who Knew**

21   **What, And When**

22   A class member might have learned that the prices charged online were higher than those

23   in the store from which their groceries were delivered in multiple ways:

24   *Price Comparison.*  Customers could have simply compared prices.  For example:

25   • A customer could have compared the prices displayed online or on the order
      confirmation to the prices at his or her store; or

26   • A customer could have taken the delivery receipt with the prices they were
      charged online, noted the pick-store (which was listed on the delivery receipt),

27   traveled to the pick-store, and compared prices.

28

Such price comparisons are not unusual; many shoppers follow price changes closely, hunting for discounts and coupons. Indeed, this is how Plaintiff discovered the price difference—he took his delivery receipt to a store and compared prices. *See* ECF No. 132-21 (Exh. 19 to Blackman Decl.) at 219:20-23:2.

*FAQ Page.* A customer also could have learned of the online price differences by reviewing Safeway.com's Frequently Asked Questions ("FAQs"), which made clear that not all online prices were the same:

- The dedicated Prices & Promotions page stated:

  **Will I pay the same prices online that are in your stores?**

  *Except for certain items*, you'll find *most* of the same great promotions online as in your local store. . . . You will receive the prices and promotions applicable from your *online store* on the day of delivery as noted next to each item. (Emphasis added.)

- On or about June 6, 2011, this FAQ was amended to add the language: "In-store prices, discounts and offers may not apply to online purchases"

- On or about June 10, 2011, Safeway amended this FAQ again, noting that "Online and in-store prices may differ;"

- On or about October 6, 2011, Safeway amended the FAQ to read: "Online and in-store prices, promotions, discounts and offers may differ. Online and in-store prices, promotions and discounts may also differ depending upon your location and the location of the store from which your items were selected. Both online and in-store prices may change between the time you place your order and the time you schedule your delivery."

*See* ECF Nos. 132-17 (Exh. 15 to Blackman Decl.) & 124-5 (Exh. A to Mathews Decl.) at 6:28-7:19.

If a customer had questions about the online shopping experience, he or she would likely turn first to the FAQ page. Between June 10, 2010 and February 25, 2015, more than 1,553,880 visitors viewed Safeway's online delivery FAQ pages. Fleming Decl., ¶7. Presumably some of these customers understood from the FAQs that online prices would be different than physical store prices, and purchased goods nonetheless.

*Advertisements and Marketing Materials.* A customer might have learned of the differential by reviewing Safeway's advertisements or other marketing communications:

- On or about June 8, 2011, Safeway updated the disclaimer in its weekly circular (distributed to thousands of customers) from "In-store Club Card prices may not apply to certain products offered online" to "Online and in-store prices may differ."

-8-

- On or about June 22, 2011, Safeway added to its weekly circular: "In store prices, discounts and offers may not apply to online purchases;" and

- On August 29, 2012, Safeway emailed all active, lapsed and RNO (registered but not ordered) customers who had opened an email from Safeway.com in the last six months. The email stated that "[g]rocery delivery prices, promotions, discounts and offers may differ from your local store."

*See* ECF No. 124-5 at 6:18-7:3, 132-1 at ¶17 & 132-5.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ While this Court has concluded that the August 2012 email, standing alone, did not give customers sufficient notice to infer acceptance of the revised Special Terms, the Court should consider the email as part of the overall evidentiary picture as to whether customers learned through one or more sources that Safeway's online prices were higher than its physical store prices for non-promotional items.

*Driver Scripts.* Safeway's online customers often ask the driver who delivered the groceries to answer questions about Safeway's prices. *See* ECF No. 132-21 (Exh. 19 to Blackman Decl.) at 197:2-198:13. These conversations are not recorded, and no record of them is kept, so it is difficult to know how often they occurred, with whom, and what was said without inquiring of each customer. But those scripts required drivers, if they were asked about prices, to inform the customer that, among other things, "[o]nline shopping has its own distinct prices and some may be higher than your local store. But you'll also find many online exclusive promotions that aren't available in-store. And except for a few items, all Club Card specials are the same." ECF No. 132-3 (Exh. 2 to Guthrie Decl.).

---

[2]  If a customer opened the email and loaded the images, a tracking pixel was activated that allowed Safeway to track the number of these emails that were opened. Fleming Decl., ¶8. If the customer opened the email, but the images were not loaded (e.g. the customer used a text only reader), Safeway cannot track whether the customer viewed the email or not. *Id.* It is thus likely that more than 50,569 customers opened the email since Safeway has data only on those who activated the tracking pixel.

