SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
James C. Shah (SBN 260435)
Rose F. Luzon (SBN 221544)
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367
jshah@smfslaw.com
rluzon@sfmslaw.com

CHIMICLES & TIKELLIS LLP
Steven A. Schwartz (admitted *pro hac vice*)
Timothy N. Mathews (admitted *pro hac vice*)
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
SteveSchwartz@chimicles.com
TimothyMathews@chimicles.com

Attorneys for Plaintiff Michael Rodman
and all others similarly situated

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL RODMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAFEWAY, INC.,<br><br>Defendant. | Case No.: 3:11-cv-03003 JST (JCS)<br><br>**PLAINTIFF'S OPPOSITION TO SAFEWAY'S MOTION TO DECERTIFY CLASS**<br><br>Date: April 23, 2015<br>Time: 2:00 p.m.<br>Crtrm.: 9 – 19th Floor<br>Trial Date: None Set<br>Judge: Hon. Jon S. Tigar<br><br>Complaint filed: June 17, 2011 |

**TABLE OF CONTENTS**

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 3

A. SAFEWAY CANNOT PROVE ANY AFFIRMATIVE DEFENSES AS TO A PREDOMINANT NUMBER OF CLASS MEMBERS ........ 3

1. The Evidence Offered By Safeway Is Insufficient To Prove That Any Class Members Knew About The $.10-per-$.99 Markup ........ 4

a. Surveys ........ 4

b. Customer Service Records ........ 9

c. FAQs, Driver FAQs, and the August 2012 Email ........ 10

2. Safeway Cannot Meet its Burden of Proof by Mere Speculation ........ 13

a. Safeway Cannot Meet Its Burden to Prove Waiver ........ 15

b. Safeway Cannot Meet Its Burden to Prove Voluntary Payment ........ 16

c. Safeway Cannot Meet Its Burden to Prove Mutual Mistake ........ 19

B. SAFEWAY IS NOT ENTITLED TO OFFSET BREACH OF CONTRACT DAMAGES BY UNRELATED DISCOUNTS IT OFFERED CUSTOMERS ........ 20

C. SAFEWAY'S SUPERIORITY ARGUMENTS ARE BASELESS ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Oil Service v. Hope Oil Co.*,
194 Cal. App. 2d 581 (Cal. App. 2d Dist. 1961) .......... 17, 18

*In re Apple iPod iTunes Antitrust Litig.*,
2014 U.S. Dist. LEXIS 165254 (N.D. Cal. Nov. 25, 2014) .......... 1

*United States on behalf of Army Athletic Ass'n v. Reliance Ins. Co.*,
799 F.2d 1382 (9th Cir. 1986) .......... 15

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
226 Cal. App. 3d 442 (1990) .......... 21

*Brotherson v. Prof'l Basketball Club, L.L.C.*,
262 F.R.D. 564 (W.D. Wash. 2009) .......... 15

*Caldera v. The J.M. Smucker Co.*,
2014 U.S. Dist. LEXIS 53912 (C.D. Cal. Apr. 15, 2014) .......... 22

*Chodos v. West Publishing Co.*,
292 F.3d 992 (9th Cir. 2002) .......... 16

*CLN Props. v. Republic Servs.*,
2010 U.S. Dist. LEXIS 135953 (D. Ariz. Dec. 9, 2010) .......... 17

*Coast Trading Co. v. Cudahay Co.*,
593 F.2d 1074 (9th Cir. 1979) .......... 23

*Craig v. White*,
187 Cal. 489 (1921) .......... 15

*Depalma v. Westland Software House*,
225 Cal. App. 3d 1534 (Cal. App. 2d Dist. 1990) .......... 22

*Douglas v. U.S. Dist. Court for Cent. Dist. of California*,
495 F.3d 1062 (9th Cir. 2007) .......... 4

*DuBeck v. California Physicians' Service*,
No. B250129, 2015 Cal. App. LEXIS 203 (Cal. App. 2d Dist. Mar. 5, 2015) .......... 15

*Endres v. Wells Fargo Bank*, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ........ 17

*Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th Cir. 2008) ........ 17

*In re Google Inc. Gmail Litigation*, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ........ 17

*Harron, Rickard & McCone v. Sisk*, 19 Cal. App. 628 (Cal. App. 3d Dist. 1912) ........ 16

*Hernandez v. Dutch Goose, Inc.*, 2013 U.S. Dist. LEXIS 153707 (N.D. Cal. Oct. 25, 2013) ........ 9

*Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274 (1995) ........ 27

*Holman v. Experian Info. Solutions, Inc.*, 2013 U.S. Dist. LEXIS 130790 (N.D. Cal. Sept. 12, 2013) ........ 6

*Jones v. Conagra Foods, Inc.*, 2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014) ........ 27

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960 (Cal. 2004) ........ 21

*Lilly v. Jamba Juice Co.*, 2014 U.S. Dist. LEXIS 131997 (N.D. Cal. Sept. 18, 2014) ........ 22

*McKinnon v. Dollar Thrifty Auto. Group*, 2013 U.S. Dist. LEXIS 29095 (N.D. Cal. Mar. 4, 2013) ........ 18

*In re Med. Capital Sec. Litig.*, No. 10-2145, 2011 U.S. Dist. LEXIS 126659 (C.D. Cal. July 26, 2011) ........ 15

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ........ 25

*Parsons v. Ryan*, 2014 U.S. Dist. LEXIS 108959 (D. Ariz. Aug. 7, 2014) ........ 1

*In Re POM Wonderful LLC Marketing And Sales Practices Litig.*, 2014 U.S. Dist. LEXIS 40415 (C.D. Cal. March 25, 2014) ........ 22

*Roling v. E*Trade Securities LLC*, 860 F. Supp. 2d 1035 (N.D. Cal. 2012) ........ 16

*Slaven v. BP Am., Inc.*, 190 F.R.D. 649 (C.D. Cal. 2000) ........ 1

*Smith v. Mady*, 146 Cal. App. 3d 128 (1983) ........ 3

*Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611 (S.D. Cal. 2014) ........ 1

*Stratton v. Tejani*, 139 Cal. App. 3d 204 (1982) ........ 23

*Tavenner v. Talon Group*, 2012 U.S. Dist. LEXIS 41043 (W.D. Wash. Mar. 26, 2012) ........ 18