*Special Terms.*  Customers could have learned of the price differential, at least as of November 15, 2011, by reviewing the amended Special Terms, posted to Safeway's website, which stated: "Please note that before shopping online at Safeway.com that online and physical stores prices, promotions and offers may differ, and prices in your online store may differ depending on your geographic location."  ECF No. 175-1 (Exh. 1 to Guthrie Decl.).

*Class Notice*.  On June 20, 2014, Safeway emailed the Court-approved summary form Class Notice to putative class members.  Fleming Decl., ¶10.  The summary Class Notice informed recipients that online prices were different than in-store ones.  It stated:  "Beginning around April 2010 … Safeway implemented new pricing that increased prices for items offered for online ordering and delivery, other than Club Card specials items and certain online-only promotions, above the prices charged in the physical store from which the items were selected and delivered. Plaintiff alleges that the pricing disparity violated the terms and conditions of the online delivery agreement, and constitutes a breach of contract."  *See* ECF No. 169 (Order), Ex. A.  On July 21, 2014, Safeway mailed the summary notice containing the same quoted language to putative class members who could not be reached by email and for whom Safeway had a valid address.  Fleming Decl., ¶10.  Any customers who had not previously been made aware of the various disclosures that there is no price parity would have received this Class Notice expressly informing them of that fact in the context of this very proceeding.  However, there was no material change to shopping activity even after the Class Notice was delivered, indicating that most if not all Class members already did not expect price parity.  *See* Campbell Decl., Ex. L.  Indeed, in response to the Class Notice, opt out forms were received that anecdotally confirm just this - that Class members were already aware that no price parity was provided before receiving the Class Notice.[3]  The question that remains to be answered in further proceedings is then when each Class

---

[3]  "I was fully aware of the price I was paying for the items purchased online and proceeded with purchase" (Blackman Decl., Exh. N); "… I don't agree with the complaints listed and am very satisfied with Safeway delivery and their prices" (*Id.*); "I was aware that Safeway charged more for items bought for delivery but I assumed that was because their delivery charge was so minimal."  (*Id.*); and "It's sad that someone is suing a grocery store while they enjoy the luxury/convenience of having their groceries delivered to them.  You should expect to pay a little more for groceries that are hand picked by hard working people and delivered to your door" (*Id.*).

1  member learned that there was no price parity (even assuming they expected it), to ascertain which

2  transactions might be subject to a damage calculation.

3                             \*        \*        \*

4  In sum, a significant percentage of customers learned that online prices were different from

5  in-store prices and nevertheless continued to shop online. Those customers could have learned of

6  the differential in many ways, but to determine which consumers did so and when (*i.e.*, to

7  determine which transactions affirmative defenses would apply) will require individualized

8  inquiries as to each customer's experience, understandings, and actions at various times.

9  ### III.    ARGUMENT

10  **A.**    **The Court Must Reevaluate Whether Continued Class Certification Is Proper**

11  Federal Rule of Civil Procedure 23(c)(1)(C) provides that an order certifying a class "may

12  be altered or amended before final judgment." Upon a motion to decertify a class, "a court must

13  reevaluate whether the class continues to meet the requirements of Rule 23." *Bruno v. Eckhart*

14  *Corp.*, 280 F.R.D. 540, 544 (C.D. Cal. 2012). Even though the defendant is the moving party in a

15  motion for decertification, the burden remains on the plaintiff to show that certification continues

16  to be appropriate as the case has progressed. *See Marlo v. United Parcel Service, Inc.*, 639 F.3d

17  942, 947-48 (9th Cir. 2011); *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS

18  173789, \*14 (N.D. Cal. Dec. 15, 2014). Finally, as with a motion for class certification, in a

19  decertification motion, the Court must conduct "a rigorous analysis" to determine whether the

20  plaintiff meets the Rule 23 requirements. *See Werdebaugh*, 2014 U.S. Dist. LEXIS 173789, at

21  \*17. This analysis may "entail some overlap" with the underlying claim's merits. *Wal-Mart*

22  *Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). If classwide issues cannot be determined with

23  classwide evidence, then individualized issues predominate and certification is inappropriate.