*Vaccarino v. Midland Nat'l Life Ins. Co.*, 2014 U.S. Dist. LEXIS 18601 (C.D. Cal. Feb. 3, 2014) ........ 21

*Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1 (1995) ........ 15

*Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789 (N.D. Cal. Dec. 15, 2014) ........ 1, 22

*Xum Speegle, Inc. v. Fields*, 216 Cal. App. 2d 546 (Cal. App. 1st Dist. 1963) ........ 16

**OTHER AUTHORITIES**

Restatement of Contracts 2d, § 350 ........ 16

Restatement (Second) of Contracts, § 211 cmt. ........ 15

# I. INTRODUCTION

Plaintiff, Michael Rodman ("Plaintiff" or "Rodman"), submits this Opposition to the Motion for Decertification ("Motion" or "Decert. Mot.") filed by Defendant, Safeway, Inc. ("Defendant" or "Safeway"). The parties spent considerable time briefing the certification issue prior to this Court's March 10, 2014 Order Granting in Part and Denying in Part Plaintiff's Motion for Class Certification. Therefore, it is not surprising that the Motion primarily rehashes old arguments and evidence that have already been considered and rejected by the Court. While a court can modify a class certification order at any time prior to entry of final judgment, "decertification and modification should theoretically only take place after some change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary." *In re Apple iPod iTunes Antitrust Litig.*, 2014 U.S. Dist. LEXIS 165254, at *17 (N.D. Cal. Nov. 25, 2014) (internal quotations omitted).[1]

This Court has already determined, on a class-wide basis as a matter of law, that the Special Terms promised price parity and that Safeway breached that contractual promise. Amended SJ Order (Dkt. No. 237) (hereinafter, "SJ Order"), at 13, 19. Ironically, in connection with summary judgment briefing, Safeway objected to introduction of FAQs and survey evidence, arguing that extrinsic evidence could not be used to vary the terms of an integrated contract.[2] *See* Evidentiary Objections

---

1 There is some disagreement among courts as to which party bears the burden on a motion for decertification. Many courts hold that the party seeking decertification (here, Safeway) bears the burden. *Holman v. Experian Info. Solutions, Inc.*, 2013 U.S. Dist. LEXIS 130790 (N.D. Cal. Sept. 12, 2013); *see also Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 622 (S.D. Cal. 2014); *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 651 (C.D. Cal. 2000); *Parsons v. Ryan*, 2014 U.S. Dist. LEXIS 108959, at *21-22 (D. Ariz. Aug. 7, 2014). Other courts have held that the burden remains with plaintiffs. *See e.g., Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789 (N.D. Cal. Dec. 15, 2014). At a minimum, however, the party seeking to decertify should at least be held to a threshold burden to show that previously unconsidered facts or law justify revisiting the certification order. Safeway cannot meet that threshold.

2 As to the surveys and FAQs that Plaintiff submitted in connection with summary judgment, Safeway asserted: "The surveys did not ask for the customers' understanding of any specific language in the Special Terms . . . [and therefore] provide no insight into how the customers 'understood' the Special Terms. . . . At most, the surveys reflect general understandings or expectations not grounded

(Dkt. No. 194-5), at 4, 10-12. Now Safeway takes a contrary position, seeking to use extrinsic evidence to vary the meaning of an integrated contract. Although Safeway makes this argument under the guise of raising affirmative defenses as to damages, it is little more than a repeat of previously unsuccessful arguments seeking to relieve Safeway from being held accountable for breaching its contractual promise of price parity.

Notwithstanding its clear contractual obligation, Safeway speculates that "*if* customers knew or believed that Safeway was not providing price parity and nevertheless placed orders, they consented to Safeway's pricing policy or waived their right to object to it, or both." Decert. Mot. (Dkt. No. 238-3), at 2 (emphasis added). This is the same argument that Safeway made in opposition to Plaintiff's Motion to Class Certification. (Dkt. No. 131-6), at 23-24. This Court rejected that argument, stating that certification could only be called into question if Safeway could prove that "**a predominant number of Class Members might have knowingly and willingly chosen to pay an additional fee that they were under no obligation to pay under the terms of the contract**." Class Cert. Order (Dkt. No. 163), at 18 (emphasis added). Here, Safeway cannot prove that ***any*** Class member, much less a ***predominant*** number of Class members, knew that Safeway was breaching the contract and knowingly and willingly paid more than they were obligated to pay under the contract.

Safeway also seeks decertification based on the meritless (frankly silly) argument that calculating damages will require offsets for ancillary benefits that Class members may have received,

---

in particular contractual language." Safeway SJ Opp. (Dkt. No. 182-3), at 15. The Court determined that it was unnecessary to consider Plaintiff's evidence:

> Plaintiff has submitted significant extrinsic evidence – including the same FAQs, evidence of Safeway's own course of performance, and customer surveys – which he argues tends to show that Safeway understood the terms to represent price parity, and understood its customers to have believed that as well. Safeway objects to the admissibility of all such evidence. In any event, it is unnecessary for the Court to consider Plaintiff's extrinsic evidence. After considering the language of the Special Terms, and all extrinsic evidence Defendant has submitted to shed light on the meaning of those terms, the Court concludes that Plaintiff's interpretation is the more faithful interpretation of what a reasonable contracting party would have understood the terms to promise.

SJ Order, at 13.

such as discounted delivery fees. Class members are entitled to receive damages that will put them in as good a position as if the breaching party had *fully performed* its obligations. Had Safeway fully performed, Class members would have received price parity in addition to any other promotions offered by Safeway, such as discounted delivery.