24  **B.**    **Safeway's Affirmative Defenses Of Consent, Waiver, And Mutual Mistake Require**

25          **Individualized Inquiry And Warrant Decertification**

26  A defendant is "entitled to litigate any individual affirmative defenses [it] may have to

27  class members' claims." *Wal-Mart Stores*, 131 S. Ct. at 2561; *see also* 1 McLaughlin on Class

28  Actions § 5:43 (11th ed. Nov. 2014) (Westlaw). "'[I]f the adjudication of a defense … would

necessitate individual inquiries, and those inquiries would predominate over inquiries into common questions, certification should be denied." *Trahan v. U.S. Bank National Ass'n*, 2015 U.S. Dist. LEXIS 1144, *14 (N.D. Cal. Jan. 6, 2015) (quoting *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 268 F.R.D. 604, 612 (N.D. Cal. 2010)).  "In determining whether common questions predominate, the Court identifies the substantive issues related to plaintiff's claims (both the causes of action and affirmative defenses), and then considers the proof necessary to establish each element of the claim or defense; and considers how these issues would be tried." *Lilly v. Jamba Juice Co.*, 2014 U.S. Dist. LEXIS 131997, *22-23 (N.D. Cal. Sept. 18, 2014).

Safeway will pursue at trial the affirmative defenses of consent, waiver, estoppel and mutual mistake, among others.  *See* ECF No. 39 (Answer to FAC) at 16-18.  Each will require individualized inquiry.  A customer consented to the markup if he or she (1) learned that Safeway did not charge the same prices online as it did in its physical stores yet (2) nevertheless consented to Safeway's pricing policy by making a voluntary payment for online orders.  Customers also waived any right to challenge the alleged price parity term by accepting Safeway's performance without objection.  Similarly, customers who accepted the benefits added in connection with the markup are estopped from seeking recovery that retains those benefits (*i.e.*, they must be individually ascertained and offset).  And, if a customer never expected price parity, even when signing up for the online service and before placing a first order, both the customer and Safeway would have expected the same thing—namely, no price parity—and therefore including a price parity term was a mutual mistake.  These affirmative defenses necessitate individual inquiries because, as set out above, a customer could learn about Safeway's pricing policy in multiple ways at virtually any point in time, and determining who knew what and when is impossible on a classwide basis.

    **1.**    **Numerous Customers Consented To Safeway's Online Pricing Policy By Making Voluntary Payments For Groceries With Knowledge That Online Prices Differed From In-Store Prices**

A Safeway.com customer cannot obtain damages if, knowing that Safeway charged higher prices online, he or she voluntarily paid for groceries ordered online.  This is because of "the

familiar rule that a payment voluntarily made with knowledge of the facts affords no ground for an action to recover it back." *American Oil Service v. Hope Oil Co.*, 194 Cal. App. 2d 581, 586 (1961); *see also* Cal. Civ. Code §§ 3515-3516 (maxims of consent and acquiescence).  Courts have frequently denied class certification on the ground that determining whether a customer had certain knowledge but nevertheless made a voluntary payment requires individualized inquiries.

In *Endres v. Wells Fargo Bank*, for example, Judge Hamilton denied class certification where "the voluntary-payment doctrine, which may bar any claims made by class members who continued to incur and voluntarily pay . . . overdraft protection fees," would have required individualized inquiries.  No. C 06-7019, 2008 WL 344204, at *11-12 (N.D. Cal. 2008).  Likewise, in *CLN Properties, Inc. v. Republic Services, Inc.*, the district court denied class certification where "litigation of the breach claim would require a factual inquiry into whether or not the customer consented" to certain fees.  No. CV-09-1428, 2010 U.S. Dist. LEXIS 135953, at *27 (D. Ariz. Dec. 13, 2010).  In *In re Google Inc. Gmail Litigation*, Judge Koh denied class certification where "email users could have learned of [Google's allegedly unlawful practices]" from "a panoply of sources."  No. 13-MD-02430, 2014 WL 1102660, at *17 (N.D. Cal. Mar. 18, 2014).   And in a case arising under the Telephone Consumer Protection Act, the Fifth Circuit reversed an order certifying a class where "individual inquiries of the recipients [were] necessary to sort out which transmission was consented to and which was not."  *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 328-29 (5th Cir. 2008).

Here, as shown above, between ██████████ of Class members knew or believed, at some point in time, that Safeway charged different and higher prices online than in the physical stores, and about ████ of those customers would have placed online orders thereafter nevertheless.  In fact, most of these customers would have placed multiple subsequent orders.  But determining who learned what and when is impossible without individual inquiries.  Customers could have learned about Safeway's pricing policy from "a panoply of sources," *e.g.*, by comparing online prices to in-store prices, reading versions of the FAQ page, reading advertisements, talking with their delivery persons, reading the August 2012 email, or reviewing the Class Notice.  Each class

1   member would have to be interviewed and his or her knowledge tested.  Individual inquiries will

2   thus overwhelm common ones.  This warrants decertification of the class.