Finally, Safeway rehashes its superiority argument, imploring the Court to relieve Safeway from its contract based on unsupported (and baseless) assertions of subjective good faith. In fact, Safeway knew its customers expected price parity, and knew that it needed to disclose its "dramatically re-envision[ed]" pricing when it implemented the markup. Safeway, however, chose not to disclose the markup, deliberately selected a markup schedule that would not be obvious to its customers, and trained its customer service personnel to deny the existence of a markup. *See generally* Class Cert. Motion (Dkt. No. 120-5), at 3-7 (and accompanying exhibits); Class Cert. Reply (Dkt. No. 137-5), at 4-5, 7-8 (and accompanying exhibits); Plaintiff's MPSJ (Dkt. No. 170-5), at 6-11 (and accompanying exhibits).[3]

## II. ARGUMENT

### A. SAFEWAY CANNOT PROVE ANY AFFIRMATIVE DEFENSES AS TO A PREDOMINANT NUMBER OF CLASS MEMBERS

Safeway's waiver, consent, and mutual mistake arguments are all predicated on Safeway's attempt to avoid being bound by its own form contract of adhesion, which included "not one but two 'integration clauses,' which state specifically that '[n]otwithstanding any statements on the . . . [Safeway.com] web pages or elsewhere, these Terms and Conditions are the agreement between you and . . . [Safeway],' and that the terms 'shall be the sole terms of the agreement between you and [Safeway] regarding your online purchases.'" Class Cert. Order (Dkt. No. 163), at 14. Safeway's attempt to avoid the terms of its integrated contract is particularly galling given that, *inter alia*:

[3] A full recitation of all material facts that have previously been set forth in the record would be inordinately lengthy. Accordingly, Plaintiff incorporates by reference his Class Certification and Summary Judgment briefing and evidentiary submissions where appropriate.



[4]

Safeway bears the burden of proof as to its affirmative defenses of waiver, consent, and mutual mistake. *See generally, Hernandez v. Dutch Goose, Inc*., 2013 U.S. Dist. LEXIS 153707, at *5-6 (N.D. Cal. Oct. 25, 2013) ("A defendant bears the burden of proof on its affirmative defenses."). To prove an affirmative defense, Safeway cannot merely speculate that a Class member *might* have waived or consented to pay more for groceries than the customer was legally obligated to pay. Safeway must meet the burden of proof with respect to *each* Class member against whom it has a defense. Safeway has come forward with no evidence showing that it can prove affirmative defenses as to *any* class member, much less a *predominant* number.

**1. The Evidence Offered By Safeway Is Insufficient To Prove That Any Class Members Knew About The $.10-per-$.99 Markup**

**a. <u>Surveys</u>**

As an initial matter, none of the survey evidence upon which Safeway bases its decertification efforts is new. To the contrary, this survey evidence was known and available to Safeway at the time

---

[4] It is also ironic that Safeway now speculates that some customers must have discovered (thereby purportedly consenting to) Safeway's intentionally deceptive markup schedule, which adds $.10 for every $.99 to the price of most non-promoted items, when Safeway has never actually disclosed that it marks up the price of all non-promoted items. To date, Safeway has disclosed only that online and in-store prices "*may* differ," not that non-promoted product prices are marked up. *See* Decert. Mot., at 8-9; *compare, e.g.*, Class Cert. Ex. Y (Dkt. No. 120-56) (Costco disclosure stating, "All prices listed on this website are 'delivered prices,' which include a slight markup over the walk-in price to cover the costs associated with delivery."). Indeed, Safeway opposed public disclosure of the markup schedule in this litigation. *See* Dkt. No. 122 at ¶ 6.g. (asserting that the "specific pricing formula Safeway.com uses for the online price zone . . . [is a] key element[] to Safeway.com's business strategy and operation," and should be sealed).

certification was initially briefed by the parties. In fact, most of the surveys were previously submitted by the parties in connection with briefing Class certification, summary judgment, or both. In any event, whether considered then, or now, the survey evidence does not remotely suggest or demonstrate that certification was inappropriate. Safeway mischaracterizes the survey evidence on which its waiver, consent, and mutual mistake arguments rest. The surveys do not prove that *any* Class members knew about the markup, much less that they consented to Safeway breaching its contract. To the contrary, as reflected below, the surveys show that the vast majority of Class members believed they were getting the same prices and promotions as in-store, and at most only a small number of Class members believed that *either* promotions *or* prices might be different. Any assertion that the surveys demonstrate that Class members "knowingly and willingly chose[] to pay an additional fee that they were under no obligation to pay under the terms of the contract" is untenable.

**Visitor Intent Survey** – Plaintiff's MPSJ Ex. 32 (Dkt. No. 170-53)



[5] This tends to refute Safeway's unsupported assertion that "*non*-promotional prices were not the driving, much less sole, reason customers purchased the *non*-promoted items." Decert. Mot., at 6.

**2010 Satisfaction Survey** – Plaintiff's MPSJ Ex. 34 (Dkt. No. 170-57)

[redacted]

**Barriers to Trial Survey** – Plaintiff's MPSJ Ex. 33 (Dkt. No. 170-55)

[redacted]

---

6 As discussed in Plaintiff's Class Certification and Summary Judgment briefs, Safeway's contract (and also its FAQs and advertising) distinguished between prices, which Safeway promised would be the same as the pick-store price, and promotions, which could vary between online and in-store. *See* e.g., Plaintiff's MPSJ (Dkt. No. 170-5), at 5 & n. 6. Plaintiff has not challenged Safeway's practice of offering some promotions on in-store purchases only, such as Safeway's practice implemented in 2009 of offering promotions on cases of soda or water in the store only. Safeway's survey questions routinely asked a compound question, however, [redacted] Thus, even as to the small number of customers who answered in the negative, the surveys are insufficient to demonstrate that they knew the online prices were marked-up above the pick-store price, as opposed to certain promotions being available in-store only.

7 These results were consistent both before and after implementation of the markup. As noted in Plaintiff's Motion for Summary Judgment, [redacted]



**2010-2011 Weekly Website Satisfaction Surveys** – Fleming Decert. Exs. A & B

**2012 RNO Survey** – McCready Class Cert. Opp. Ex. 12 (Dkt. No. 131-21)

**2012-2014 Lapsed Customer Surveys** – Fleming Decert. Exs. E-G

**2010-2011 Lapsed Customer Surveys -** Fleming Decert. Exs. C & D

8

8

PLAINTIFF'S OPPOSITION TO SAFEWAY'S MOTION TO DECERTIFY CLASS



**b. Customer Service Records**

In addition to the survey evidence, Safeway also repeats arguments it previously made in opposing certification related to the report of Joseph Anastasi. These arguments have already been considered by the Court. Plaintiff incorporates by reference the arguments he made previously with respect to Anastasi's report and does not repeat them all here at length. Class Cert. Reply (Dkt. No. 137-5), at 6-10.