### 2.   Numerous Customers Waived Their Right To Enforce The Special Terms By Accepting Safeway's Performance Without Objection

5   "California courts will find waiver when a party intentionally relinquishes a right, or when

6   that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable

7   belief that such right has been relinquished."  *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d

8   1551, 1559 (9th Cir. 1991) (citing *Rheem Mfg Co. v. United States*, 57 Cal. 2d 621 (1962)).  A

9   customer waives his or her right to recover damages for breach of contract when, with knowledge

10  of the alleged injury, he or she "continues to accept performance from the guilty party" without

11  objection.  *Whitney Inv. Co. v. Westview Dev. Co.*, 273 Cal. App. 2d 594, 603 (1969).

12  In a recent decision from this District, Judge Chen ruled that consumers who signed a form

13  contract and knew they were being charged inappropriate fees but continued to accept

14  performance without objection waived their right to damages.  In *Roling v. E*Trade Securities*

15  *LLC*, 860 F. Supp. 2d 1035 (N.D. Cal. 2012), two customers of E*Trade alleged that E*Trade

16  charged them inactivity fees on their accounts, thereby breaching the parties' form contract.  *Id.* at

17  1037.  One customer (Mr. Roling) knew the fees would be charged, but once they were charged,

18  did not object or claim breach, and instead continued under the contract.  *Id*. at 1039-40.  Another

19  customer (Mr. Landvater) discovered the fees for the first time after he was charged, but thereafter

20  paid them and continued performing under the contract without complaining.  *Id.* at 1040.  Judge

21  Chen ruled that because *both* customers "accepted performance of the contract terms without

22  claiming a breach," *both* customers waived their claims for the fees.  *Id.* at 1039-40, *see also id.* at

23  1040 ("[T]he Court finds, as a matter of law, that both Mr. Roling and Mr. Landvater waived their

24  right to contest E*Trade's charging and collecting of the inactivity fees.").

25  Here, a customer who, before placing an order, knew that Safeway would not provide price

26  parity, but placed the order, paid for the goods, and accepted delivery nonetheless, waived his or

27  her right to damages.  And, a Class member who believed at the time of purchase that Safeway

28  was promising price parity, but later discovered that Safeway had breached that promise, has also

1  waived his or her right to damages if he or she continued to use the service and place orders

2  thereafter.

3      As with consent, waiver requires individualized inquiries to determine whether and when a

4  customer learned that Safeway marked up its online prices and whether the customer continued to

5  place orders and accept Safeway's delivery of groceries thereafter.

6      **3.   Numerous Customers Never Expected Price Parity, Even When Contracting,**

7      **And So A Mutual Mistake Bars Their Claims For Damages**

8      If a customer, when contracting, had the same expectations and understandings as

9  Safeway—namely, no price parity—then "both parties" would have been "mistaken about [the

10 promise of price parity]; . . . [Safeway] would not have agreed to enter into [the] contract if [it]

11 had known about the mistake," such that the Special Terms' language promising price parity

12 would be inapplicable.  CACI 331 (bilateral mistake results in no contract); *see* Cal. Civ. Code

13 § 3399 (contract may be revised based on mutual mistake); *Hess v. Ford Motor Co.*, 27 Cal. 4th

14 516, 524 (2002) ("mutual mistake" occurs when expression of agreement differs from both

15 parties' understanding at the time of contracting).[4]

16     As with the other affirmative defenses, determining which customers expected price parity

17 at the time of contracting would require individualize inquiries.  The data show that even before

18 the markup was implemented, many customers did not expect price parity, indicating that many

19 customers did not expect price parity at registration.  If the Special Terms require price parity, as

20 this Court has ruled, then that requirement was a mutual mistake by both Safeway and those

21 customers who did not expect parity.

22 **C.   The Existence Of Damages Cannot Be Determined On A Classwide Basis**

23     **1.   Plaintiff Must Present A Reliable Classwide Damages Model In Order To**

24     **Certify A Class, And Damages Cannot Be Bifurcated Because It Is An**

25     **Element of Plaintiff's Contract Claim**

26

27 ────────────

[4]  Safeway is not precluded from insisting on rescission or reformation of the Special Terms based
on this mutual mistake.  *See* Rest. (2d) Contracts, § 153.  Safeway is aggrieved because, if the

28 mutual mistake is not corrected, it would face damages which it was not required to provide and
would not have provided had it known price parity was required.