For these reasons, the Court previously concluded:

> It is far from clear that these customers legally consented to the undisclosed charges by continuing to use the Safeway.com service. The customers who indicated that they learned of the undisclosed charges were calling to complain about them. *See, e.g.*, Exh. HH to Suppl. Mat[]hews Decl. But much more importantly, there is nothing in the record before this Court that suggests that determining this issue will require so much individualized inquiry as to defeat certification. Defendant has provided evidence that the number of Proposed Class Members who communicated to Safeway that they knew of the additional charge and also continued to shop afterwards is significantly less than one percent of the total number of customers. Anastasi Decl. ¶ 70-71.

Class Cert Order (Dkt. No. 163), at 17. Safeway provides no reason why this recycled argument should be countenanced this time around.

**c. FAQs, Driver FAQs, and the August 2012 Email**

Safeway continues its exercise in rank speculation by positing that a "class member *might have* learned that the prices charged online were higher than those in the store from which their groceries were delivered in multiple ways." Decert. Mot., at 7. In support of this argument, Safeway points to FAQs, Driver FAQs, weekly circulars, and an August 2012 email, all of which have been considered by the Court previously. Most importantly, none of these notified Class members that they had a contractual right to price parity that Safeway was secretly breaching.

This Court has already determined that "the Special Terms explicitly provide that representations on the website are not part of the parties' agreement, and so the FAQs are only probative of Safeway's understanding of what it was offering in the contract, not what a reasonable consumer would have understood the contract to have been offering."[10] SJ Order, at 12. The same is true for Driver FAQs, weekly circulars, and the August 2012 email -- the integration clause in the Special Terms renders these arguments legally irrelevant.

---

10 As the Court also acknowledged, "'to permit a creditor to choose an allegedly ambiguous form of agreement, and then by extrinsic evidence seek to give it the effect of a different and unambiguous form, would be to disregard totally the rules respecting interpretation of adhesion contracts, and to create an extreme danger of over-reaching on the part of creditors with superior bargaining positions.'" Class Cert. Order, at 14 (quoting *Tahoe Nat'l Bank v. Phillips*, 4 Cal. 3d 11, 20 (1971)).

Safeway also regurgitates the argument that an August 2012 email notified Class members of its price markup. This Court has already determined that the August 2012 email did not give "Class Members notice of the change to the Special Terms, as it did not refer to the Special Terms or indicate that Safeway had made any change to them, …was not sent to all Class Members, but instead was only sent to those users who had opened a safeway.com email within the last six months, [and] . . . was not even factually accurate . . . ." SJ Order, at 19. This Court denied Safeway's Motion for Reconsideration as it related to the August 2012 email. (Dkt. No. 236).

---

11 Safeway defeated Class certification of Plaintiff's statutory claims, in part, on the basis that only a small number of visitors actually viewed the FAQ pages. Safeway cannot now credibly argue that a predominant number of Class members read them.

12 Safeway does not offer any evidence as to the number of website visitors who reviewed the Special Terms after November 2011 who were *not* in the process of registering, even though this information is likely in Safeway's possession.

Likewise, the Class Notice sent in June 2014 did not disclose to Class members that Safeway was breaching a contractual obligation. To the contrary, it stated that, "Safeway implemented new pricing for items offered for online ordering. . . Plaintiff alleges that the price disparity violated the terms and conditions . . . [and] Safeway denies that it did anything wrong and denies that the terms and conditions promised that the prices for groceries ordered online would be the same as the prices in the physical stores from which the groceries were selected and delivered…."[13] (Dkt. No. 166-1).

Finally, Safeway states that "the vast majority of [its] online customers are repeat shoppers," and Safeway speculates that some of them must have figured it out eventually. Decert. Mot., at 6. Safeway's *ipse dixit* is not probative of anything and hardly satisfies its burden for its affirmative defenses. Moreover, the factual predicate underlying Safeway's assertion is misleading at best, because, in reality,

13

14

[redacted]

Importantly, there is no evidence that any of the Class members who placed a large number of orders did so after they discovered the non-transparent markup (which required knowledge of the identity of the pick store, which changed over time, and the prices charged therein, which also changed repeatedly). Moreover, there is no evidence that any of these Class members understood they had a contractual right to enforce the price parity promise, but nonetheless knowingly consented to paying the 10% markup, thereby deliberately waiving enforcement of their contractual rights. The fact that just 32 individuals opted out of the Class [redacted] suggests the opposite is true.

### 2. Safeway Cannot Meet Its Burden Of Proof By Mere Speculation

Safeway admits that waiver, consent, and mutual mistake are affirmative defenses. Safeway bears the burden of proof. Yet Safeway has made no attempt to identify which Class members provided the answers to the surveys that Safeway believes indicated consent to Safeway's breach of contract. Nor has Safeway offered any evidence to prove that a particular Class member understood and agreed to Safeway's breach of contract because he or she read an FAQ, heard a driver explain pricing differences, or read the fine print in a newspaper circular (even if such facts could overcome the two integration clauses in Safeway's contracts). The best that Safeway can offer is mere speculation that "a significant percentage [of Class members] *must have known*" about the markup and continued to place orders. Decert. Mot., at 6. This speculation falls woefully short of satisfying

---

[15] Table 2 of Exhibit I is virtually meaningless because the percentages for each column total well-above 100%, and Safeway makes no explanation as to what this represents.

Safeway's burden. As this Court has already noted, "If [Safeway] is arguing that predominance automatically fails if there is *any possibility* that *any* Class Members *might have* consented to the terms of a contract, it would be arguing that no class action could ever be maintained for breach of a form contract." Class Cert. Order, at 18 (emphasis in original). Safeway's argument is utterly without merit, and, if accepted, would nullify the foundations of California contract law:

> California recognizes the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation. The parties' undisclosed intent or understanding is irrelevant to contract interpretation. It is for this reason that when viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.