Damages are an essential element of a breach of contract claim.  *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  Thus, Plaintiff must establish that all class members suffered damages (*i.e.*, that the entire class has a claim).  *Erica P. John Fund, Inc. v. Halliburton Co.* 131 S. Ct. 2179, 2184 (2011) ("Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying causes of action.").  If establishing damages would require numerous individualized inquiries, class certification is inappropriate.  *See In re Flash Memory Antitrust Litigation*, 2010 U.S. Dist. LEXIS 59491, at *59 (N.D. Cal. Mar. 31, 2010) (denying certification where damages methodology "would . . . sweep in an unacceptable number of uninjured plaintiffs");  *Thompson v. Clear Channel Communs., Inc.*, 247 F.R.D. 98, 135 (C.D. Cal. 2007) ("where fact of damage cannot be established for every class member through proof common to the class," the need to establish liability for individual class members defeats Rule 23(b)(3) predominance).

Plaintiff also bears the burden to present a model for calculating damages that "is consistent with [his] liability case" and measures only those damages that are attributable to the defendant's allegedly wrongful conduct.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *Lilly v. Jamba Juice*, *supra*, at *30-31 ("the correct reading of *Comcast* is that plaintiffs must establish at the certification stage that 'damages … [can] feasibly and efficiently be calculated once the common liability questions are adjudicated.'[citation]"); *id.* (where defendant can show damage calculations will be more complex than simply consulting a database, plaintiff must furnish "expert reports or at least some evidentiary foundation" to meet plaintiff's burden).  In general, to carry that burden, the plaintiff must propose a method of calculating damages that will render the determination of each class member's recovery a "virtually mechanical task."  *In re Google Adwords Litig.*, 2012 U.S. Dist. LEXIS 1216, at *45-46 n.13 (N.D. Cal. Jan. 5, 2012).

If the plaintiff cannot meet these burdens, class certification is improper.  *In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478, 491-92 (N.D. Cal. 2008) (citing cases denying class certification where proposed damages models failed to provide reliable measures of damages).  For example, in *Werdebaugh*, *supra*, Judge Koh considered whether the plaintiff had

presented a damages model that could determine the premium consumers paid for a mislabeled product.  The court determined that plaintiff's model could not do so because it conflated the effect of the alleged mislabeling with the value of the brand, failed to account for other factors impacting price, and included damages not attributable to the defendant's alleged wrongdoing.  Similarly, in *Lilly, supra*, this Court concluded that the proper value of a class remedy needed to account for the benefits consumers received from the defendant in any damages model where the plaintiff was seeking a "full refund."  *Lilly v. Jamba Juice* at *31.  *See also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1105 n.6 (9th Cir. 2013) (correct measure of economic injury is difference between what plaintiff paid and what plaintiff would have paid had he known the truth, *i.e.*, the value of the false statement).  Though *Werdebaugh*, *Lilly*, and *Hinojos* were all false advertising claims, the measure of relief sought was identical to the contract damages sought here – the value of the promise that was not performed in relation to the price paid.  Thus, just as in *Lilly* there were benefits (free shipping, dollar value credits, online exclusives) that must be attributable and attributed to particular items in particular transactions to accurately determine only the value of the promise not performed.

>    ### 2.    Calculating Damages, Or Even The Fact Of Damage, Is Not A Mechanical Task Because Certain Class Members Received Benefits That A Factfinder Must Consider In Awarding Any Damages

Under California law, an aggrieved party suing for breach of contract may recover actual damages, and no more—he is not entitled to a windfall.  *Coast Trading Co. v. Cudahy Co.*, 592 F.2d 1074, 1083 (9th Cir. 1979) (refusing to "sanction" damages calculation that would provide a windfall); *Smith v. Mady*, 146 Cal. App. 3d 128, 133 (1983) (plaintiff "should not be permitted to receive a windfall"); *accord Stratton v. Tejani*, 139 Cal. App. 3d 204, 214-15 (1982).

Similarly, where an aggrieved party received benefits that he or she would not have received absent the breach, that party is estopped from accepting the benefits and seeking a full refund for the breach without an offset for the value of those benefits.  *In Re POM Wonderful LLC Marketing And Sales Practices Litig.*, 2014 U.S. Dist. LEXIS 40415, *11-14 (C.D. Cal. Mar. 25, 2014) (applying *Comcast* and concluding a "full refund" model is not appropriate where

1   customers received some benefit from the defendant); *Jones v. Conagra Foods, Inc.*, 2014 U.S.

2   Dist. LEXIS 80139, *72-73 (N.D. Cal. June 13, 2014). ("full refund" model is not appropriate

3   because "it fails to take into account the value class members received by purchasing the products.

4   … [t]he difference between what the plaintiff paid and the value of what the plaintiff received is a

5   proper measure"); *Caldera* v. *The J.M. Smucker Co.*, 2014 U.S. Dist. LEXIS 53912, *10 (C.D.

6   Cal. Apr. 15, 2014) ("full refund" of purchase price model only appropriate where not a single

7   class member received any benefit).