Class Cert. Order, at 13 (internal citations and quotations omitted). Safeway has admitted that customer expectations cannot change contractual obligations: "knowing that customers expect a certain price does not give rise to a contractual obligation to provide that price . . . ." Safeway SJ Opp., at 16. That is particularly true given Safeway's two integration clauses.

In its summary judgment decision, this Court held that "*Douglas* teaches that assent to a contract's revised terms 'can only be inferred' from a customer's ongoing use of a service **'after [the customer] received proper notice of the proposed changes**.'" SJ Order, at 17 (citing *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007)). Safeway's waiver, consent, and mistake arguments seek to end-run that holding. "Safeway is best positioned to make sure customers are aware of changes that Safeway has made to its contract with Class Members." SJ Order, at 18. *See also* Class Cert. Order, at 14-15 ("in a standardized contract 'a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.'") (quoting Restatement (Second) of Contracts § 211(2)).

Having failed to actually notify customers of its non-obvious markup, Safeway cannot merely speculate that some customers must have figured it out. Here, "there is no reason to suspect that it is

likely that a predominant number of Class Members might have knowingly and willingly chosen to pay an additional fee that they were under no obligation to pay under the terms of the contract." As noted in *Brotherson v. Prof'l Basketball Club, L.L.C.*, 262 F.R.D. 564, 573 (W.D. Wash. 2009), cited in this Court's Class Certification Order, "In the ordinary contract case, proof that the exercise of a contract will be lucrative for the plaintiff is enough to erase any question about whether he would have chosen to eschew the contract's benefits."[16]

**a. <u>Safeway Cannot Meet Its Burden to Prove Waiver</u>**

"Waiver occurs when there is an existing right, ***a knowledge of its existence*, and an *actual* intention to relinquish it**, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished . . . . A finding of waiver or ratification, thus, requires ***a known right*** and express or implied intent to relinquish that right." *United States on behalf of Army Athletic Ass'n v. Reliance Ins. Co.*, 799 F.2d 1382, 1387 (9th Cir. 1986) (emphasis added, internal quotations and citation omitted); *see also DuBeck v. Cal. Physicians' Serv.*, No. B250129, 2015 Cal. App. LEXIS 203, at *19 (Cal. App. 2d Dist. Mar. 5, 2015) (emphasis added). "No man can be bound by a waiver of his rights, unless waiver is distinctly made, ***with full knowledge of the rights which he intends to waive***; and the fact that he knows his rights, and intends to waive them." *Craig v. White*, 187 Cal. 489, 498 (1921) (emphasis added).

"The **burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation**, and **doubtful cases will be decided against a waiver**." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 31 (1995) (emphasis added and internal quotations omitted). "Doubtful cases will be decided against a waiver." *Id.*; *see*

[16] *Cf*. Restatement (Second) of Contracts, § 211 cmt. e ("courts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it . . . [**even if the] result may be to give the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute**.") (internal quotation omitted); *In re Med. Capital Sec. Litig.*, No. 10-2145, 2011 U.S. Dist. LEXIS 126659, at *33-34 (C.D. Cal. July 26, 2011) ("Courts routinely certify class actions involving breaches of form contracts.").

*also Xum Speegle, Inc. v. Fields*, 216 Cal. App. 2d 546, 555 (Cal. App. 1st Dist. 1963) (same).[17] Safeway cannot meet its burden to prove, by clear and convincing evidence, the waiver of a known right by *even a single* Class member, much less a predominant number of them.[18]

Finally, *even if* a miniscule percentage of customers actually knew, prior to placing an order, that Safeway intended to breach its contract obligation, the mere fact that a customer placed an order does not mean that the customer agreed to, or waived, the breach of contract. An injured party is entitled to elect to complete the contract and sue for damages for the other party's breach. *Chodos v. West Publishing Co*., 292 F.3d 992, 1001 (9th Cir. 2002) ("Where [a party's] performance is not prevented, the injured party may elect instead to affirm the contract and complete performance. If such is his election, his exclusive remedy is an action for damages.") (internal quotations and citations omitted).[19]

**b. <u>Safeway Cannot Meet Its Burden To Prove Voluntary Payment</u>**

Safeway's argument under the voluntary payment doctrine also fails. Initially, it is not even clear that the voluntary payment doctrine applies here. Safeway has not cited a single case applying the voluntary payment doctrine under California law to prevent a party to an integrated contract from

---

17 *Roling v. E*Trade Securities LLC*, 860 F. Supp. 2d 1035 (N.D. Cal. 2012), cited by Safeway, is inapposite. In that case the court determined that the two representative plaintiffs had actual knowledge of the fees being charged, which were listed as a separate line item on the billing statements (unlike the hidden excessive charges here), and the court further found that the contract permitted the fees. *Id*. at 1039-1043.

18 Virtually all Class members declined to opt out of this Class action. Safeway points to the opt-out letters filed by just four individuals, which express, to one degree or another, an awareness that prices online may have been higher, to argue that some Class members waived rights. It is questionable if even those four opt out letters constitute valid waivers of rights made with full knowledge (particularly since in the Notice, Safeway denied it made a promise of price parity and the contract had not yet been interpreted by the Court). Regardless, those four opt-outs are not Class members and, therefore, have no impact on Class certification.

19 *See also* Restatement of Contracts 2d, § 350, cmt. e ("If the party in breach offers to perform the contract for a different price, this may amount to a suitable alternative . . . [unless] the offer is conditioned on surrender by the injured party of his claim for breach."); *Harron, Rickard & McCone v. Sisk*, 19 Cal. App. 628, 631 (Cal. App. 3d Dist. 1912) ("the fact that the buyer has a right to rescind does not compel him to resort to that remedy. He may still, if he so elects, . . . affirm the sale and maintain an action on the warranty for damages").

recovering breach of contract damages.[20] Plaintiff is not aware of any California caselaw applying the doctrine in that manner.