8          Therefore, a factfinder would need to determine, on an order by order basis (1) the benefits

9   each Class member received because of the markup and deduct the value of those benefits from

10  any price differential for each order; and (2) any price offsets not dependent on the

11  implementation of the markup, and deduct their value from any price differential for each

12  item/order.  These include:

13  •   *Online Exclusives* – Safeway has historically offered various discounts and
        incentives to new and existing online customers.  These have included discounts
14      that can lower the total order price so much that the customer received an overall
        price for their overall order that was less than what they would have gotten had in-
15      store pricing been applied across the board.  For example, Safeway.com has offered
        at times a discount of $7 to $10 off a customer's first or next online purchase.  *See*
16      ECF No. 132-1 (Guthrie Decl.), ¶14.  It has also separately offered a $5 discount
        off an online order to any customer who entered the promotion code during the
17      online checkout process (subject to certain restrictions like stacking).  Fleming
        Decl., ¶11.  These discounts are tracked and listed as a line-item discount just as
18      product discounts are.  Safeway.com further offers exclusive online discounts for
        individual items.  *Id.*  These item discounts are extensive and have changed
19      regularly over time.  *Id.* ██████████████████████████████████████████
        ████████████████████████████████████████████████████████████████████
20      ██████████████████████████████████████████ *See* Campbell Decl., ¶6.

21  •   *Delivery Discounts* – In correlation with implementing the online price zone,
        Safeway also expanded the number of discounted or free delivery "slots," giving
22      customers the opportunity to pay a lower delivery fee (a value of up to $12.95
        when the delivery is free) to permit a price-sensitive customer to offset the markup.
23      ECF Nos. 132-1 (Guthrie Decl.), ¶14 & 132-6 (McCready Decl.), ¶13.

24  •   *Benefits* – Safeway provided other benefits whose value cannot be mechanically
        calculated.  Safeway added one-hour delivery windows, shortening the time
25      customers had to wait for orders.  The value these enhancements added was part of
        the overall restructuring of the pricing and service options, which Safeway would
26      not have given had it not charged the markup.  *See* ECF No. 132-20 (Exh. 18 to
        Blackman Decl.) at 177:23-178:25.

27  Any damages a customer incurred by the online markup would need to be offset by the value of

28  these discounts and "freebies."  In some cases the offset would eliminate the damages on an entire

1   order, or even altogether.  The point is, however, that different customers would be entitled to

2   different (or no) damages depending on what benefits or offsets they received.  There is no

3   classwide method of determining which customers, on which orders, received these benefits or

4   offsets.

5       For example, Safeway tracks its online exclusives and delivery discounts as "coupon

6   expenses."[5]  Campbell Decl., ¶6.  ████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19

20  Campbell Decl., ¶6.  In short, each of these online exclusives would need to be examined and

21  reconciled *on a customer by customer, order by order, and item by item* basis to determine the

22  amount and extent of the offset against any charged markup.  This is not a mechanical task

23  amenable to class treatment.

24

25

26  _____

27  [5] ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████

3.   **Calculating Damages, Or Even The Fact Of Damage, Is Not A Mechanical Task Because The Proper Measure Of Damages Is Not The Markup**

The foregoing assumes customers are entitled to damages in an amount equal to the difference between the price their online purchases and the amount that the customers would have been charged if they had made those same purchases in a physical store.  As shown above, individualized discounts make this damages model infeasible to apply on a classwide basis.  Even if it were feasible to calculate damages in this manner, the Court should reject the model because it would not be tied to Plaintiff's theory of liability in this action.

When calculating damages, the factfinder generally asks what position the plaintiff would be in had the defendant fully performed.  *See* Cal. Civ. Code § 3300; *see also Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 455 (1990) ("The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised.").  In other words, compensatory damages should restore the value of the promised performance.  *See, e.g.*, *Hinojos*, 718 F.3d 1098, 1105 n.6.  Plaintiff has failed to carry his burden to offer a damages model that accounts for the lost value of "price parity."  The value cannot be the simple difference in price between the online store and the pick store because customers agreed to the online prices displayed on their screen when they placed an order, and Safeway could have performed the price parity term by charging the same price online and raising its pick store prices instead.  Or Safeway could have raised both prices in tandem by some lesser amount.