Nevertheless, even if the voluntary payment doctrine can prevent recovery for breach of an integrated contract under California law, Safeway has failed to demonstrate that it can meet the evidentiary burden to prove the defense as to any Class member here. Safeway cites *American Oil Service v. Hope Oil Co.*, 194 Cal. App. 2d 581, 586 (Cal. App. 2d Dist. 1961) for the "familiar rule that a payment voluntarily made with knowledge of the facts affords no ground for an action to recover it back," but Safeway neglects to quote the equally important caveat that immediately follows: "But it is elementary that **an excessive payment made in ignorance of the fact that it is excessive is recoverable**." Indeed, the *American Oil* case directly refutes Safeway's arguments. There the Court held that payments made under a contract were *not* voluntary paid when the payor did not know that they were excessive under the terms of the contract. The Court specifically noted that the President of the overpaying company (who, it appears, signed the contract) had never read the contract, and the accountant who wrote the checks was not aware of the terms of the contract. *Id*. at 585. Thus, the Court rejected the defendant's argument that the payments had been voluntarily made with full knowledge. Since Safeway asserts that virtually no Class members actually read the contract (Decert. Mot., at 22), those Class members obviously could not have voluntarily agreed to

---

20 The cases cited by Safeway concerning voluntary payment are all inapposite. *Endres v. Wells Fargo Bank*, 2008 WL 344204, at *11-12 (N.D. Cal. Feb. 6, 2008), involved consumer protection claims based on non-uniform oral representations and marketing materials, not claims for breach of contract. *CLN Props. v. Republic Servs.,* 2010 U.S. Dist. LEXIS 135953, at *28 (D. Ariz. Dec. 9, 2010), involved breach of contract claims under 39 different states' laws and numerous different contracts, some of which expressly provided that "fees may be increased with the consent of the customer and that such consent 'may be evidenced verbally, in writing, or by actions and practices of the parties.'" Moreover, the Court acknowledged only that voluntary payment could be a defense under Georgia and Missouri law, not California law. *Id*. at *29. *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *17 (N.D. Cal. Mar. 18, 2014), involved the question whether Google email users consented to interceptions of emails under the wiretap act. It was not a breach of contract case. Finally, *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 328-29 (5th Cir. 2008) involved the question whether fax recipients had consented to receive faxes under the Telephone Consumer Protection Act. These cases are not instructive.

pay more than the amount permitted under the contract, just as the overpaying party in *American Oil* did not realize that its payments were excessive and therefore did not voluntarily pay more than the contract specified.

Further, Safeway bears the burden of proving its affirmative defense of voluntary payment. *See McKinnon v. Dollar Thrifty Auto. Group*, 2013 U.S. Dist. LEXIS 29095, at *9 (N.D. Cal. Mar. 4, 2013) ("California law treats the voluntary payment doctrine as an affirmative defense."). It cannot meet this burden by merely hypothesizing that some Class member *might* have stumbled upon its secret markup formula. "Means of knowledge [is] not the equivalent of knowledge." *Am. Oil Service,* 194 Cal. App. 2d at 587. Rather, Safeway must prove that Class members knew that Safeway was marking up the price of groceries beyond what was permitted under the contract and "knowingly and willingly chose[] to pay an additional fee that they were under no obligation to pay under the terms of the contract." Class Cert. Order, at 18.

Mere speculation is not sufficient to prove Safeway's affirmative defense of voluntary payment, much less to justify decertification:

> Defendant will, of course, be permitted to present any evidence it may have showing that one or more class members had full knowledge of the facts on which the class claims are based and nevertheless paid the recording, wire/express, and reconveyance fees. In the absence of evidence that this defense is likely to meet with success, much less any indication that a significant portion of the class will be impacted by the voluntary payment doctrine, the theoretical possibility of individual issues is not enough to outweigh the benefits of common resolution of classwide issues.

*Tavenner v. Talon Group*, 2012 U.S. Dist. LEXIS 41043, at *10-11 (W.D. Wash. Mar. 26, 2012).

Moreover, Safeway has admitted (indeed, argued) that Class members could never know whether the price charged for a particular order was higher than the in-store price until *after* the order was completed and delivered. Decert. Mot., at 22. That is because "Safeway.com does not inform its users which store is the Pick Store for a given order until the order is complete . . . [and] Safeway frequently changes which stores serve as Pick Stores, and which Pick Stores serve which delivery areas." Class Cert. Order, at 2 (*citing* Anastasi Decl. and Guthrie Decl.). In the face of this

admission, Safeway cannot prove that any Class member had full knowledge to satisfy the standard under the voluntary payment doctrine. Since Safeway never actually disclosed prior to a delivery that it intended to charge more than the contractually allowed price, and since Safeway charged Class members' credit cards at the time of checkout in the store and only presented the receipt showing the prices that had been charged when the order was delivered (*see* Class Cert. Ex. D (Dkt. No. 120-13)), the payment charged at the time the order was checked out in the store could never have been voluntarily made with full knowledge of all facts.

Safeway also actively concealed the markup for years. [redacted] Accordingly, Safeway cannot meet its burden to prove voluntary payment, even if the doctrine could excuse a breach of an integrated contract.

**c. <u>Safeway Cannot Meet Its Burden to Prove Mutual Mistake</u>**

Safeway's mutual mistake argument also fails, as Safeway cannot prove that *either* party mistakenly believed at the time of contracting that the express terms of the contract permitted the markup, much less that both parties did. First, Safeway cannot demonstrate that it was mistaken about the terms of the contract. Safeway knew that the vast majority of customers believed that online and in-store prices were the same, and knew that it needed to disclose the markup. Safeway nevertheless refused to disclose the markup and continued to promise price parity in the contract, even though [redacted] *See e.g.*, Class Cert. Exs. F,

G, J, K, M, and N (Dkt. Nos. 124-14, 124-16, 124-22, 124-26, & 124-28).[21] Safeway's designees refused to answer questions about why Safeway did not disclose the markup on the grounds of attorney client privilege.[22] Safeway should not be permitted to assert that it subjectively believed the contract permitted it to charge a mark-up unless it is willing to waive that privilege (and the time for that has long passed). Safeway has never produced any contemporaneous evidence reflecting that it subjectively believed the contract allowed the markup. Safeway's after-the-fact, unsupported, self-serving representations must be disregarded.