Plaintiff assumes online prices would have been considerably less if Safeway had charged the same prices in both sales channels.  But the evidence is to the contrary— ███████████ ███████████████████████████████████████.  Calculating what Safeway *would have charged* online if it had intended to promise price parity is a counter-factual and complex problem, but one that Plaintiff was required to address in a damages model to recover damages on a classwide basis.  *See also In Re POM Wonderful,* 2014 U.S. Dist. LEXIS 40415, at *18 (a "price premium" model is "not possibly" "amenable to class proof" where customers bought product for myriad reasons other than price and therefore the value each customer placed on a subjective promise was different); *id.* at 20-21 (plaintiff failed to submit expert testimony

1   connecting customer's motivations for purchasing higher priced option to defendant's conduct;

2   simply assuming customer would have purchased lower priced option in absence of defendant's

3   conduct is not sufficient under *Comcast*); *Jones v. Conagra Foods*, 2014 U.S. Dist. LEXIS 80139

4   at **75-76, **83-84 (comparing products purchased to other lower priced alternatives is "deeply

5   flawed" model because, *inter alia*, it does not account for differences other than price); *Caldera v.*

6   *The J.M. Smucker Co.*, 2014 U.S. Dist. LEXIS 53912 at **11-12 (plaintiff may prove classwide

7   damages only with "evidence that attaches a dollar value to the 'consumer impact or advantage'[to

8   defendant] caused by the unlawful business practices.") (internal citations and quotations omitted);

9   *id.* at *12 ("In reality, the true value of the products to consumers likely varies depending on

10  individual consumer's motivation for purchasing the products at issue.").[6]  Plaintiff having failed

11  to present a proper damages model, this Court should decertify the class.

**D.     A Class Action Is Not Superior Because Class Damages Under Plaintiff's Theory Are**
13       **Grossly Disproportionate To Any Expected Injury**

14          The question of superiority has changed with the Court's partial summary judgment order.

15  The Court ruled that none of Safeway's efforts in posting and providing information about the

16  price differential were sufficient to conclude the customer assented.  ECF No. 237 (Order) at 15:9-

17  16:2 & 19:3-16.  According to Plaintiff's theory, this determination requires the Court to award

18  class members all the monies resulting from the implementation of the online price zone from

19  April 12, 2010 to the present.  Plaintiff's theory, however, misconstrues the expectations of

20  Safeway's online customers and/or erroneously inflates damages, rendering a class action an

21  inferior method of litigating breach of contract damages.  The anecdotal comments of the opt-outs

22  capture the unfairness and windfall nature of the remedy that would come from class treatment.

23  *See* Fn. 3, *supra* (Blackman Decl., Ex. N).

24          Plaintiff's claim is that Safeway promised price parity in its Special Terms such that online

25  customers expected to be charged the same prices for their home delivery items that were

---

[6]  Much like the plaintiffs' models did in *POM Wonderful, Jones and Caldera*, Plaintiff's damage
model also fails to take this into account.  In particular, it ignores the different decision-making
factors inherent in each item selected under a Hi-Lo business model as opposed to "flatter"
process under an EDLP model.  *See* Section II(A) at 6:6-16, *ante* (citing ECF No. 132-12
(McCready Decl.), ¶2).

available on that day in their pick store.  Most online customers, however, did not read the Special

Terms when they registered for the home delivery service.  ECF No. 132-30 (Sorenson Decl.), ¶7.

While the law charges these customers with knowledge of the Special Terms, they would not have

any basis for expecting or believing that Safeway had promised price parity if they never read the

Special Terms.  Online shoppers also could not reasonably evaluate a price comparison at the time

they registered or submitted their orders because they had no idea which Safeway store would be

used as their pick store and did not know the prices offered or available in that store.  *See* ECF No.

132-1 (Guthrie Decl.), ¶¶12-13.  A comparison promise, therefore, would have been meaningless

in the customer's decision to use the home delivery service.  Thus, ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████.  These facts, coupled with the fact Safeway's data, focus groups and customer

complaints (as detailed above) confirm that online shoppers were aware of the price differences

and continued to place orders notwithstanding, cast serious doubt over whether a comparison

promise was material to each order.

Moreover, Safeway acted in good faith to preserve its online grocery business and did not

intend to deceive its online customers by increasing prices through the online price zone.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

_____

[7] ████████████████████████████████████████████

████████████████████████████████████████████



[redacted]

[redacted]…"). Safeway also decided it would decrease delivery fees by offering more discounted delivery slots. ECF No. 132-6 (McCready Decl.), ¶13. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

1    Furthermore, with the implementation of the online price zone, Safeway believed it was

2  properly communicating its pricing structure to its customers.  It had changed its marketing and

3  advertising more than a year earlier to eliminate references to pricing similarities.  ECF Nos. 132-

4  1 (Guthrie Decl.), ¶¶15-16 & 132-2 (Exh. 1 to Guthrie Decl.).  It prepared scripts for both the