Second, Safeway cannot demonstrate that Class members were mistaken about the contract. Safeway's survey evidence shows that the vast majority of survey respondents believed online and in-store prices were the same. Moreover, Safeway acknowledges that mistake of fact occurs when the expression of an agreement differs from both parties' understanding *at the time of contracting*. Decert. Mot., at 15 (citing *Hess*). Here, the contract was formed *at the time of registration*, and Safeway admits that no customer could know at the time of registration (or even when their order is placed) whether the prices ultimately charged would be the same as in the pick-store. In short, Safeway cannot demonstrate mutual mistake.

### B. SAFEWAY IS NOT ENTITLED TO OFFSET BREACH OF CONTRACT DAMAGES BY UNRELATED DISCOUNTS IT OFFERED CUSTOMERS

Safeway has admitted, on several occasions, that calculating the markup is a mechanical task.[23] Safeway now claims, however, that calculating damages will require individual inquiries

---

21 [redacted]

22 *See* Plaintiff's MPSJ (Dkt. No. 170-5), at 9 n. 10.

23 The formula for the markup is reflected at page 5 of the Court's Class Certification Order. [redacted] *See also* Safeway's Class Cert. Opp. (Dkt.

because Safeway is entitled to offset breach of contract damages by ancillary benefits Class members may have received by ordering groceries online. Specifically, Safeway argues that a Class member cannot recover the full amount of the markup if he or she: (1) received an online exclusive promotion, such as a coupon for $10 off a customer's first order; (2) utilized a discounted or free delivery time slot; or (3) utilized one of the one-hour delivery slots, of which Safeway began offering more in connection with its overall restructuring around the time the markup was implemented. None of these qualifies as an offset to damages for breach of contract. If Safeway had fully performed under the contract, Class members would have received the same prices as the pick-store *and* these other benefits offered by Safeway. Nevertheless, even if these were determined to be valid offsets (they most assuredly are not) they can be matched to the relevant customer and transaction through Safeway's data. (*See* below).

It is axiomatic, as Safeway admits, that damages for breach of contract are those that will put the injured party in as good a position as if the breaching party had *fully performed* its obligations. *See* Decert. Mot., at 20 (citing Cal. Civ. Code. § 3300, and *Brandon & Tibbs v. George Kevorkian Accountancy Corp*., 226 Cal. App. 3d 442, 455 (1990) ("the aim is to put the injured party in as good a position as he would have been had performance been rendered as promised")).[24] *See also Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist*., 34 Cal. 4th 960, 967 (2004) ("Damages

---

No. 131-6), at 22 (admitting that determining the markup over the pick store price is "capable of 'mechanical' application.").

[24] *Brandon* also held that "[o]ne whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness," and that "while a plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment." 226 Cal. App. 3d at 458, 459 (internal citations omitted); *see also Vaccarino v. Midland Nat'l Life Ins. Co*., 2014 U.S. Dist. LEXIS 18601, at *35-36 (C.D. Cal. Feb. 3, 2014) ("under California law, plaintiffs are required to, at most, provide a reasonable estimate of their damages. Because the class action is a procedural vehicle for the vindication of underlying rights, the damages that each class member is entitled to is ultimately a function of other substantive law . . . . [P]laintiffs' damages model need only calculate damages as accurately as required by California law . . . . Here, California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.").

awarded to an injured party for breach of contract seek to approximate the agreed-upon performance . . . [and] put the plaintiff in as good a position as he or she would have occupied if the defendant had not breached the contract").

"[*O*]*nly* those gains that could not have been made had there been no breach are treated as an offset against actual damages." *Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274, 282, (1995) (citing 5 Corbin on Contracts, § 1041); *accord Hubbard v. Phil's BBQ of Point Loma, Inc.*, 2013 U.S. Dist. LEXIS 63112 (S.D. Cal. May 1, 2013); *see also Depalma v. Westland Software House*, 225 Cal. App. 3d 1534, 1545-46 (Cal. App. 2d Dist. 1990) (refusing to offset breach of contract damages by tax benefits received by plaintiff due to the breach). Safeway fails to cite a single case holding that a party liable for breach of contract can offset damages by benefits that the other party was also entitled to receive.[25]

Here, if Safeway had fully performed the contract, Class members would have received the same prices as the pick-store, plus any other ancillary benefits that were offered to them, such as online exclusive coupons then in effect, discounted delivery windows, and any other benefits that Safeway was offering to the public.[26] The Special Terms (*see e.g*., Dkt. No. 171-10) distinguished

---

[25] The cases cited by Safeway in support of its erroneous argument are all false advertising cases that deal with an issue unique to those claims—segregating the portion of the purchase price attributable solely to the alleged false representation from the rest of the purchase price attributable to the other benefits of the product. *In Re POM Wonderful LLC Mktg. & Sales Practices Litig*., 2014 U.S. Dist. LEXIS 40415, at *11-14 (C.D. Cal. Mar. 25, 2014), for example, involved an allegedly false statement that juice was "all natural" and merely stands for the unremarkable proposition that a full refund was not appropriate where, notwithstanding the false "all natural" label, consumers received some benefit. *See also Lilly v. Jamba Juice Co.*, 2014 U.S. Dist. LEXIS 131997, at *22-23 (N.D. Cal. Sept. 18, 2014) (same); *Jones v. Conagra Foods, Inc*., 2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014) (Wesson oil advertised as 100% natural); *Caldera v. The J.M. Smucker Co.*, 2014 U.S. Dist. LEXIS 53912, at *10 (C.D. Cal. Apr. 15, 2014) (representation regarding fat content of jelly); *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789, at *14 (N.D. Cal. Dec. 15, 2014) (almond milk was "all natural" and contained "evaporated cane juice" instead of sugar). In those cases plaintiffs sought to double dip by keeping the mislabeled food plus getting a full refund. The Class here does not seek a full refund of the purchase price of all items delivered; rather, the Class seeks a refund solely of the extra-contractual 10% markup.

[26] Safeway muses that it *could have* complied with its price parity promise by raising its store prices, or that it could have continued to comply with its price parity promise and increase profits by

between "prices," "promotions," and delivery fees (compare Section 3, "Product Pricing . . .," with Section 4, "Promotions"), and the promise of price parity was not contingent on foregoing any promotions or discounted delivery fees that may have been offered by Safeway.[27] Thus, Plaintiff here seeks no windfall or double recovery.[28]

[redacted]

---

increasing its delivery fees, decreasing is level service, or reducing the amount or level of its promotions. It did not do so, however, and these hypotheticals are not relevant to calculating breach of contract damages in the real world.