5  delivery drivers and call center that informed customers "some online prices may be higher than

6  those in your local store."  *Id.* at ¶16; *see also* ECF Nos. 132-3 (Exh. 2 to Guthrie Decl.) & 132-4

7  (Exh. 3 to Guthrie Decl.).  It posted an answer to the FAQ "will I pay the same prices online that

8  are in your stores" that stated, in part, "you'll find most of the same great promotions online as in

9  your local store" and "you will receive the prices and promotions applicable from your online

10  store on the day of delivery as noted next to each item."  ECF No. 132-17 (Exh. 15 to Blackman

11  Decl.).  Finally, it believed (rightly or wrongly) that Section 3 of the Special Terms explained the

12  variance in prices based on the timing between when a customer placed his order and when that

13  order is delivered – not a promise of price parity.  ECF No. 132-1 (Guthrie Decl.), ¶4.

14    In sum, there is little evidence that customers expected price parity or that such a term was

15  material to their decision to use the online service.  Safeway acted in good faith and did not intend

16  to deceive or defraud its online customers.  Awarding class member the entirety of the price

17  increase, therefore, would amount to a windfall for customers who knew of the price difference

18  and/or did not care about price parity.  Consequently, the severe impact of class damages

19  compared to the expectations of the class members and Safeway's good faith—i.e., the

20  disproportionate amount a class damages award would mean—renders class treatment inferior.

21  *See Anderson v. Capital One Bank*, 224 F.R.D. 444 (W.D. Wis. Oct. 5, 2004) (denying

22  certification because "the issues relating to the damages incurred by each individual member of

23  the proposed class and the lack of any statutory cap on the maximum award of damages for the

24  class means that the class damages could be far out of proportion to the harm done."); *Ratner v.*

25  *Chemical Bank New York Trust Co.*, 54 F.R.D. 412 (S.D.N.Y. Feb. 14, 1972)  (refusing class

26  treatment because proposed recovery of $13 billion in statutory damages "would be a horrendous,

27  possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit

28  to defendant, for what is at most a technical and debatable violation of the Truth in Lending

1   Act.").[8]  *See Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 234–35 (9th Cir. 1974)  ("At some

2   point the logic of the law leads in this situation to an ad absurdum result. We believe this is it.").

### IV.   <u>CONCLUSION</u>

4          Potentially ███ or more of the Class will be barred from recovering damages because they

5   placed orders and accepted delivery of their goods, knowing that Safeway was not providing price

6   parity.  Because identifying them with classwide proof is impossible, this Court should decertify

7   the Class.  Moreover, calculating damages is not a mechanical task.  Determining which benefits

8   each Class member took advantage of and calculating the required offsets necessitates individual

9   inquiries.  Finally, it would be unfair to allow damages to proceed on a classwide basis.  For these

10  reasons, the Court should grant this motion and decertify the Class as to Plaintiff's breach of

11  contract claim.

12  Dated:  March 2, 2015                    SHEPPARD MULLIN RICHTER & HAMPTON LLP

14                              By _____*/s/ Brian R. Blackman*_____
                                        CRAIG CARDON
15                                      BRIAN R. BLACKMAN
                                        JAY T. RAMSEY
16                              Attorneys for Defendant SAFEWAY INC.

---

19  [8]  In *Bateman v. American Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010), the Ninth Circuit
20  examined the application of *Ratner*'s disproportionality analysis to putative class claims under the
    Fair and Accurate Credit Transactions Act ("FACTA").  Although the Court concluded that the
21  proportionality of potential liability to actual harm was an improper consideration under FACTA,
    it did not reject *Ratner*'s analysis or its application in other contexts.  623 F.3d at 712-13; *see id.* at
22  713 n.3 ("We reserve judgment, however, on whether Rule 23(b)(3) *per se* prohibits consideration
    of a defendant's potential liability in deciding whether to certify a class.  Because we conclude
23  that considering such liability contravenes congressional intent under FACTA, we need no decide
    that broader question.").  *Bateman* reasoned, moreover, that proportionality was an improper
24  consideration because Congress did not intend to limit the amount of damages, which, in turn,
    furthered FACTA's deterrent purpose.  *Id*. at 717-19.
25
           Similar concerns do not exist in this action.  There is no deterrent element to contract
26  damages.  Furthermore, contract damages focus on the parties' expectations and endeavor to place
    them in the same positions they would have been had their expectations been fulfilled.  As
27  discussed above, imposing class damages would be disproportionate to the expectations of most
    class members.  Thus, the reasoning of *Ratner* and *Kline* should be applied in assessing
28  superiority.