[27] [redacted]

[28] Safeway's citation to *Coast Trading Co. v. Cudahay Co.*, 593 F.2d 1074, 1083 (9th Cir. 1979), for the proposition that "Under California law, an aggrieved party suing for breach of contract may recover actual damages and no more – he is not entitled to a windfall," is misplaced. Decert. Mot., at 17 (also citing *Smith v. Mady*, 146 Cal. App. 3d 128, 133 (1983), and *Stratton v. Tejani*, 139 Cal. App. 3d 204, 214-15 (1982)). *Coast Trading* related to damages *under Oregon law* for an anticipatory breach of grain installment contracts where the complicated offset issues related to an attempt to calculate appropriate mitigation based on questionable post-breach sales. *Smith* and *Stratton* involved real estate deals where one party failed to close and the aggrieved party sought to double dip on damages. In *Stratton* the seller sought both lost sale profits and rental damages. In *Smith* the seller's consequential damages for extra insurance and upkeep were offset set by a $10,000 increase in the sale price reached a "few days after the expected close of escrow and breach by [buyer]."

[29] Although Safeway's so-called "coupon expenses," which appear to consist primarily of discounted delivery fee offers, are legally irrelevant, it should also be noted that Safeway's coupon expense argument relies on documents and evidence that were never identified in Safeway's Rule 26 disclosures, nor were they produced to Plaintiff until after Safeway filed its Decertification Motion. Plaintiff's initial discovery requests had sought production of "[a]ll financial reports including audited financial reports for the Safeway.com online shopping business," but Safeway objected that the request was "unduly burdensome" and "seeks information that is irrelevant to the claims and defenses raised in this action…." Mathews Decl. Ex. A, at 22-23 (Request 24). The parties briefed the issue of production of internal segment financial documents several times before Judge Spero and, ultimately, Safeway did not produce internal segment financials. *See* Dkt. No. 62, at 9 (Joint Discovery Letter); Dkt. No. 66 (Transcript of Proceedings at 20:15 – 20:19); Dkt. No. 65, ¶ 11 (Order compelling production of audited financials); Dkt. No. 67, at 2 n. 2 (Safeway appeal of Order to Judge White); Dkt. No. 69 (Order by Judge White with instruction to "limit the scope of initial discovery to the central determinative issues with an eye toward settlement."); Dkt. No. 76, at 5, § D (Joint Discovery Letter); Dkt. No. 78 (Discovery Order that did not compel production of segment



These discounts were never offered as a *quid pro quo* in exchange for consent to Safeway's breach of contract.

Finally, even if Safeway could offset breach of contract damages with ancillary promotions (which it cannot), applying such credit would still be a mechanical task. Safeway has admitted that it "maintains transaction data that allows it to generally identify if a product was subject to a promotion," (Class Cert. Ex. U, at 8).

financial statements). Plaintiff did not receive Safeway's Profit and Loss statements until March 9, and did not receive complete "coupon expense" data until March 18, 2015 (*see* Mathews Decl., at ¶ 6), and has had no opportunity to depose any witness concerning Safeway's coupon expenses.

[30]

[31]

### C. SAFEWAY'S SUPERIORITY ARGUMENTS ARE BASELESS

Equally futile is Safeway's attempt to reassert its previously asserted (and rejected) superiority argument. Specifically, Safeway asserts that the online delivery segment of Safeway could not have stayed in business absent the markup. According to Safeway, therefore, paying breach of contract damages to Class members would constitute a windfall. Whether the online component of Safeway's enterprise was only made profitable through the systematic breach of its contracts, of course, does not implicate superiority. "What decisions Safeway might choose to make its customer offerings in the event it is found liable is neither knowable by this Court nor a relevant factor in determining superiority." Class Cert. Order, at 23. *See also Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ("Reducing recoveries by forcing everyone to litigate independently . . . has little to recommend it."). Safeway could have disclosed the markup and offered a revised contract to consumers, but instead it chose to conceal the markup because it also believed that if "a customer figured [] out [that there were significant disparities between what shoppers pay for brick/mortar versus dot.com] they would probably abandon Safeway.com altogether." Class Cert. Ex. F (Dkt. No. 120-17).

Safeway relies on *Ratner v. Chemical Bank N.Y. Trust Co.*, which the Court previously distinguished, stating that "Ratner's notion of the 'superiority' requirement has been rejected by many other courts," (Class Cert. Order, at 23 n. 7), and also cites equally inapplicable cases involving statutory penalties. As the Court previously concluded, "[h]ere, a class action would only entitle Class Members to recover their actually suffered contractual damages, not recover statutory penalties." Class Cert. Order, at 23.

Finally, Safeway's arguments regarding its alleged "good faith" in implementing the markup without any corresponding removal of the price parity promise in the Special Terms (or clear disclosure of the markup anywhere) are factually baseless and legally irrelevant.

DATED: March 23, 2015

CHIMICLES & TIKELLIS LLP

By: */s/ Timothy N. Mathews*

Steven A. Schwartz (admitted *pro hac vice*)
Timothy N. Mathews (admitted *pro hac vice*)
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
SteveSchwartz@chimicles.com
TimothyMathews@chimicles.com

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
James C. Shah (SBN 260435)
Rose F. Luzon (SBN 221544)
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile: (866) 300-7367
jshah@sfmslaw.com
rluzon@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
Scott R. Shepherd (admitted *pro hac vice*)
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
sshepherd@sfmslaw.com

Attorneys for Plaintiff Michael Rodman and all others similarly situated

## CERTIFICATE OF SERVICE

I, Timothy N. Mathews, hereby certify that a true and correct copy of Plaintiff's Opposition to Safeway's Motion to Decertify Class, has been electronically filed and served on all Defendants' counsel, via the Court's ECF system, this 23rd day of March, 2015.

By: *<u>/s/ Timothy N. Mathews</u>*

Timothy N. Mathews (*pro hac vice*)
tnm@chimicles.com
Chimicles & Tikellis LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Phone: (610) 642-8500
Fax: (610) 649-3633